SHARTSIS FRIESE LLP
RICHARD F. MUNZINGER (Bar #217902)
SANJEET S. GANJAM (Bar # 285615)
SUZANNE S. ORZA (Bar #312906)
DIEGO B. FLORES (Bar #324603)
ALEXANDER R. MORROW (Bar #341052)
rmunzinger@sflaw.com
sganjam@sflaw.com
sorza@sflaw.com
dflores@sflaw.com
amorrow@sflaw.com
One Maritime Plaza, Eighteenth Floor
San Francisco, CA  94111-3598
Telephone:     (415) 421-6500
Facsimile:      (415) 421-2922

Attorneys for Plaintiffs
CI QUERCUS CORPORATION, INC., SAVATREE, LLC, and
ARBORWELL, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARBORWELL, LLC, a California limited liability company; CI QUERCUS CORPORATION, INC., a Delaware corporation, and SAVATREE, LLC, a Delaware limited liability company, <br><br> Plaintiff, <br><br> v. <br><br> ALERUS FINANCIAL, N.A.; ANDREW G. LAVELLE, an individual; NEIL WOOLNER, an individual; MATT DICKINSON, an individual; KRIS YAMAGUCHI, an individual; DOUG HAGGE, an individual; ARBOR MD TREE CARE INC., a California corporation; ALVIN F. SORTWELL and ANNE B. SORTWELL as Co-Trustees of the A&A SORTWELL FAMILY TRUST; and DOES 1 through 10, inclusive, <br><br> Defendants, <br><br> and <br><br> ARBORWELL, INC. EMPLOYEE STOCK OWNERSHIP PLAN, <br><br> Nominal Defendant. | Case No. 4:23-cv-02770-HSG <br><br> **FIRST AMENDED COMPLAINT** |

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  94111-3598

## I.   NATURE OF THE ACTION

1.      Plaintiffs Arborwell, LLC ("Arborwell"), SavATree, LLC ("SavATree") and CI Quercus Corporation, Inc. ("CI Quercus" or the "Buyer") bring this action under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et seq.* ("ERISA"), against Defendants Alerus Financial, N.A. ("Alerus"), Andrew G. LaVelle ("LaVelle"), Neil Woolner ("Woolner"), Alvin F. Sortwell (a/k/a Peter Sortwell and referred to herein as "Sortwell") and Anne B. Sortwell as Co-Trustees of the A&A Sortwell Family Trust (collectively, the "Sortwells") and Does 1–10 (collectively, the "Defendants").  As described herein, Defendants breached their ERISA fiduciary duties and knowingly participated in transactions prohibited by ERISA by orchestrating for their benefit the sale of stock of Arborwell's predecessor entity, Arborwell, Inc. ("Arborwell, Inc." or the "Company"), by the Arborwell, Inc. Employee Stock Ownership Plan (the "ESOP" or the "Plan") to CI Quercus (the "2020 Sale").  In direct violation of ERISA and with Defendant Alerus's knowledge and participation, Defendants Sortwells, LaVelle and Woolner used the ESOP's sale of Arborwell, Inc. stock to unjustly enrich themselves at the expense of the ESOP, the ESOP's employee participants, and the Buyer CI Quercus.

2.      Defendants LaVelle and Woolner further harmed, and are continuing to harm, Arborwell by breaching their noncompete and confidentiality obligations that they entered into as part of the 2020 Sale in order to extract a substantially higher purchase price from CI Quercus, which further damaged CI Quercus, Arborwell, SavATree, LLC, a subsidiary of CI Quercus, and the ESOP participants, many of whom are still employed by Arborwell and/or SavATree, and rolled over their individual proceeds from the 2020 Sale into SavATree's retirement plan.

3.      The ESOP was a type of pension plan, specifically an employee stock ownership plan that was designed to invest primarily in the stock of its sponsor, Arborwell, Inc., pursuant to ERISA § 407(d)(6), 29 U.S.C. § 1107(d)(6).  In 2017, the ESOP purchased 100% of Arborwell, Inc.'s stock from Defendants Sortwells, LaVelle and Woolner and each of them received subordinated notes for their stock.

4.      Defendants Sortwells, LaVelle and Woolner were ERISA fiduciaries for the ESOP. Sortwell was the Chairman of the Board of Directors of Arborwell, Inc. (the "Board") and a

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

- 1 -

Case No.
4:23-cv-02770-HSG

FIRST AMENDED COMPLAINT

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

member of the Arborwell, Inc. ESOP Administrative Committee (the "ESOP Committee"). LaVelle was Arborwell, Inc.'s President, a member of the Board, and a member of the ESOP Administrative Committee.  Woolner was a senior executive at Arborwell, Inc. who actively participated in key decisions made by the Board and the ESOP Committee.

5.      In contravention of their ERISA fiduciary duties and ERISA's prohibited transaction rules, in 2020, the Sortwells, LaVelle and Woolner orchestrated the ESOP's sale of 100% of Arborwell, Inc.'s stock to CI Quercus, which closed on December 9, 2020.  As part of the 2020 Sale, the Sortwells, LaVelle and Woolner received from CI Quercus a combined total of $13,589,662[1] in payments for allocated and unallocated ESOP shares, stock warrants, subordinated notes, and stock appreciation rights ("SARs"), plus other extensive personal benefits. At the time of the 2020 Sale, the ESOP had not fully paid back the purchase price for the shares that the Sortwells, LaVelle, and Woolner had transferred into the ESOP at the time of its formation in 2017, which means that they had not completed vesting their shares in the ESOP.  The full allocation, vesting, and payout of their shares were accelerated such that the full payoff of their subordinated notes was accelerated by nearly six years, the full payout of their warrants was accelerated by nearly seven years, and the full payout of their SARS was accelerated by almost two years.  LaVelle and Woolner also received five-year extensions of their real property leases to Arborwell, Inc. and its successor entity, Arborwell.  LaVelle also received an improved employment agreement with SavATree, a rollover equity in SavATree, and participation in SavATree's profit incentive units ("PIU") plan.  The Sortwells also received rollover equity in SavATree.

6.      Defendants Sortwells, LaVelle and Woolner benefited disproportionately from the ESOP's Sale of Arborwell, Inc. stock, at the expense of the ESOP participants.  Out of the $34,700,000 total CI Quercus paid at closing pursuant to the terms of the Stock Purchase Agreement ("SPA"), attached hereto as **Exhibit A**, the ESOP only received $12,467,810 for 100% of the shares of Arborwell, Inc. stock.  The 2020 Sale and subsequent termination of the ESOP

---

[1] All of the dollar amounts contained in this Complaint have been rounded, where appropriate, to eliminate fractions of a dollar.

were premature, taking place just over three years after the ESOP had been established in 2017. At the time of the 2020 Sale, most of the ESOP's holdings of Arborwell, Inc. stock had not even been released to the ESOP participants' accounts. Arborwell, Inc.'s senior bank debt was substantially unpaid and its subordinated debt was wholly unpaid. And there were only two years remaining for Arborwell, Inc.'s re-eligibility to elect S corporation status and thereby become fully exempt from federal income taxes, and partially exempt from California state income taxes. Arborwell, Inc. was growing successfully year-to-year and, in the absence of the 2020 Sale, would have grown even faster at a tax-free rate, thus generating extensive additional financial benefits for the ESOP and its participants.

7. Defendant Alerus was the ESOP's independent trustee and a named ERISA fiduciary. Alerus was responsible for determining whether the ESOP should approve, consent to, and engage in the 2020 Sale, and ensuring that the price the ESOP received during the 2020 Sale was for no less than adequate consideration. Alerus did not do so. Instead, Alerus allowed Defendants Sortwells, LaVelle and Woolner to personally enrich themselves at the ESOP's expense. Alerus breached its fiduciary duty, facilitated the fiduciary breaches of Defendants Sortwells, LaVelle, and Woolner, and knowingly participated in their prohibited transactions.

8. To make matters worse, immediately after orchestrating the ESOP's 2020 Sale of Arborwell, Inc. stock, Defendants LaVelle and Woolner severely damaged, and continue to damage, Arborwell, Inc.'s successor entity, Plaintiff Arborwell, by breaching their contractual covenants not to compete with Arborwell, not to solicit or induce employees of Arborwell for employment or hire, and not to divert, solicit, take away or accept business from any customer, client or account of Arborwell. These covenants were material to CI Quercus and Defendant Alerus, the ESOP's Trustee. Indeed, without these covenants, there would have been no 2020 Sale. Despite these covenants, within a month of the 2020 Sale, Defendants LaVelle and Woolner began preparations to buy a competing tree care business. Within a few months thereafter, they completed their purchase of a direct competitor, Arbor MD Tree Care, Inc. ("Arbor MD"), resigned from Arborwell, joined Arbor MD, and began poaching key employees and high-level customers, causing substantial financial harm to Arborwell, the ESOP, the ESOP participants and CI Quercus.

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

Because these covenants were an integral part of the sale of the ESOP's assets and a transaction to which the ESOP's Trustee Alerus was a party and beneficiary, these covenants must be enforced under ERISA.

9.      Defendants Sortwells, LaVelle and Woolner planned and orchestrated the 2020 Sale to obtain accelerated and additional personal benefits they would not otherwise have been entitled to, diverted ESOP assets to themselves, and then LaVelle and Woolner unjustly enriched themselves further by breaching their non-compete covenants and soliciting Arborwell's employees and clients.  Sortwell knew or should have known that LaVelle and Woolner had no intention of honoring their noncompete covenants, but he failed to disclose this information to Arborwell, Inc., Arborwell and CI Quercus.  As the ESOP's Trustee, Defendant Alerus enabled Defendants Sortwells, LaVelle and Woolner's self-dealing, and knowingly participated in the prohibited transactions.

10.      Plaintiffs bring this action against Defendants to recover their losses under ERISA § 502(b)(2), 29 U.S.C. § 1132(b)(2), and for other appropriate equitable relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).  Plaintiffs also seek damages and other relief as a result of LaVelle's and Woolner's breaches of their contractual obligations and covenants under the SPA.

11.      In addition, Plaintiffs SavATree and Arborwell seek to recover damages from Defendants LaVelle, Woolner, Matt Dickinson ("Dickinson"), Kris Yamaguchi ("Yamaguchi"), Doug Hagge ("Hagge") (collectively, the "Individual Defendants"), and Arbor MD Tree Care, Inc. ("Arbor MD") for their wrongful conduct following Plaintiffs' purchase of Arborwell.  These Defendants misappropriated Arborwell's trade secrets and contractually protected confidential information, and used that proprietary information to compete with Arborwell through the company they purchased—Arbor MD—while some or all of them were still employed by Arborwell.  Defendants' conduct violate the Defend Trade Secrets Act ("DTSA"), the California Uniform Trade Secret Act ("CUTSA"), their fiduciary duty of loyalty as officers and/or employees of Arborwell, and employment contracts they executed with Arborwell.

## II.   JURISDICTION, VENUE, STANDING, AND DIVISIONAL ASSIGNMENT

### Subject Matter Jurisdiction

12.     This Court has subject matter jurisdiction over the claims at issue in this case.  For the claims based on ERISA, this Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because they arise under the laws of the United States and pursuant to ERISA § 502(e)(1), 29 U.S.C. §1332(e)(1), which provides for exclusive federal jurisdiction of actions brought under ERISA.  Similarly,  the DTSA, 18 U.S.C. § 1836(c), provides original jurisdiction for trade secret infringement claim brought thereunder.  And, for the claims under California state law, this Court has supplemental jurisdiction under 28 U.S.C. § 1367 because they are so related to the DTSA and ERISA claims with original jurisdiction that they form part of the same case or controversy.

### Personal Jurisdiction

13.     This Court has personal jurisdiction over Defendants because Defendants transact business in and have significant contacts with this District, and because ERISA provides for nationwide service of process under ERISA § 502(e)(2), 29 U.S.C § 1132(e)(2); *see also* 18 U.S.C. § 1836(c).

### Venue

14.     Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), the DTSA, 18 U.S.C. § 1836(c), and generally pursuant to 28 U.S.C. § 1391 for at least the following reasons:

(a)     The ESOP is administered in this District;

(b)     Defendants may be found in this District, as they transact business in, and/or have significant contacts with this District;

(c)     Some Defendants reside in this District; and/or

(d)     Some of the alleged breaches took place in this District.

### ERISA Standing

15.     Plaintiff Arborwell is the same entity as Arborwell, Inc.—the named fiduciary of the ESOP, its sponsor and its administrator, which selected and monitored the Trustee and the ESOP Administrative Committee (the "ESOP Committee").  Arborwell converted to an LLC after

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

the purchase by Plaintiffs, but remains the same entity and the fiduciary of the ESOP, and it continued to administer it after the acquisition. Accordingly, Arborwell has statutory standing as a "fiduciary" to bring the instant claims under ERISA § 502(e)(2), 29 U.S.C. §§ 1132(e)(2).

16.    Plaintiff SavATree is also the named fiduciary of the successor ERISA plan to the ESOP, which assumed the assets of the ESOP participants who continued to be employed by Arborwell following its acquisition and who chose to roll over their interests in the ESOP to the Arborwell/SavATree 401k Plan (the "401k Plan"). Accordingly, as the named fiduciary of the successor 401k Plan, SavATree and its subsidiary Arborwell have standing under 29 U.S.C. §§ 1132(a) to sue fiduciaries of the predecessor ESOP plan. *Pilkington PLC v. Perelman*, 72 F.3d 1396, 1401 (9th Cir. 1995).

17.    Plaintiff Arborwell, as a Plan fiduciary, has constitutional standing to bring the instant claims because the ESOP has suffered "actual harm," including but not limited to diminution in value of the ESOP and its assets, and Arborwell is the fiduciary Plan sponsor and administrator.

18.    Plaintiff CI Quercus has standing to assert contract claims against LaVelle and Woolner because it entered into a noncompete agreement with LaVelle and Woolner, which amended the ESOP and thus is governed by ERISA, and Defendants breached that agreement, causing Plaintiff CI Quercus "actual harm." CI Quercus is not asserting ERISA or fiduciary claims in this action.

**Divisional Assignment**

19.    The instant action arises in the County of Alameda, including because the agreements relevant to this action were entered into in that County, Arborwell is headquartered in that County, and the ESOP is administered in that County. Thus, under Civil Local Rule 3-2(c)–(d), assignment of this action to the Court's San Francisco division or Oakland division is proper.

## III.    PARTIES

20.    Plaintiff Arborwell, LLC is a California limited liability company with its principal place of business in Hayward, California. Arborwell is the successor-in-interest to Arborwell, Inc., which CI Quercus acquired on or about December 9, 2020 pursuant to the SPA. In connection

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

with the 2020 Sale, Arborwell, Inc. was converted to Arborwell, LLC on or about December 22, 2020, and it is now a subsidiary of Plaintiff SavATree.  SavATree and Arborwell operate a tree care business on the West Coast.

21.     Plaintiff SavATree LLC is a Delaware limited liability company with its principal place of business in New York.  SavATree operates a nationwide tree care business.

22.     Plaintiff CI Quercus Corporation, Inc. is a Delaware corporation with its principal place of business in New York.  CI Quercus is a holding company for a family of professional tree, shrub and lawn care businesses operating throughout the United States, including SavATree, which provides tree care services on the East Coast, the Midwest, and on the West Coast (through its acquisition of Arborwell).

23.     Defendant Alerus Financial, N.A. ("Alerus") is a federally chartered bank organized under the National Banking Act with an active business address at 501 N. El Camino, Suite 200, San Clemente, California 92672 and is a wholly owned subsidiary of Alerus Financial Corporation, a publicly owned financial holding company incorporated in Delaware and headquartered in Grand Forks, North Dakota, involved through its subsidiaries in the commercial and mortgage banking, diversified financial services, and trust advisory and trust services businesses.  Alerus was the ESOP's Trustee at all relevant times.  As Trustee, Alerus is a named fiduciary of the ESOP within the meaning of ERISA § 402, 29 U.S.C. § 1102.

24.     Defendants Peter Sortwell and his spouse Anne B. Sortwell, as Co-Trustees of the A&A Sortwell Family Trust, were equity warrant holders, the largest ESOP stock holders at the time of the 2020 Sale, and members of the Board of Directors of Arborwell, Inc.  Additionally, Sortwell was the founder of the Company, the Chairman of the Board of Directors of the Company, and a member of the ESOP Administrative Committee leading up to and at the time of the 2020 Sale.  The Sortwells were at all relevant times fiduciaries of the ESOP within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), and a "party in interest" as to the ESOP as defined in ERISA § 3(14), 29 U.S.C. § 1002(14).  Upon information and belief, the Sortwells reside in San Jose, California.

25.   Defendant Andrew G. LaVelle was Arborwell, Inc.'s President, Secretary, a member of its Board of Directors, and a member of the ESOP Administrative Committee leading up to and at the time of the 2020 Sale.  LaVelle was also an equity warrant holder in Arborwell, Inc. and one of the largest ESOP stock holders at the time of the 2020 Sale.  LaVelle was at all relevant times a fiduciary of the ESOP within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), and a "party in interest" as to the ESOP as defined in ERISA § 3(14), 29 U.S.C. § 1002(14).  Upon information and belief, LaVelle resides in Orinda, California.

26.   Defendant Neil Woolner was a senior Arborwell, Inc. executive who worked closely with LaVelle.  Woolner actively participated in key decisions made by the Board and the ESOP Committee, including the decision to sell Arborwell, Inc. to CI Quercus.  Woolner was also an equity warrant holder and one of the largest ESOP stock holders at the time of the 2020 Sale.  Woolner was at all relevant times a fiduciary of the ESOP within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), and a "party in interest" as to the ESOP as defined in ERISA § 3(14), 29 U.S.C. § 1002(14).   Upon information and belief, Woolner resides in San Jose, California.

27.   Defendant Matthew Dickinson was the Regional Vice-President at Arborwell for the Oakland and East Bay regions from 2006 until he quit to join Arbor MD on or about May 21, 2021.  Upon information and belief, Dickinson resides in Boulder Creek, California.

28.   Defendant Kris Yamaguchi was the Regional Vice-President at Arborwell for the South Bay region from 2007 until he quit to join Arbor MD on or about May 28, 2021.  Upon information and belief, Yamaguchi resides in Manteca, California.

29.   Defendant Doug Hagge  was a salesperson and account manager at Arborwell for the Oakland and East Bay regions.  He reported to Dickinson at Arborwell from 2011 until he quit to join Arbor MD on or about June 21, 2021.  Upon information and belief, Hagge resides in Concord, California.

30.   Defendant Arbor MD Tree Care, Inc. is a California corporation, with its principal place of business in San Jose, California.  Arbor MD is a direct competitor of Arborwell, and, on information and belief, Arbor MD provides most if not all of the services advertised by Arborwell.

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  94111-3598

Arborwell is informed and believes that Arbor MD has been doing business since about 2004. Arborwell is informed and believes that Arbor MD is owned entirely or in part by LaVelle, Woolner, Dickinson, Yamaguchi and Hagge.  Arborwell intends to seek discovery on this issue to determine the identity of other owners, if any, and the ownership structure of Arbor MD.

31.     Plaintiffs are unaware of the names of Defendants identified herein as DOES 1 through 10, inclusive, and therefore sues them by those fictitious names.  Plaintiffs are informed and believe, and thereon allege, that Defendants sued herein as DOES are responsible in some manner for the practices, acts, conduct, and occurrences alleged herein, as either actual perpetrators or coconspirators, aiders and abettors, officers, directors and/or managing agents with the knowledge, control, authority, direction and/or ratification of the other Defendants, and each of them.  Plaintiffs will seek leave of the Court to amend this Complaint to allege the true names and capacities of the DOE Defendants, and the roles they played, once their identities and/or manner of participation in the wrongful conduct herein described is ascertained.

32.     Defendants were at all times working in concert and/or as each others' agents.

## IV.     FACTUAL ALLEGATIONS

### A.     Facts Underlying Plaintiffs' ERISA Claims

#### 1.   Arborwell, Inc.

33.     Arborwell, Inc. was a California corporation founded in 2001.  It rapidly grew to become a leading provider of commercial tree care and management services on the West Coast by cultivating long-term, mutually beneficial relationships with customers and employees. Arborwell, Inc.'s experienced salespeople, International Society of Arboriculture ("ISA") certified arborists, field labor and administrative staff serve marquee commercial clients, property management companies, real estate developers, contractors, municipalities, homeowner associations and homeowners.

#### 2.   The formation of the ESOP

34.     Prior to 2017, the Sortwells, LaVelle and Woolner were the only shareholders of Arborwell, Inc.  The Sortwells and LaVelle were each directors of Arborwell, Inc.  Sortwell held the title of Chairman of the Board and LaVelle held the title of President and Secretary.

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  94111-3598

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

35.     In 2017, Defendants decided to form the ESOP, effective January 1, 2017.  The Sortwells, LaVelle, and Woolner together then sold 100% of Arborwell, Inc.'s stock to the ESOP, effective November 1, 2017 (the "2017 Stock Purchase").  In connection with the ESOP's 2017 Stock Purchase, the Sortwells, LaVelle, and Woolner received subordinated notes and warrants and LaVelle and Woolner were granted retention SARs, which, as set forth herein, were not cashed out or paid off until LaVelle and Woolner later sold their interests in Arborwell, Inc. to CI Quercus during the 2020 Sale pursuant to the SPA.

36.     The Sortwells, LaVelle, and Woolner formed the ESOP and sold their shares to it as a part of strategic plan to market Arborwell, Inc. for a sale or merger.  Sortwell, in particular, intended to retire from Arborwell, Inc. and was looking to be bought out.  On information and belief, the Sortwells, LaVelle, and Woolner also formed the ESOP to maximize their individual tax benefits upon such a sale.

### 3.  The ESOP

37.     The ESOP's Plan Document states that "[t]he Plan will be administered by [Arborwell, Inc.] and an Administrative Committee composed of one or more individuals appointed by the [Arborwell, Inc.] Board of Directors…."  LaVelle and Sortwell appointed themselves to the ESOP Committee.  The remaining members of the ESOP Committee were Brad Carson, Arborwell, Inc.'s Chief Financial Officer who answered to Sortwell and LaVelle, and another Arborwell, Inc. director who was appointed by the Sortwells.  Accordingly, Defendants LaVelle and Sortwell effectively controlled and directed Arborwell, Inc., the ESOP Committee, and the ESOP at all times.

38.     The Plan states that "[Arborwell, Inc.] shall be the named fiduciary with authority to control and manage the administration of the Plan, except where the Plan otherwise delegates such responsibility to the Committee."  Thus, the Plan designates Arborwell, Inc. as the ERISA "plan administrator," *see* ERISA § 3(16), 29 U.S.C. § 1002(16), and thereby also as an ERISA "fiduciary," *see* ERISA § 3(26), 29 U.S.C. § 1002(26), with the power and responsibility to control and manage the administration of the Plan.

39.     The Plan further states that "[t]he members of the Committee shall be the named fiduciaries with authority to invest the Trust Assets except where the Plan otherwise delegates such responsibility to the Trustee."  Thus, LaVelle and Sortwell controlled the investment of the ESOP's assets, including Arborwell, Inc.'s stock.

40.     Acting through the ESOP Committee, LaVelle and Sortwell also had control over the daily administration of the Plan.  The Plan states "[t]he Committee shall have all powers necessary to enable it to administer the Plan and Trust Agreement in accordance with their provisions," including, without limitation, fiduciary and ministerial administrative functions relating generally to managing the accruals, accounting, maintenance and distributions, and related directions to the trustee, in respect of the ESOP participants' individual accounts.

41.     The ESOP Committee was also authorized and empowered to direct the Trustee with respect to the sale of Arborwell, Inc. stock held in the ESOP.  In other words, as to this function, the Trustee was a "directed trustee" and the ESOP Committee was the functioning fiduciary (the "named fiduciary" for this purpose).  *See* ERISA § 403(a)(1), 29 U.S.C. § 1103)(a)(1).

42.     Thus, the ESOP Committee through its members had three separate powers and fiduciary responsibilities:  (1) to invest trust assets unless otherwise delegated to the ESOP trustee; (2) to perform and manage Plan's administrative functions; and (3) to direct the Trustee in respect of certain actions, including the sale of Arborwell, Inc. stock held in the ESOP trust.

43.     Defendant Alerus, the ESOP trustee, was a one-time only "discretionary" trustee for the original 2017 Stock Purchase and thereafter was the continuing, day-to-day directed trustee of the ESOP.  The ESOP Trust Agreement provides that the Trustee generally is a directed trustee, including with respect to the sale of the stock of Arborwell, Inc., and the Plan provides that the trustee is a directed trustee with respect to sales of Arborwell, Inc. stock, but at a price for not less than Fair Market Value (defined as the ESOP's appraised value for the stock).

44.     Directions to the Trustee under both the Plan and Trust Agreement were to come from the ESOP Committee, which in making the decision to direct the Trustee to sell Arborwell, Inc. stock "must comply with the fiduciary duties applicable to the Committee [under ERISA §

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  94111-3598

1  404(a)(1), 29 U.S.C.§ 1104(a)(1),] and the primary benefit rule [of ERISA § 408(b)(3)(A), 29

2  U.S.C. § 1008(b)((3)(A), and Internal Rev. Code § 4975(d)(3)(A), 26 U.S.C. § 4975(d)(3)(A)]."

### 4.  The ESOP's 2020 sale of 100% of Arborwell, Inc. stock

45.  Sortwell became ill in or about 2020.  In June 2020, Arborwell, Inc., acting at the direction of the Sortwells, LaVelle, and, on information and belief, Woolner, entered into negotiations regarding the sale of Arborwell, Inc. to CI Quercus.  Plaintiffs are informed and believe that due to Sortwell's illness, and with his authorization, Woolner and LaVelle exercised substantial control and discretion over those negotiations.  By the end of June 2020, CI Quercus had made an offer to acquire 100% of Arborwell, Inc.'s stock for a total enterprise value of $35,000,000.

46.  In August 2020, Arborwell, Inc., on information and belief acting at the direction of the Sortwells, LaVelle, and Woolner, signed a letter of intent to proceed with the 2020 Sale of 100% of Arborwell, Inc. stock from the ESOP to CI Quercus for total consideration of $35,000,000, which was just $1,000,000 more than the final purchase price at the time of the 2020 Sale.  At the time Arborwell, Inc. signed the Letter of Intent and agreed to the general terms of the 2020 Sale of the ESOP's stock, Alerus was still a "directed trustee" as set forth in paragraphs 41 and 42 above.

47.  In September 2020, *after* the total purchase price and material terms of the 2020 Sale had already been negotiated, Alerus was engaged to evaluate (and on information and belief, "rubber stamp") the merits of the 2020 Sale of Arborwell, Inc. to CI Quercus.  Alerus agreed "to act as an independent trustee of the ESOP for the purpose of reviewing, analyzing, and making a determination as to whether the ESOP should approve, consent to, and/or otherwise engage."  Alerus further agreed to "determine that the price paid for the stock in any sale transaction will not be less than adequate consideration" under ERISA § 3(18)(B), 29 U.S.C. § 1002(18)(b), and the Department of Labor's proposed regulations regarding the definition of adequate consideration.

48.  Alerus, however, remained a "directed trustee" until the closing of the 2020 Sale on December 9, 2020, at which point LaVelle and Sortwell caused Arborwell, Inc. to amend the Plan to grant Alerus "discretionary power and authority to negotiate any proposed sale of Company

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  94111-3598

Stock" and the "power and authority to take any actions necessary or appropriate (including, but not limited to, the execution of documents on the [ESOP] Trust's behalf) to effect any such sale of Company Stock." Incredibly, this amendment was adopted on the same day that the 2020 Sale closed. Conspicuously, Alerus's grant of discretionary power and authority was made retroactive to the ESOP's formation in 2017, even though in actuality Alerus had served as a "directed trustee" during that entire period between the ESOP's formation and the 2020 Sale.

49. On December 9, 2020, at the same time LaVelle and Sortwell caused Arborwell, Inc. to amend the Plan to grant Alerus retroactive discretionary authority to sell Arborwell, Inc. stock on behalf of the ESOP, Arborwell, Inc., the ESOP, Alerus, the Sortwells, LaVelle, and Woolner, on the one hand, and the buyer CI Quercus, on the other hand, executed a SPA finalizing the 2020 Sale of Arborwell, Inc.

50. CI Quercus paid a total purchase price of $34,000,000 for Arborwell, Inc. Of this amount, the ESOP received only $10,267,810 for its beneficiaries (which includes $730,076 for Woolner and LaVelle's vested stock held through the ESOP). The Sortwells, LaVelle, and Woolner, on the other hand, directly received most of the remaining proceeds from the sale, as well as additional personal benefits:

(a) $10,380,978 to the Sortwells to pay off the Company's subordinated debt to them;

(b) $145,024 to the Sortwells to cash out a portion of their warrants in the Company;

(c) $750,000 to the Sortwells in the form of SavATree equity to cash out their remaining warrants in the Company;

(d) $613,136 to LaVelle to pay off the Company's subordinated debt to him;

(e) $158,978 to LaVelle to cash out his SARs in the Company;

(f) $118,228 to LaVelle in the form of SavATree equity to cash out Lavelle's warrants in the Company;

(g) $463,787 to Woolner to pay off the Company's subordinated debt to him;

(h) $151,151 to Woolner cash out his SARs in the Company; and

- 13 -

FIRST AMENDED COMPLAINT

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

(i)      $78,304 to Woolner to cash out his warrants in the Company.

The balance of the purchase price was used to pay off the transaction costs for the acquisition (e.g. fees to Alerus, the investment advisor, and attorneys) and to pay off Arborwell, Inc.'s senior debt.

51.      Sortwell, LaVelle, and Woolner, all of whom were ERISA fiduciaries and parties-in-interest, therefore received extensive personal benefits as a result of the 2020 Sale they had orchestrated, including total combined payments of $12,859,586 in cash and SavATree stock (not including the $730,076 that Woolner and LaVelle later received through the ESOP for the vested stock they held through the ESOP).  As a result of their self-dealing, the Sortwells, LaVelle, and Woolner obtained for themselves the following personal benefits:

(a)      The Sortwells, LaVelle and Woolner obtained the early payout of their allocated *and unallocated* vested *and unvested* ESOP Arborwell, Inc. stock accounts.  Neither LaVelle nor Woolner were fully vested in his ESOP account because a participant's interest in his ESOP accounts vested on a graded basis over six full years, and the Plan did not afford hours of service credit for periods of employment prior to the effective date of the ESOP, January 1, 2017.  Indeed, as of the Closing, LaVelle and Woolner were only 40% vested in their respective ESOP accounts.

(b)      The Sortwells, LaVelle and Woolner obtained the early payoff of the subordinated notes they received as part of the 2017 Stock Purchase.  The subordinated notes issued to them in 2017 had original maturities of nine years (maturing in 2026) and were payable interest-only until full principal payment, such interest, at 6% annually, to be paid 41% currently in cash and 51% deferred as pay-in-kind quarterly compounded interest *to be added to principal*.  Thus, as a direct result of the 2020 Sale, these payoffs were accelerated by nearly six years.

(c)      The Sortwells, LaVelle and Woolner obtained the full payout of stock warrants issued in connection with the 2017 Stock Purchase.  The fully vested warrants issued to the Sortwells, LaVelle, and Woolner in 2017 were exercisable after 10 years at $2.57 per share.  Thus, as a direct result of the 2020 Sale, this payout was accelerated by nearly seven years.

(d)      LaVelle and Woolner obtained the full payout of SARs issued in connection with the 2017 Stock Purchase.  The SARs vested at 20% per year and were exercisable (if vested)

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

1    at $2.57 after five years (2023 for Defendant LaVelle and 2023 and 2024 for Defendant Woolner).

2    The SARs were only partially vested at the time of the 2020 Sale.  Thus, as a direct result of the

3    2020 Sale, the payout of the SARs was accelerated by nearly two years.

4             (e)     LaVelle and Woolner obtained the renewal and extension of Arborwell,

5    Inc.'s real property leases on two of its operating properties, co-owned by LaVelle and Woolner,

6    for five years post-Closing at an escalated rent.

7             (f)     The Sortwells and LaVelle obtained a rollover equity interest in SavATree,

8    a significantly improved employment agreement with SavATree (providing a generous salary

9    increase and a one-year severance not provided by Arborwell, Inc.), and participation in CI

10   Quercus's PIU incentive plan.

11        52.   Although the Sortwells, LaVelle and Woolner benefited extensively from the 2020

12   Sale they had orchestrated, the ESOP and its participants did not.  Out of the $34,000,000 purchase

13   price, the ESOP received (before adjustments) only $10,267,810 for 100% of Arborwell, Inc.'s

14   stock, which was only approximately 30% of the total purchase price.  The premature nature of

15   the 2020 Sale also deprived the ESOP and its participants of extremely valuable future benefits,

16   as further described below in paragraph 54 below.  Crucially, at the time of the 2020 Sale, most of

17   the ESOP's holdings of Arborwell, Inc. stock had not been released to participant accounts.

18   Sortwells, LaVelle and Woolner, in conjunction with Alerus, treated participant accounts as 85%

19   vested rather than 100% vested, which reduced the amount of the sale proceeds that went to the

20   ESOP and increased the amount available to benefit the Sortwells, LaVelle and Woolner, and fund

21   their various personal benefits from the 2020 Sale.  This also meant that any Plan participants who

22   chose to roll over their interests into SavATree's 401k Plan had a lesser amount to roll over.

23        53.   In violation of their ERISA fiduciary duties and the ERISA prohibited transaction

24   rules, the Sortwells, LaVelle, and Woolner orchestrated the 2020 Sale to obtain accelerated and

25   additional personal benefits (including an early payoff of their loans) and personally enrich

26   themselves at the expense of Arborwell, Inc., the ESOP, the ESOP participants, and the Buyer,

27   Plaintiff CI Quercus.

28

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  94111-3598

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

54.     Defendant Alerus approved the 2020 Sale on behalf of the ESOP and signed the SPA in its capacity as the ESOP Trustee.  By doing so, Alerus breached its own fiduciary duties, facilitated the breaches of fiduciary duty by the Sortwells, LaVelle and Woolner, and knowingly participated in prohibited transactions.

55.     Plaintiffs are informed and believe that Alerus failed to perform appropriate due diligence and financial determinations regarding the 2020 Sale.  For example, Plaintiffs are informed and believe that Alerus failed to conduct the required "hold or sell" analysis in light of Arborwell, Inc.'s near-imminent S Corporation election or evaluate the adequacy of seller indemnities, covenants, and representations.  Plaintiffs are informed and believe that Alerus also failed to consider the fairness of payments and other benefits provided to the non-ESOP parties to the 2020 Sale, namely, the extensive personal benefits the Sortwells, LaVelle, and Woolner received.  Moreover, as set forth above in paragraphs 41 and 42, Alerus was still a "directed trustee" up until the date of the closing of the 2020 Sale, and it was not even engaged to consider the fairness of the 2020 Sale until *after* the terms and purchase price of the 2020 Sale had been negotiated.

56.     Rather than conduct a prudent investigation of the merits of the 2020 Sale, Alerus merely "rubber stamped" the 2020 Sale orchestrated by the Sortwells, LaVelle and Woolner.  A prudent fiduciary who had conducted a diligent investigation would have determined that the 2020 Sale was not in the ESOP's best interest and that the 2020 Sale was instead designed to personally enrich Defendants Sortwell, LaVelle, and Woolner at the ESOP's expense.  As noted above, the 2020 Sale was premature, taking place just three years after the ESOP's formation.  At the time of the 2020 Sale, most of the ESOP's holdings of Arborwell, Inc. stock had not even been released to participant accounts.  Arborwell, Inc.'s senior bank debt was also substantially unpaid and its subordinated debt was wholly unpaid.  Additionally, there were only two years left until Arborwell, Inc. would be eligible to elect S corporation status, at which point Arborwell, Inc. would become fully exempt from federal income taxes and at both the corporate and shareholder level, and partially exempt from California state income taxes (reduced for S corporations from 8.84% to 1.5%) at the corporate level and fully exempt at the shareholder level.  Arborwell, Inc.'s financial

- 16 -

FIRST AMENDED COMPLAINT

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

performance was improving year-to-year.  In the absence of the premature 2020 Sale, Arborwell, Inc.'s financial performance would have improved at an even greater rate after the upcoming S corporation status election and the scheduled repayment of debt Arborwell, Inc. incurred in the 2017 Stock Purchase.  The benefits the ESOP and its participants would have received from this near-certain future financial growth would have vastly outweighed the payments the ESOP and its participants received as a result of the 2020 Sale.

### 5.  The Non-Compete covenants in the SPA

57.     The goodwill of Arborwell, Inc. was expressly negotiated and included in the 2020 Sale.  First, the SPA specifically references a transfer of goodwill to CI Quercus.  Second, CI Quercus purchased the entire business as a going concern for fair market value, determined as a multiple of Arborwell, Inc.'s EBITDA.  The purchase of a going business concern for a multiple of its recurring annual earnings (rather than book value) creates an inference that goodwill was included in the sale.  Third, by definition under California law, "fair market value" includes goodwill.  Indeed, the Fairness Opinion issued by Defendant Alerus's financial advisor in connection with the 2020 Sale stated that the "analysis also examined the impact of any *employment, consulting, or non-compete agreements entered into by Management*, as well as the form and timing of all consideration to be received by any party in the proposed transaction." (Emphasis added.)[2]

58.     To protect the goodwill CI Quercus was purchasing, it required as a condition of its purchase that Woolner and LaVelle, two of the three principal owners of Arborwell, Inc., who had committed to working for Arborwell after the sale, agree to a non-compete in connection with the 2020 Sale.  (Sortwell represented that he planned to retire following the 2020 Sale and did so.) Woolner and LaVelle covenanted to not compete with Arborwell or solicit its customers, directly or indirectly, for a period of three years, and not to solicit employees for a period of five years, within the California counties in which Arborwell does business.  This covenant is contained in

---

[2] Plaintiffs have requested, but have not received, from Defendant Alerus a copy of the year-end appraisal of the fair market value of the Company.

Case No.
4:23-cv-02770-HSG                    FIRST AMENDED COMPLAINT

Section 5.1 of the SPA (the "Non-Compete"), which LaVelle and Woolner heavily negotiated and voluntarily signed in their individual capacities:

5.1 <u>Covenant Not to Compete; Confidentiality</u>.

In consideration of the promises herein contained and in consideration of the payments and other consideration to be provided to Seller and the Warrant Holders, as set forth in this Agreement, the Covered Persons, each of whom is, directly or indirectly, receiving a material portion of the payments and other consideration to be provided by Buyer hereunder, and in consideration thereof and as a material inducement to Buyer to enter into this Agreement (it being understood that, absent such inducement, Buyer would not have entered into this Agreement), do hereby agree for the benefit of Buyer and any Affiliate, successor or assign of Buyer as follows:

(a) <u>Restrictive Covenant</u>.   During the Restricted Period, each Covered Person shall not:

(i) directly or indirectly engage in the Business and shall not directly or indirectly, own, manage, operate, control, be employed by, be a consultant to, participate in or have a financial interest in, or be connected in any manner (including as an employee, consultant, officer, director, owner or lender) with the ownership, management, operation or conduct of any entity (other than on behalf of Buyer or its Affiliates) engaged in the Business or any similar Business for the Restricted Period, as set forth in this Agreement, anywhere within the Business Territory;

(ii) divert, take away, solicit, or accept business from any individual, firm, partnership or other entity that is then or has been at any time in the past six (6) months a client, customer or account of the Company or any of its Affiliates; or

(iii) solicit, attempt to solicit or induce for employment, hire, employ, train or supervise any Person who then is or has been at any time in the past six (6) months employed by the Company; provided, however, that, without limiting the restriction on hiring set forth in this Section 5.1(a)(iii), the foregoing will not prevent any Covered Person from conducting any general advertisements or internet solicitations for employment, not specifically targeted at such Persons, directly or through any agent (including placement and recruiting agencies).

"<u>Covered Person</u>" means each of the Sortwell Parties, ***Mr. LaVelle and Mr. Woolner***.  "<u>Restricted Period</u>" means a period of five (5) years following the Closing Date; <u>provided</u>, <u>that</u> solely for purposes of (a) <u>Section 5.1</u>(a)(i) and Section 5.1(a)(ii), in the case of any Covered Person other than the Sortwell Parties, "<u>Restricted Period</u>" means a period of three (3) years following the Closing Date; and (b) <u>Section 5.1(a)(iii)</u>, in the case of any Covered Person other than the Sortwell Parties, "<u>Restricted Period</u>" means a period of five (5) years following the Closing Date; <u>provided</u>, <u>further</u>, that the Restricted Period shall be tolled during (and shall be deemed automatically extended by) any period in which any Covered Person is in violation of any of the provisions of <u>Section 5.1(a)</u>.  "<u>Business Territory</u>" means the following counties: Alameda, Amador, Butte, Contra Costa, El Dorado, Fresno, Los Angeles, Marin, Merced, Monterrey, Napa, Orange, Placer, Riverside, Sacramento, San Bernardino, San Diego, San Francisco, San Joaquin, San Mateo, Santa Clara, Santa Cruz, Solano, Sonoma, Stanislaus, Sutter, Yolo, and Yuba.  Each

of the covenants of the parties to this Agreement contained in this <u>Section 5.1(a)</u> shall be deemed and shall be construed as a separate and independent covenant.

(Emphasis added.)

59.     LaVelle and Woolner were fully aware of the Non-Compete's requirements prior to signing it.  On October 13, 2020, prior to the closing, Defendant LaVelle emailed Defendant Woolner a copy of the draft SPA with the subject line "This is the first draft of the stock purchase agreement sent today from SavATree," in which he stated:

> This is only the starting point with other documents to follow.  The Arborwell team will be negotiating this part first.  Where this impacts you (and me) is in Article V - Covenants.  This is the restriction they want to put on us after close.  Look at it and we can talk.  Our [Employee Stock Ownership Plan] attorney thinks a 3 year non-compete would be more appropriate and she thinks we can get that.  At some point we will bring you in to the conversation since you'll have to sign this.  I just don't want you to waste your time until some of the technical bugs are taken out first.
>
> Again, this is only the first draft we will be negotiating this week and there are several more documents to come.

Defendants LaVelle and Woolner exchanged this email nearly two months before the closing. Over the next two months, the parties through counsel exchanged multiple revisions to the Non-Compete provision.  Defendants did not sign the SPA until on or about December 9, 2020, and so they had nearly two months from receipt of the first draft to review any issues with Plan's counsel, or to consult other counsel before signing (which they may have done).

60.     The Non-Compete was material to CI Quercus and to Alerus as the ESOP's Trustee. Without the Non-Compete, the 2020 Sale would not have taken place, and Defendants LaVelle and Woolner would have received nothing.

61.     In addition to agreeing to the Non-Compete, Woolner and LaVelle represented in writing and orally that they would continue in their roles at Arborwell following the 2020 Sale, to induce CI Quercus to close the deal.  For example, in the SPA, LaVelle and Woolner represented that "[t]o the Knowledge of the Company, no director, officer, member of senior management, other key employee, or group of key employees of the Company intends to terminate employment or service with the Company."  (Ex. A (SPA) at 20.)  In addition to this signed, written representation in SPA, LaVelle and Woolner each affirmatively represented multiple times in-

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  94111-3598

Case No.
4:23-cv-02770-HSG

FIRST AMENDED COMPLAINT

person to CI Quercus and SavATree senior management that they would "stay on" after the 2020 Sale of Arborwell and that they were "all in." CI Quercus reasonably relied on these representations to its detriment.

62.     Plaintiffs are informed and believe that LaVelle and Woolner intentionally and knowingly misrepresented their intent to continue with their employment with Arborwell and to honor the Non-Compete, and they always intended to compete following the closing of the SPA. LaVelle and Woolner concealed their true intent and instead affirmatively misrepresented that they would not compete to induce CI Quercus to close the deal and cash them out of Arborwell, Inc. Although discovery has not commenced, and much of the evidence proving that LaVelle and Woolner concealed their plan to compete will come from their testimony and their private communications, LaVelle and Woolner's private communications that Plaintiffs have already obtained show that LaVelle and Woolner began looking for a competing tree care business to purchase less than a month after the 2020 Sale, which demonstrates that their contention—that they decided to leave Arborwell over their dissatisfaction with the integration of Arborwell into SavATree—lacks credibility.

63.     Plaintiffs are informed and believe that Sortwell, who had a close personal and professional relationship with LaVelle and Woolner spanning nearly two decades, knew or should have known that LaVelle and Woolner had no intention to continue their employment with Arborwell and had intended to start a competing tree care business. Plaintiffs are informed and believe that Sortwell concealed this information from CI Quercus in order to induce CI Quercus to purchase Arborwell, Inc. and maximize the purchase price.

64.     Plaintiffs are further informed and believe that Alerus failed to conduct due diligence into whether LaVelle and Woolner intended to honor the Non-Compete in breach of its fiduciary duties. Proper diligence would have revealed that LaVelle and Woolner had no intention of honoring the Non-Compete, to the detriment of the Company, and the 2020 Sale was merely an attempt to accelerate the pay off of their loan to the ESOP, their warrants and their SARs.

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

65.     By breaching the Non-Compete, LaVelle and Woolner have also breached their ERISA fiduciary duties, including by potentially harming the ESOP participants who rolled over their interests into the 401k Plan.

**B.      Facts Underlying Plaintiffs' Post-Transaction Claims Regarding the Individual Defendants' Retention of Trade Secrets and Confidential Information, and Solicitation of Customers**

**1.      Arborwell's Trade Secrets and Confidential Information**

66.     Arborwell relies on valuable trade secrets and confidential information to provide its customers with integrated tree and shrub care and management services, including mapping, budgeting, maintenance plans, removal, plant health care and general tree care.  Arborwell developed these trade secrets and confidential information over the last twenty years that it has been in business, spending substantial time and resources to do so, and Arborwell has taken reasonable precautions to protect their secrecy.  Arborwell asserts that all of the following categories of information are trade secrets (the "Trade Secrets").  If, however, the court or jury finds that any do not so qualify, such information is still confidential pursuant to contract, as discussed below (the "Confidential Information").

**a.      Site Maps**

67.     Arborwell creates and maintains detailed, interactive electronic site maps for most of its customers (its "Site Maps") in a secure database called ArborNote.  Arborwell's Site Maps typically set forth:  (1) the location of every tree and plant on the customer's property in relation to buildings, utilities, roads, and other infrastructure; (2) photos of the trees and plants; (3) specific tree and plant information, including the species, height, diameter, age, maturity, health inspection history, maintenance schedule, work history; (4) special care instructions; and (5) in some cases, Plant Heath Care ("PHC") Plan Information, General Tree Care ("GTC") Information and Watering Plans.  Arborwell employees can access all of this information for each tree or plant on a client property by clicking on that tree or plan on the map within the secure database.  The compilation of Site Maps, as well as each individual map (each of which is itself a compilation), is a trade secret, and it constitutes misappropriation under the DTSA, 18 U.S.C. §§ 1836, 1839(5), as well as the CUTSA, Cal. Civ. Code §§ 3426.1(b)(1)–(2), for Defendants to "acquire" or "use"

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

- 21 -

the compilations in any way, including but not limited to taking or using the compilations as a whole and taking or using any information from the compilations, including information that is publicly available, as opposed to obtaining such information exclusively and independently from the public domain..

68.     Arborwell typically absorbs the cost of generating a Site Map for the customer at the outset of the engagement and for updating it as needed.  For its larger customers such as Apple Inc. ("Apple"), generating a Site Map is a substantial financial investment.  The process requires multiple onsite and offsite staff with expertise in identifying tree species and assessing age, size, maturity and health.  Each individual tree must be catalogued, photographed and entered into Arborwell's mapping software.  The process can exceed forty (40) hours of labor to survey and document a large site.

69.     The Site Maps are routinely updated for active customers.  Updating an existing Site Map takes substantially less time and resources than creating a new Site Map, so both Arborwell and its long term customers benefit from the cost savings and continuity for follow-up or recurring services.  Site Maps allow Arborwell to efficiently service customers by allowing arborists to assist customers with tree issues remotely, without having to do an onsite visit each time.  They also allow field staff to quickly identify and work on the right tree, or even a part or branch of a tree, at the right time.

70.     For all these reasons, the Site Map for a customer is valuable to Arborwell's competitors.  Each Site Map effectively acts as an instruction booklet for meeting a particular customer's needs.  The Site Maps enable Arborwell to produce superior outcomes for its customers at a lower price point, providing Arborwell a competitive advantage in the marketplace.

71.     The Site Maps also enable Arborwell to maximize profit by allowing it to minimize unnecessary, recurring labor so that it can keep more of its revenue.  Since Arborwell's business is based on a fixed-bid model, like all commercial tree care businesses, reducing its costs directly increases its profits.  A competitor who obtains a completed Site Map can avoid the huge investment in labor and resources required to produce the Site Map in the first instance.

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

72. Site Maps also sometimes incorporate trade secret and confidential information from PHC Plans, Watering Plans and GTC Information, which are further discussed below.

**b.    General Tree Care Information**

73. Arborwell maintains a password-protected compilation of client-specific GTC information on NetSuite, as well as in estimates, sales orders and invoices ("GTC Information"). Arborwell's GTC Information includes the GTC schedules, methods, strategies and recommendations that Arborwell arborists have developed for each customer based on the species, age, size and growth of trees and plants on that customer's property(ies), significant input from the customer and is time-intensive, especially for new customers. Arborwell invests substantial resources to train its arborists in this process and in continuing education. Based on their evaluations, Arborwell arborists make GTC recommendations to the customer and reduce those recommendations to written instructions in a job order, drought conditions, aesthetics, site crowding and whether existing or future growth might damage nearby buildings or power lines, or cause other safety concerns. The compilation of GTC Information is a trade secret, and it constitutes misappropriation under the DTSA, 18 U.S.C. §§ 1836, 1839(5), as well as the CUTSA, Cal. Civ. Code §§ 3426.1(b)(1)–(2), for Defendants to "acquire" or "use" the compilation in any way, including but not limited to taking or using the compilation as a whole and taking or using any information from the compilation, including information that is publicly available, as opposed to obtaining such information exclusively and independently from the public domain.

74. Arborwell routinely updates the GTC Information for a customer, generally around the time of seasonal pruning. Updating the GTC Information for a past or existing customer takes substantially less time and resources than for a new customer, so both Arborwell and its long term customers benefit from the cost savings and continuity for follow-up or recurring services. And, Arborwell uses GTC Information to time its marketing to customers for follow-up inspections or pruning. This information would be extremely valuable to competitors because it would enable them to time their marketing effort to solicit Arborwell's repeat customers.

75. The GTC Information is a customer-specific trade secret and is confidential. It is valuable to Arborwell's competitors because it would allow them to avoid the initial time and

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

resources required to survey and understand pruning and maintenance history, to make more of a profit and to solicit Arborwell customers by promising and providing the same GTC services.

### c.    Plant Health Care (Information and Plans)

76.    Arborwell maintains a password-protected compilation of PHC information on NetSuite ("PHC Information").  Arborwell's PHC Information includes fertilizer, fungicide and pesticide blends and application methods and schedules, which vary by tree and plant species.  The blends, methods and schedules are developed by professionally-trained and certified arborists. Arborwell's PHC Information includes which PHC methods work for certain trees and plants, and which do not.  Arborwell's PHC Information also includes a compilation of case studies it has conducted, as well as a compilation of "white papers" it has collected regarding PHC.  The compilation of PHC Information is a trade secret, and it constitutes misappropriation under the DTSA, 18 U.S.C. §§ 1836, 1839(5), as well as the CUTSA, Cal. Civ. Code §§ 3426.1(b)(1)–(2), for Defendants to "acquire" or "use" the compilation in any way, including but not limited to taking or using the compilation as a whole and taking or using any information from the compilation, including information that is publicly available, as opposed to obtaining such information exclusively and independently from the public domain.

77.    Arborwell's PHC Information includes proprietary fertilizer, fungicide and pesticide blends and application methods and schedules, which vary by plant species. The proprietary blends and schedules are developed by professionally-trained and certified arborists. The process involves substantial trial and error, balancing not only efficacy, but also materials cost and availability at scale, as well as timing, practicality, safety and ease of application by employees out in the field. For example, products that are typically sprayed cannot be used on trees near ponds or other bodies of water due to contamination concerns, so Arborwell has developed alternative blends that can be applied without spraying.   The proprietary blends and schedules are continuously refined for different plants and clients and improved based on the efficacy and outcomes observed in the field, as well as the availability of new materials and science.

78.    Arborwell's competitive advantage in PHC research and development is derived in part from its scale. Arborwell's arborists have access to field data from Arborwell's numerous sites

- 24 -

and microclimates throughout the Bay Area and elsewhere in California, allowing for testing in diverse environments. Through a trial and error process, Arborwell has developed data over the years as to which PHC methods produce good results in which locations, and which do not.

79.    Arborwell has also developed and maintained a password-protected compilation of customer-specific PHC plans for its customers on NetSuite ("PHC Plans"), which includes the PHC methods and schedules implemented by Arborwell for each particular client. Arborwell's PHC Plans are set forth in arborist reports and work orders. The compilation of PHC Plans, as well as each individual PHC Plan (each of which is itself a compilation), is a trade secret, and it constitutes misappropriation under the DTSA, 18 U.S.C. §§ 1836, 1839(5), as well as the CUTSA, Cal. Civ. Code §§ 3426.1(b)(1)–(2), for Defendants to "acquire" or "use" the compilations in any way, including but not limited to taking or using the compilations as a whole and taking or using any information from the compilations, including information that is publicly available, as opposed to obtaining such information exclusively and independently from the public domain.

80.    PHC Information and PHC Plans are valuable to Arborwell competitors because they require specialized knowledge and expertise to prepare, which is often out of reach for smaller competitors who do not have the scale required to maintain the expertise in house or the years of study, research and development necessary to grow that expertise. They are further valuable to competitors because using this information would save competitors the many hours and many thousands of dollars necessary to accumulate and organize it. The PHC Plans would further allow a competitor to promise and provide the same or similar PHC services as Arborwell.

### d.    Watering Plans

81.    Arborwell maintains a password-protected compilation of customer-specific watering plans it has developed on NetSuite ("Watering Plans"). Arborwell's Watering Plans include tailored watering schedules, strategies and amounts for each of its customers, which vary by tree and plant species, climate conditions, soil conditions, water availability and microclimates. The compilation of Watering Plans, as well as each individual Watering Plan (each of which is itself a compilation), is a trade secret, and it constitutes misappropriation under the DTSA, 18 U.S.C. §§ 1836, 1839(5), as well as the CUTSA, Cal. Civ. Code §§ 3426.1(b)(1)–(2), for

Defendants to "acquire" or "use" the compilations in any way, including but not limited to taking or using the compilations as a whole and taking or using any information from the compilations, including information that is publicly available, as opposed to obtaining such information exclusively and independently from the public domain.

### e.    Customer Information

82.    Arborwell maintains a compilation of information related to its existing and prospective customers on a password-protected NetSuite database ("Customer Information"). Arborwell's Customer Information includes names, addresses, email addresses and telephone numbers for each of its customers, as well as particular contacts within each customer's organization for specific issues (*e.g.*, who to contact to get paid or to discuss tree care issues) and notes regarding the customer.  Arborwell's Customer Information also includes the sales history, estimates, job orders, invoices, and special needs and preferences for each customer.  In addition to current customers, Arborwell's Customer Information includes the names of potential customers for whom Arborwell has provided an estimate for work in the last fourteen months, as well as their addresses, email addresses, telephone numbers, contacts and the estimates provided by Arborwell. The compilation of Customer Information is a trade secret, and it constitutes misappropriation under the DTSA, 18 U.S.C. §§ 1836, 1839(5), as well as the CUTSA, Cal. Civ. Code §§ 3426.1(b)(1)–(2),  for Defendants to "acquire" or "use" the compilation in any way, including but not limited to taking or using the compilation as a whole and taking or using any information from the compilation, including information that is publicly available, as opposed to obtaining such information exclusively and independently from the public domain.  This information allows Arborwell to save time and money by targeting its marketing and, if misappropriated by a competitor, would allow that competitor to do so as well, without making its own substantial investment of time and money.

### f.    Pricing Information

83.    Arborwell maintains a password-protected compilation of pricing information for its services on NetSuite ("Pricing Information").  The Pricing Information includes a spreadsheet of prices for more than 200 itemized services, with a specific estimate of the time and cost for each

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  94111-3598

of those itemized services.  The pricing index was created using, and incorporates, Arborwell's historical margins and its overhead, labor, equipment and materials costs. Arborwell's Pricing Information also includes pricing guidelines and pricing goals.  Arborwell's Pricing Information further includes the historical pricing information for each customer, including the prices at which Arborwell estimated and ultimately performed services, which are set forth in the database, as well as in estimates, sales orders and purchase orders.  The compilation of Pricing Information, its pricing index, pricing goals, and pricing guidelines (each of which is itself a compilation) is a trade secret, and it constitutes misappropriation under the DTSA, 18 U.S.C. §§ 1836, 1839(5), as well as the CUTSA, Cal. Civ. Code §§ 3426.1(b)(1)–(2), for Defendants to "acquire" or "use" the compilations in any way, including but not limited to taking or using the compilations as a whole and taking or using any information from the compilations, including information that is publicly available, as opposed to obtaining such information exclusively and independently from the public domain.

84.     In the highly competitive market for tree care services, margins are thin and a properly calibrated pricing strategy is key to winning and maintaining customers, as well as generating a profit.  The general pricing practice in the tree care industry is to provide a fixed quote for the scope of the contracted services, based on an estimate of the required labor hours at fixed labor rates that are specific to the geographic region.  The labor quote includes all equipment and materials, so Arborwell quotes labor hours for specific services based on its historical margins and its own overhead, labor, equipment and materials cost.  Over many years, Arborwell created and has maintained a compilation of prices for more than 300 itemized services, with a specific estimate of labor hours for each of those itemized services.  This Pricing Information is periodically updated.

85.     Customers also vary in their price sensitivity.  The Pricing Information allows Arborwell to optimize the services Arborwell recommends based on the customer's ability and willingness to pay.  Arborwell also adjusts or discounts its pricing based on the customer, their industry, local competition, the service volume and Arborwell's history with that customer.  All of this customer-specific Pricing Information is maintained in writing on an electronic database.

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

Case No.
4:23-cv-02770-HSG                    FIRST AMENDED COMPLAINT

### 2. Arborwell's efforts to protect its Trade Secrets and Confidential Information

86.    Arborwell has taken reasonable efforts to maintain the secrecy of its Trade Secrets and Confidential Information.  Arborwell restricts access to each category of its Trade Secrets and Confidential Information to only those employees who need access to that information.

87.    For example, Arborwell maintains PHC Information on an internal network and restricts access to this information to in-house PHC experts.  Arborwell's account managers do not have general access to this information, but they can and do request specific information to respond to customer questions and do rely on instructions and recommendations provided by Arborwell's PHC experts.  They also have access to customer-specific PHC Plans for their accounts, which incorporate PHC Information as needed and which are available to the customer, account managers and field staff working on that account.  Over time, account managers necessarily acquire broad knowledge of PHC Information from their consultations with the PHC experts and from reviewing PHC Plans for their accounts.

88.    Similarly, Arborwell restricts access to Site Maps, GTC Information, PHC Plans and Watering Plans to account managers and the employees working on a particular account.  Arborwell grants customers access to Site Maps through a cloud-based platform, with digital access restrictions.  During an engagement, customers may access interactive maps and reports online, which are updated in real time.  Customer access is terminated at the end of the engagement.

89.    Arborwell also keeps its Customer Information and Pricing Information confidential by restricting access to the data.  That information is maintained in an internal software known as "NetSuite."  NetSuite is encrypted and user accounts are password protected with two-factor authentication.  Each employee has a user account with NetSuite, with varying levels of access depending on the employee's function.  For example, a customer service representative has limited access to pricing and sales history.  In contrast, the Individual Defendants were Regional Vice-Presidents and account managers, so they had access to Customer Information and Pricing Information both because they supervised all aspects of the regional business and because they relied on that information to manage existing customer accounts and sell Arborwell services.

90.     All employees with access to the Trade Secrets and Confidential Information, including the Individual Defendants, are obligated to keep this information confidential pursuant to their employment agreements, Arborwell's employment handbook and the employee duty of loyalty.

91.     Arborwell requires its employees to sign an employment agreement that requires them to (1) acknowledge that they will have access to Trade Secrets and other Confidential Information identified above through the course of their employment and (2) agree to not use or disclose that information other than in furtherance of their employment.  Each of the Individual Defendants signed such an agreement, as further discussed below.

92.     Arborwell's Employee Handbook, which is attached hereto as **Exhibit B**, further sets forth Arborwell's employee policies regarding non-disclosure or use of Trade Secrets and Confidential Information:

**Non-Disclosure or Use of Trade Secrets**

During the term of employment with Arborwell, employees may have access to and become familiar with information of a confidential, proprietary, or secret nature, which is or may be either applicable or related to the present or future business of the Company, its research and development, or the business of its customers.  For example, trade secret information includes, but is not limited to, devices, inventions, processes and compilations of information, records, specifications, and information concerning customers or vendors.  Employees shall not disclose any of the above-mentioned trade secrets, directly or indirectly, or use them in any way, either during the term of their employment or at any time thereafter, except as required in the course of employment with the Company.  The above agreement should not be construed as constituting a promise of continued employment for at-will employment purposes.

**Customer Lists**

The employee understands that customer lists of Arborwell, for which the employee has or will have access to during the employee's employment, are trade secrets and shall be solely the property of the employer.

The employee agrees that he/she shall neither directly nor indirectly solicit business as to products or services competitive with those of the Company based on information from the customer lists.

Ex. B, p. 9.

93.     As further discussed below, LaVelle, Dickinson, Yamaguchi and Hagge each signed (1) acknowledgments that they received a copy of, and will read and familiarize themselves

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  94111-3598

with the Employee Handbook and (2) employment agreements requiring them to keep secret Arborwell Trade Secrets and Confidential Information.  Woolner and LaVelle each signed further employment agreements and the Stock Purchase Agreement, which required them to do the same. Thus, the Individual Defendants knew or should have known that they had access to Trade Secrets and Confidential Information belonging to Arborwell, and that Arborwell did not consent to the use of that information by anyone other than authorized employees of Arborwell and for any purpose other than in furtherance of Arborwell business.

### 3.  The Individual Defendants' Employment Agreements

94.  The Individual Defendants were Regional Vice-Presidents and/or account managers, who were responsible for both sales and operations in their respective regions.

#### a.  Woolner

95.  Woolner was the second employee of Arborwell, joining on or about April 18, 2001.  At the outset of his employment, Woolner entered into an employment agreement with Arborwell, which is attached hereto as **Exhibit C** (the "Woolner Employment Agreement").  The Woolner Employment Agreement requires Woolner to not use of disclose Arborwell Trade Secrets or Confidential Information except in furtherance of his employment:

> 9.  <u>Non-Disclosure</u>.  You acknowledge that during your employment with the Employer, confidential information of the Employer will be disclosed to you and that any unauthorized disclosure of such information to third parties or use other than for the Employer's purposes could cause extensive harm to the Employer. Confidential information of the Employer includes any and all trade secrets, confidential, private or secret information of the Employer including without limitation (i) business and financial information of the Employer, (ii) business methods and practices of the Employer, (iii) marketing strategies of the Employer, and (iv) such information as the Employer may from time to time designate as being confidential to the Employer.  Confidential information will not include information that is in the public domain, or information that falls into the public domain, unless such information falls into the public domain by disclosure or other acts by you, or through your fault.
>
> You undertake with the Employer that you will not during your employment with the Employer or at any time thereafter, unless prior written consent is given by the Employer, either directly or indirectly, utilize on your own behalf or on behalf of any other person, firm or company (a "person") or divulge to any other person, except as required by the terms and nature of your employment with the Employer, any confidential information of the Employer, and you shall use your best endeavors to prevent the unauthorized disclosure or publication of such information.  In addition, you agree that you will not copy any confidential information of the Employer including any curriculum belonging to the Employer

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  94111-3598

nor remove same form the Employer's premises without the express written permission of the Employer.  You recognize and acknowledge that a breach of this provision may result in the termination of your employment and/or the institution of legal proceedings against you.

Ex. C, p. 2.

96.    On or about January 1, 2008, Woolner entered into a further agreement with Arborwell regarding an incentive-based compensation plan, which again required him to protect the confidentiality of Arborwell's Trade Secrets and Confidential Information, attached hereto as **Exhibit D** (the "Woolner Confidentiality Agreement").  The relevant provisions provide:

**1.1  My Duties.**

I shall protect the confidentiality of all of the Company's confidential information. This means, among other things, that:

(a)    I shall abide by all of the Company's policies concerning confidential information;

(b)    I shall use reasonable efforts to prevent other persons from misusing the Company's confidential information;

(c)    I shall notify the Company if I become aware that any of the Company's confidential information has been misused or disclosed improperly;

(d)    I shall use the Company's confidential information only for the benefit of the Company;

(e)    I shall not photocopy or otherwise reproduce any of the Company's confidential information other than for a Company purpose; and

(f)    I shall obtain the written consent of the president of the Company (or a person the president has authorized to give such consent) before I permit anyone outside of the Company to know or use any confidential information of the Company.

**1.2  Confidential Information.**

The Company considers all information relating to the following matters to be confidential:

(a)    newly developed products;

(b)    product composition;

(c)    processes;

(d)    know-how;

(e)    designs;

- 31 -

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  94111-3598

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

(f)     software tailored or designed for the Company's use;

(g)     technical information;

(h)     the unpublished contents of any pending patent application;

(i)     equipment configurations;

(j)     capital equipment plans, schematics, and lay-outs;

(k)     formulas;

(l)     test data;

(m)     customer lists;

(n)     communications with customers and suppliers;

(o)     financial information;

(p)     business plans;

(q)     financial projections;

(r)     marketing plans;

(s)     marketing strategies;

(t)     suppliers of items tailored or designed for the Company's business;

(u)     details of commercial arrangements and negotiations;

(v)     identities of specific individuals with whom the Company has interacted at customer and supplier businesses;

(w)     customer information;

(x)     pricing strategies;

(y)     prices of specific products to specific customers;

(z)     communications with counsel, advisors and potential partners or investors in and to the Company;

(aa)    compensation and qualifications of Company employees and independent contractors;

(bb)    job descriptions of Company employees who do not interact with the public;

(cc)    any information labeled or otherwise treated as "secret," "proprietary," or "confidential"; and

(dd)    any other information that actually derives or may in the future derive independent economic value from not being generally known to, and not being readily ascertainable by proper means by, other persons who can

- 32 -

obtain economic value from its disclosure or use and is subject to efforts by the Company to maintain its secrecy.

### 1.3  Purpose of this Agreement.

I acknowledge (a) that the Company's confidential information is commercially and competitively valuable and is vital to the success of the Company's business at all locations at which the Company does business; (b) that the unauthorized use or disclosure of the Company's confidential information will cause irreparable harm to the Company; (c) that, by this Agreement, the Company is taking reasonable steps to protect its legitimate interest in its confidential information; and (d) that the restrictions set forth in this Agreement are reasonably necessary to protect the Company's legitimate interest in its confidential information.

### 1.4.  Compilations of Public Information.

Certain of the Confidential Information consists of compilations and analysis of information that is in the public domain or otherwise generally available, but that would not be meaningful unless assembled by a person for the purpose of entering into the Company's business.  I acknowledge that the Company has compiled this information over a long time and at considerable effort, expense, and opportunity cost.  I acknowledge that this otherwise public information is in fact confidential and valuable because the use to which it has been put is not generally known, and agree that I shall not use any of such otherwise public information for the purpose of conducting or helping others to conduct any business similar to the Company's business for three years from the last disclosure of information by the Company to me.

### 1.5.  Information Developed By Me.

Confidential Information also includes all information that I learn, discover, or develop through my efforts on behalf of the Company or in connection with the Company's business, whether prior to the date of this Agreement or thereafter.

[…]

### 1.9.  Post-Employment/Engagement Duties.

I shall protect the confidentiality of the Company's confidential information, even after I stop performing services for the Company, for as long as the information remains confidential.

Ex. D, Confidentiality and Inventions Assignment Agreement, pp. 1–4.

97.     Since on or about 2008, Woolner has been a shareholder in Arborwell.  Prior to the adoption of the ESOP in November 2017, Woolner was one of three shareholders of Arborwell, Inc., the predecessor entity to Arborwell, owning 4% of the outstanding shares.  Following the adoption of the ESOP until Arborwell's acquisition, Woolner owned his shares through the ESOP.

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

### b.     LaVelle

98.     LaVelle joined Arborwell in 2005.  On or about March 23, 2005, LaVelle entered into an employment agreement with Arborwell, which is in writing (the "LaVelle Employment Agreement") and attached hereto as **Exhibit E.**  It contains the same provisions from the Woolner Employment Agreement quoted above, requiring LaVelle to not use of disclose Arborwell Trade Secrets or Confidential Information except in furtherance of his employment.

99.     On or about January 1, 2008, LaVelle entered into a further agreement with Arborwell regarding an incentive-based compensation plan, which again required him to protect the confidentiality of Arborwell's Trade Secrets and Confidential Information, attached hereto as **Exhibit F** (the "LaVelle Confidentiality Agreement").   Those provisions in the Lavelle Confidentiality Agreement are the same ones found in the Woolner Confidentiality Agreement and quoted above.

100.     On or about December 9, 2020, in connection with CI Quercus's acquisition of Arborwell, LaVelle entered into an employment agreement with Arborwell's parent, SavATree, attached hereto as **Exhibit G** (the "LaVelle SavATree Employment Agreement").  The LaVelle SavATree Employment Agreement also required him to protect the confidentiality of Arborwell's Trade Secrets and Confidential Information:

**6.     Non-Disclosure of Confidential Information.**

6.1     Employee acknowledges that, during his employment with the Company, Employee will receive, learn, develop, and otherwise have access to Confidential Information as defined below.  Employee agrees to hold all Confidential Information in trust and confidence for the Company while Employee is employed by the Company and for all time thereafter. Employee shall not use (except on behalf of the Company), divulge, disclose, or make accessible to any person, corporation, or entity, other than an employee or officer of the Company in connection with their performance for the Company, any Confidential Information, without the prior written consent of the President of SavATree.

6.2     For purposes of this Agreement, "Confidential Information" means proprietary, non-public confidential information or a compilation of such information in any form related to the business of the Company that Employee acquires or gains access to during his or her employment or other association with the Company, provided that the Company has not authorized public disclosure of the information or compilation, and that the information or compilation is not, through proper means, readily available to persons outside the Company who are under no obligation to the

- 34 -

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

Company to keep it confidential.  By way of example and not limitation, Confidential Information shall include the Company's non-public information relating to:  business and marketing plans, practices, and strategies; research, development, and testing of products and inventions and other Company intellectual property; internal methods and techniques of operation; systems and processes; collected or compiled information regarding customers, prospective customers, suppliers, and vendors; non-public cost and pricing information; sales and financial information, including without limitation budgets, projections, targets, revenues, profits, and margins; Works for Hire (as defined below); trade secrets; acquisitions and data or information (whether accumulated by the Company or obtained from a third party) as to potential or active acquisition candidates; and technical information, such as computer hardware and software, source code and object code.  Due to its special value and utility as a compilation, a compilation of Confidential Information will remain protected even if individual items of information in it are public.  Private disclosure for business purposes of Confidential Information to parties with whom the Company is doing business shall not cause the information to lose its protected status under this Agreement.  The parties acknowledge that Confidential Information is proprietary and integral to the Company's business, is valuable, that the Company has incurred substantial expense to develop and create such Confidential Information, that such Confidential Information is subject to reasonable efforts by the Company to maintain its confidential nature, and that Employee would not be given access to such Confidential Information by the Company absent Employee's covenants in this Agreement.

Ex. G, pp. 4–5.

101.    Since on or about 2008, LaVelle has been a shareholder in Arborwell.  Prior to the adoption of the ESOP in November 2017, LaVelle was one of three shareholders of Arborwell, Inc., the predecessor entity to Arborwell, owning 6% of the outstanding shares.  Following the adoption of the ESOP until Arborwell's acquisition, LaVelle owned his shares through the ESOP.

### c.    Dickinson

102.    Dickinson joined Arborwell in 2006, and eventually became the Regional Vice-President at Arborwell for the Oakland and East Bay region, the second most profitable region for the Company.  In 2020, Dickinson individually generated approximately 6% of Arborwell's sales.

103.    Dickinson entered into an employment agreement with Arborwell on or about January 16, 2006 ("Dickinson Employment Agreement"), attached hereto as **Exhibit H**, which requires Dickinson to maintain the confidentiality of Arborwell's Trade Secrets and Confidential Information:

Case No.
4:23-cv-02770-HSG

FIRST AMENDED COMPLAINT

**5. Non-Disclosure.** You acknowledge that during your employment with Arborwell, confidential information will be disclosed to you and that any unauthorized disclosure of such information to third parties or use other than for Arborwell's purpose could cause extensive harm to Arborwell. Confidential information includes any and all trade secrets, confidential, private or secret information of Arborwell including without limitation (I) business and financial information of Arborwell, (II) business methods and practices of Arborwell, (III) marketing strategies of Arborwell, and (IV) such information as Arborwell may from time to time designate as being confidential. Confidential information will not include information that is public domain, or information that falls into the public domain, unless such information falls into the public domain by disclosure or other acts by you, or through your fault.

Ex. H, p. 2.

### d.    Yamaguchi

104.    Yamaguchi joined Arborwell in 2007 as an account manager in the South Bay region, and he was eventually promoted to Regional Vice-President for the South Bay region. In 2020, Yamaguchi individually generated approximately 7% of Arborwell's sales.

105.    Yamaguchi entered into an employment agreement with Arborwell on or about June 22, 2007 ("Yamaguchi Employment Agreement"), attached hereto as **Exhibit I**, requires Dickinson to maintain the confidentiality of Arborwell's Trade Secrets and Confidential Information. Ex. I, p. 2. The non-disclosure provision in the Yamaguchi Employment Agreement is the same as the one found in the Dickinson Employment Agreement.

### e.    Hagge

106.    Hagge joined Arborwell in 2011 as an account manager for the Oakland and East Bay region. In 2020, Hagge was the highest grossing salesperson in that region and was responsible for approximately 10% of Arborwell's sales.

107.    Hagge entered into an employment agreement with Arborwell on or about March 1, 2011 ("Hagge Employment Agreement"), attached hereto as **Exhibit J**, requires Hagge to maintain the confidentiality of Arborwell's Trade Secrets and Confidential Information. Ex. J, p. 2. The non-disclosure provision in the Hagge Employment Agreement is the same as the one found in the Dickinson Employment Agreement.

### 4.    The Individual Defendants' role in the growth of Arborwell

108.    Throughout most of his career at Arborwell, Woolner was the highest grossing sales executive at Arborwell, using Arborwell's Trade Secrets and Confidential Information to secure

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

- 36 -

FIRST AMENDED COMPLAINT

marquee customers and projects for Arborwell, including services for prominent technology campuses throughout the Peninsula and South Bay regions.  Woolner was also the second highest compensated employee at Arborwell, after the CEO.

109.    LaVelle joined in 2005, initially as the Chief Operating Officer, and was later promoted to President.  As President, LaVelle was in charge of all aspects of Arborwell's business, including overseeing the work of Arborwell's Regional Vice-Presidents, safety protocols, and setting growth strategy.  LaVelle was instrumental in recruiting new account managers, bidding for large, institutional clients and expanding Arborwell's business into new markets.  Following CI Quercus's acquisition of Arborwell, and before purchasing a competing commercial tree care business, LaVelle retained his prior responsibilities, including overseeing the expansion of Arborwell into new markets on the West Coast, recruiting salespersons and keeping them engaged and working together as a team.  He was additionally responsible for integrating Arborwell into SavATree.

110.    Dickinson and Yamaguchi joined Arborwell during its early growth years and had each been with the Company for more than thirteen years before they left to join Woolner and LaVelle at Arbor MD.

111.    Hagge joined in 2011 and worked under Dickinson in the Oakland and the East Bay regions.  He was a successful salesperson at Arborwell and managed the accounts of some of Arborwell's largest customers.

112.    At Arborwell, the Individual Defendants all worked together closely to cross-sell across their respective regions.  For example, Arborwell's biggest customers like Equity Residential have many properties throughout the Bay Area, so the Individual Defendants worked cooperatively to market Arborwell services to all Equity Residential properties.

### 5.  Individual Defendants' access and discretion

113.    Arborwell relied on the Individual Defendants to build and grow each of their regional businesses, with each of them effectively acting as CEOs for their region.  The Individual Defendants had little direct oversight, instead exercising broad discretion and autonomy in managing and growing their regional businesses.  Arborwell depended on them as Regional Vice-

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  94111-3598

Presidents and account managers to accurately and in good faith report and account for all of their customer contacts, revenues, and expenses.  Arborwell trusted them to appropriately and loyally serve Arborwell's interests.  Each of the Individual Defendants thus owed fiduciary duties to Arborwell.

### 6. Woolner and LaVelle's secret, improper preparations to steal Arborwell customers, employees, Trade Secrets and Confidential Information

114.    Arborwell is informed and believes that notwithstanding their Non-Compete, their duty of loyalty and their representations to the contrary, Woolner and LaVelle were improperly preparing to buy and establish a competing commercial tree care business in the Bay Area while they were still employed by Arborwell.  Woolner and LaVelle concealed this improper competition from Arborwell.  Arborwell is informed and believes that Woolner and Lavelle secured a running start for Arbor MD by piggybacking off of Arborwell's Trade Secrets and Confidential Information and soliciting Arborwell customers and employees, all while they were still employed with Arborwell.

### a. Woolner and LaVelle Purchase Arbor MD

115.    Arborwell is informed and believes that Woolner and LaVelle purchased part or all of Arbor MD while they were still employees of Arborwell.  Before Woolner and LaVelle's involvement, Arbor MD was a small competitor of Arborwell.  Arborwell is informed and believes that Arbor MD's primary customer was Apple's "Spaceship" campus, where Arbor MD provided GTC services for smaller trees and other small projects directly managed by Apple staff, while Arborwell managed the larger trees, PHC work and any other work that required a permit from the City of Cupertino at the Spaceship campus, as well as Apple's other properties.  Arborwell is informed and believes that Woolner and LaVelle purchased their interest in Arbor MD primarily because it was pre-qualified as an Apple vendor.  This allowed them to seamlessly transition Apple from Arborwell to Arbor MD, as further discussed below.

### b. Woolner solicits Arborwell customers for Arbor MD

116.    Arborwell is informed and believes that Woolner solicited Apple for Arbor MD before he quit.  On May 20, 2021, the morning after Woolner quit Arborwell, an Apple

representative emailed Woolner's Arborwell email account asking for Arbor MD's labor rates for various services that Arborwell had been providing Apple.  The email referenced a new contract between Apple and Arbor MD that Apple was drafting.  This email exchange strongly suggests that Woolner began his solicitation of Apple even before he resigned from Arborwell.

117.    Arborwell is also informed and believes that on that same day of May 20, 2021, Woolner met with the Board of Directors of Ticonderoga HOA, a home owners association for an apartment complex managed by Common Interest Management Services ("Common Interest"), a customer and referral source for Arborwell.  Woolner scheduled this meeting on May 12, 2021, before he quit Arborwell on May 19, 2021.  Woolner did not inform anyone at Arborwell of this meeting.  Arborwell only learned of this meeting after the fact, when a Common Interest employee inadvertently emailed an Arbor MD project schedule to Woolner's Arborwell email address.

118.    Soon after, on May 24, 2021, Nichole Dillon-Lee at Common Interest emailed Woolner's Arborwell email address in response to a bid Woolner submitted on behalf of Arborwell on April 30, 2021 for Latimer Square HOA, another property managed by Common Interest.  Common Interest's email asked for revisions to the bid and further requested that Woolner meet with one of its Board members.  Arborwell followed up with Common Interest regarding this bid, but Common Interest did not respond, probably because Woolner solicited the project for Arbor MD, not Arborwell.

119.    Common Interest was a regular, large client and referral source for Arborwell before Woolner resigned.  Since Woolner resigned, however, Common Interest has not requested any work from Arborwell.  Arborwell is informed and believes that Woolner secured this project for Arbor MD before he quit on May 19, 2021.

120.    Similarly, Arborwell is informed and believes that Woolner solicited Urban Embellishment and Design for Arbor MD while he was still employed by Arborwell, which was a business opportunity belonging to Arborwell.

121.    Arborwell is informed and believes that Defendants solicited other customers and engaged in other improper preparations to compete while they were still employed by Arborwell.

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

FIRST AMENDED COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

### c.     The Individual Defendants' coordinated exit from Arborwell

122.     On or about April 7, 2021, LaVelle resigned on short notice.  In his exit interview with Arborwell's CEO, LaVelle explained that he was leaving to spend more time with his family and travel.  He did not, however, state that he would continue to do tree care work on his own or for any other company.  To the contrary, when Arborwell's CEO specifically reminded LaVelle of his Non-Compete, LaVelle assured Arborwell's CEO that he understood and that he would abide by the Non-Compete.  Upon his departure, LaVelle also exercised a put option to sell his SavATree stock back to SavATree.

123.     Soon thereafter on May 19, 2021, Woolner abruptly resigned from Arborwell by email, which surprised Arborwell's management.  Woolner was a senior executive with a nearly twenty-year tenure at Arborwell.  Based on Woolner's multiple assurances before the 2020 Sale, Arborwell expected that Woolner would continue to work for Arborwell and contribute to its growth and success.  Although Arborwell immediately contacted Woolner to ask him why he had resigned, he did not respond to those inquiries.

124.     Following Woolner's resignation, Arborwell moved swiftly to terminate Woolner's access to Arborwell's Trade Secrets and Confidential Information, as well as his email and cellphone accounts.  Arborwell is informed and believes, however, that Woolner had by this point already misappropriated Arborwell's Trade Secrets and Confidential Information for the purpose of soliciting Arborwell customers.

125.     On May 21, 2021, Dickinson resigned in a similar fashion to Woolner, with no notice or warning.  He refused an exit interview, and he misrepresented to Arborwell HR that he was "figuring out" what he wanted to do and had no immediate plans.  Arborwell is informed and believes that Dickinson was already working for Arbor MD before he resigned from Arborwell.

126.     Shortly thereafter, on May 28, 2021, Yamaguchi resigned.  He, too, resigned without notice or warning and refused an exit interview.

127.     After Dickinson quit, Hagge, who worked under Dickinson for several years, assumed all of Dickinson's accounts in Oakland and the East Bay regions.  Hagge remained with

FIRST AMENDED COMPLAINT

Arborwell for only three more weeks, however, and resigned on June 21, 2021.  He, too, provided no notice or warning and refused an exit interview.

128.    Each of the Individual Defendants concealed their true intent to compete and actual competition with Arborwell, despite their fiduciary duty to disclose such competition.  Further, Arborwell is informed and believes that before departing Arborwell, the Individual Defendants each copied Arborwell's Trade Secrets and Confidential Information, including exporting such information from NetSuite and copying emails and documents from the server.

### 7.  Woolner and LaVelle solicit Dickinson, Yamaguchi and Hagge

129.    Arborwell is informed and believes that Woolner and LaVelle solicited Dickinson, Yamaguchi and Hagge to join Arbor MD before Woolner quit Arborwell, and that each of them began working at Arbor MD immediately or soon after they resigned from Arborwell.  Dickinson, Yamaguchi and Hagge were working for Arbor MD by no later than June 30, 2021.  Woolner and LaVelle's solicitation of these high level employees was part of their scheme to duplicate every aspect of Arborwell's business in the Bay Area and to ensure continuity to the customers they were soliciting from Arborwell, despite promising in writing, and orally, not to take such actions as part of their Non-Compete in exchange for more than $1 million as consideration for their shares.

### 8.  Hagge collects Arborwell's Trade Secrets and Confidential Information before leaving

130.    Beginning on or about April 2021, Hagge began to email himself links to Site Maps for various customers.  Arborwell uses a software known as ArborNote to create and store Site Maps.  Site Maps may be viewed through an internet browser using a secure address, which is kept confidential and only shared with the customer for whom the Site Map was created and any field staff who service the location.  By the time Hagge quit on or about June 21, 2021, he had emailed himself more than 150 Site Maps.  The pace at which he emailed himself Site Maps accelerated at around the time that Woolner quit Arborwell on or about May 20, 2021.  For example, between May 20, 2021 and June 21, 2021, when Hagge quit, Hagge emailed himself Site Maps for at least 100 customer locations, including 28 on the day before he quit.  The ArborNote software does not track who viewed, printed or downloaded a Site Map, so Arborwell does not currently know what

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  94111-3598

Hagge did with those 150 Site Maps.  However, Arborwell is informed and believes that Hagge copied some or all of those Site Maps and took them with him to Arbor MD, and that he continued to access the Site Maps and misappropriate information therefrom while working for Arbor MD.

131.   On June 20, 2021, Hagge emailed at least 30 documents relating to various Arborwell customers to his personal email account.   They included Site Maps and other confidential documents for the following customers and properties:

- The Veranda Shopping Center
- Cowell HOA
- Pinnacle - Summer House Apartments
- Rudgear Meadows HOA
- BioRad Pleasanton - 5731 W Las Positas
- Pinnacle Crow Canyon - Crow Canyon Place
- Pinnacle Crow Canyon - Crow Canyon Commons
- CBRE - Emeryville - 2100 Powell
- Plaza San Ramon
- Wood Hollow Corporate Center
- California Plaza
- Belvedere HOA
- Legacy Partners - Foster City - The Seasons Apartments
- Homeowners Management Company, LLC - Reliez Valley Highlands
- Donahue Schriber Realty Group - Lone Tree Plaza
- Walnut Creek Center - 100 Pringle Ave
- Community Association Management - Oak Hollow II
- Community Association Management - Capriana HOA
- Community Association Management  - Kildara HOA
- Community Association Management - Antelope Hills
- Community Association Management - Portola Glen HOA
- Cranbrook Group, Inc. - Crossroads Common Area
- Cranbrook Group, Inc. - Breakwater Business Park
- Cranbrook Group, Inc. - Airport Corporate Centre
- Murieta HOA
- Canyon Green HOA
- AvalonBay Communities, Inc. - Eaves San Jose
- The Preserve
- Greenbrook Homes
- Avalon HOA - Fremont

132.   On June 21, 2021, the day Hagge left Arborwell, he emailed Jeff Gaber an estimate for work at his property.  There is no evidence that Arborwell completed work for this client and there are no further transactions with this client after the June 21, 2021 estimate was issued. Arborwell is informed and believes that Hagge converted this sale to Arbor MD.

133.   That same day, Hagge also emailed Arborwell customer service the contact information for Sheryl Martinovich and an estimate for work at her property.  Hagge instructed

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  94111-3598

Case No.
4:23-cv-02770-HSG

FIRST AMENDED COMPLAINT

customer service to enter Sheryl Martinovich and the estimate into the NetSuite system as a new client.  This estimate is the only entry for this client in the NetSuite system, and Arborwell did not end up completing the work for this customer.  Arborwell is informed and believes that Hagge converted this sale to Arbor MD.

### 9.  Defendants' solicitation of Arborwell customers

134.  Defendants' misappropriation of Arborwell's Trade Secrets and Confidential Information and Woolner and LaVelle's violation of their Non-Complete continued after their resignations.

135.  On May 20, 2021, the day after Woolner quit Arborwell but the day before Dickinson quit, Equity Residential, a large operator of apartment complexes in the Bay Area terminated all Arborwell services on 30-day notice across its 45 properties, after having been a loyal Arborwell customer for more than seven years.  Equity Residential gave no reason for the termination.

136.  Equity Residential was a growing customer for Arborwell, and Arborwell had invested heavily in developing that relationship.  In 2020, Equity Residential was Dickinson's third biggest client and one of Arborwell's top fifteen clients.

137.  On or about July 6, 2021, Arborwell learned that Equity Residential had retained Arbor MD from an email inadvertently sent to Dickinson's old Arborwell email address. Arborwell is informed and believes that Woolner and Dickinson began soliciting Equity Residential's business for Arbor MD before either of them resigned.  The timing of its termination and quick transition to Arbor MD shows that Defendants solicited Equity Residential before Dickinson resigned, as Arborwell had work it was ready to perform for Equity Residential. Arborwell is further informed and believes that Defendants misappropriated Arborwell's Trade Secrets and Confidential Information so that Arbor MD could assure Equity Residential that it would provide the same services at the same or better pricing as Arborwell.  Arborwell is informed and believes that the Individual Defendants could not have promised to do so without using Arborwell's Confidential Information, such as its knowledge of Equity Residential's client contacts across multiple properties, past GTC work and pricing.

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

138.    Arborwell is also informed and believes that within two weeks of quitting Arborwell, Woolner met with representatives from Apple, one of Arborwell's largest customers, and used Arborwell's Trade Secrets and Confidential Information to complete his solicitation of Apple's entire account, a process he had begun before he quit Arborwell.  Arborwell did not learn about this meeting until two weeks later on June 17, 2021, when an Apple employee inadvertently forwarded the minutes from Arbor MD and Woolner's meetings with Apple on June 1 and June 15, 2021 to Woolner's old Arborwell email address.  The minutes from the June 1, 2021 meeting state that "**Neil [Woolner] is new owner, nothing else changes**," that "Neil [Woolner] is to provide a new Arbor MD email address" and that Woolner has "9 tree care workers currently on staff and … is hiring more."  The minutes from a later June 15 meeting confirm that Woolner had agreed to provide "all of Arborwell's previous services (spraying, fertilizing, all tree pruning, removals, stump grinding)," for less than what Arborwell would have charged Apple for 2021/2022 renewal, causing Arborwell to lose more than half a million dollars of expected revenue over the next two years.

139.    Arborwell serviced Apple across multiple properties under a "Master Services Agreement," which was negotiated and renewed on an annual basis, as well as additional ad hoc services.  Arborwell is informed and believes that Defendants used Arborwell's Trade Secrets and Confidential Information—including but not limited to Woolner's knowledge of the services provided to Apple, and the Site Map, PHC Plan, GTC Information, Customer Information and Pricing Information for Apple—to underbid Arborwell.  Apple subsequently cancelled the majority of its remaining contract with Arborwell for 2021 and did not renew for 2022.

140.    Defendants also solicited Sofi, another major Arborwell client, using Arborwell's Trade Secrets and Confidential Information.  Dickinson managed this account for Arborwell before he quit, and he had access to and misappropriated Arborwell's Trade Secrets and Confidential Information concerning Sofi in order to solicit their business for Arbor MD.  On or around March 2, 2021, Dickinson instructed Arborwell mapping and estimate specialists, Leonardo Tuchman and Nicholas Griswold ("Griswold"), to prepare three-year GTC Plans— including tree care plans, estimates, and site maps—for each of Sofi's apartment buildings (the

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

"Sofi Three-Year Plans"). Sofi has apartment buildings at nine locations—Los Gatos Creek, Belmont Hills Creek, Berryessa, Riverview, Union City, Redwood Park, Sunnyvale, Dublin and Fremont—and Arborwell employees created three-year plans for each of those locations. The Sofi Three-Year Plans are part of Arborwell's Trade Secrets and Confidential Information.

141. On May 10, 2021, about a week and a half before Dickinson left Arborwell, a Sofi property manager emailed Dickinson thanking him for completing a walk-through of the property with her and asking him when Arborwell could complete the GTC work. On May 13, 2021, Griswold emailed Dickinson revised Sofi Three-Year Plans which Dickinson had instructed Tuchman and Griswold to update.

142. The day before Dickinson left Arborwell, he emailed the Sofi Three-Year Plans to himself at his personal email account "mdickinson331@gmail.com." Shortly after Dickinson left Arborwell on May 21, 2021, Sofi stopped using Arborwell. With the exception of an emergency tree removal a few days after Defendants quit Arborwell, Sofi has not retained Arborwell for any new services. The evidence shows that Defendants solicited this account, and they did so using the Sofi Three-Year Plans and other Arborwell Trade Secrets and Confidential Information concerning Sofi. The loss of this account has had a significant impact on Arborwell.

143. The Individual Defendants also solicited work from CBRE, one of Arborwell's largest and longstanding customers. On May 27, 2021, one day before leaving Arborwell, Yamaguchi emailed CBRE regarding follow-up PHC work at CBRE's corporate center in Mountain View, California, which followed a significant amount of GTC work Arborwell performed a few months prior. CBRE scheduled Arborwell to perform this follow-up work in June 2021. Arborwell, however, did not ultimately perform this work. Arborwell is informed and believes that the Individual Defendants solicited this work, and additional work, at numerous CBRE properties for Arbor MD. The Individual Defendants could not have solicited this work without misappropriating Arborwell's Trade Secrets and Confidential Information, because they would not have known what prior work had been done and what follow-up work was necessary.

144. For example, on June 15, 2021 a CBRE employee requested access to a spreadsheet stored on Woolner's personal Google Drive named "CBRE Tree Manifest." This request

generated a notification email to Woolner's Arborwell email account.  Arborwell prepared this manifest and it contains an inventory of CBRE, including its Mountain View property's trees and other information found in Arborwell's Site Map for CBRE.  Arborwell does not permit its employees to store such Trade Secrets and Confidential Information in personal Google Drive accounts.

145.   The Individual Defendants also solicited work from Greystar that Arborwell was already scheduled to perform.  On May 20, 2021, the day before Dickinson left Arborwell, he exchanged emails with Greystar - Los Gatos / Avana - San Jose to schedule a tree removal for May 27, 2021.  Arborwell, however, never completed this work and Greystar has not requested any additional work from Arborwell for any of the multiple properties it manages.

146.   Arborwell is informed and believes that the Individual Defendants have solicited other recurring customers through their improper use of misappropriated Arborwell's Trade Secrets and Confidential Information.  Arborwell has hundreds of customers in the regions that the Individual Defendants previously managed at Arborwell and are now competing in via Arbor MD, and the Individual Defendants knew the identity of these customers, their prior business history, Customer Information and Pricing Information.  Many customers do not have "evergreen" contracts with Arborwell and instead enter into a contract each time they need service, but these businesses are nonetheless recurring customers who use Arborwell services on a regular basis.  As such, the full extent of the Individual Defendants' solicitation of Arborwell customers will not be known for some time.

### 10. Woolner and LaVelle's solicitation of Arborwell employees

147.   In addition to high-level employees Dickinson, Yamaguchi and Hagge, Arborwell is informed and believes that Woolner and LaVelle also solicited several other lower-level employees from Arborwell, including salespersons, account managers, administrative team members, consultants and field employees, several of whom unexpectedly quit at the same time as, or soon after, Woolner, and whom now work for Arbor MD.

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  94111-3598

**11. Arborwell's cease and desist demand**

148.    On May 21, 2021, Arborwell sent a letter to Woolner asking him to cease and desist his activities in violation of the Non-Compete, attached hereto as **Exhibit K.**  Woolner refused to do so.  At the time it sent the demand letter, Arborwell was unaware of the extent of Woolner's illegal competition, including on information and belief, his purchase of Arborwell's competitor, Arbor MD, LaVelle's involvement, their solicitation of major Arborwell customers, and their solicitation of key Arborwell employees such as Dickinson, Yamaguchi, Hagge and others. Arborwell has learned most of these facts after sending the May 21 Letter.  Arborwell only learned of LaVelle's involvement on or about July 12, 2021, when one of its account managers visited a customer who told him that LaVelle had recently visited the customer's job site to do work on behalf of Arbor MD under LaVelle's contractor's license.  (Tree care work in California requires a current contractor's license, and on information and belief, LaVelle is the only one of the Individual Defendants who holds a valid contractor's license.)

**12. Defendants destroy evidence of their acquisition and use of Arborwell's Trade Secrets and Confidential Information and of their solicitation of Arborwell's clients and employees**

149.    The Individual Defendants have also destroyed evidence that, on information and belief, would have shown that they copied Arborwell's Trade Secrets and Confidential Information in writing prior to resigning.  The Individual Defendants were issued and used company smartphones and laptops when they were employed by Arborwell, and they knew or should have known that they had to return those devices, and any data on them, to Arborwell when they resigned.  Arborwell engaged FTI Consulting to conduct a forensic examination of the Individual Defendants' company-issued devices, which has confirmed that the Individual Defendants intentionally erased content despite the fact that they knew or should have known that there would be litigation arising out of their coordinated departure to start a competing tree care business, Arbor MD.

150.    Defendants Woolner, Dickinson, Hagge and Yamaguchi each reset their smartphones to factory configurations before returning them to Arborwell, thereby deleting all data, including all text messages, call histories, documents and voicemails from the devices.

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

- 47 -

Resetting an iPhone securely erases all user data on the phones, rendering it non-recoverable even when using forensic data recovery tools.  It is unlikely that the Individual Defendants each accidentally engaged in this reset and deletion process because it requires multiple affirmative actions.  Defendants Dickinson, Hagge, and Yamaguchi erased their phones after Defendants LaVelle and Woolner had purchased Arbor MD and began competing with Arborwell, and after Arborwell had put Woolner on notice that he should not violate his non-compete with Arborwell or misappropriate Arborwell's Trade Secrets and Confidential Information.

151.     As a result of the Individual Defendants' intentional destruction of evidence, Arborwell has no way to access the pre-departure text messages, call histories, and voicemails among the Individual Defendants, and between them and Arborwell customers.  Arborwell is informed and believes that the Individual Defendants' personal iCloud accounts could still have their text messages and possibly other files and documents, which it will obtain through discovery.  With respect to emails, although Arborwell's email server retained a copy of some of the emails sent or received from the Individual Defendants' smartphones, it did not retain copies of any emails that were deleted before they left Arborwell.  The Individual Defendants' smartphones, however, may have retained a recoverable, local copy of the deleted email.

152.     The Individual Defendants should have reasonably anticipated that their smartphone data would be relevant to litigation.  Woolner and LaVelle were not only aware of their Non-Compete obligations in the SPA, but they also explicitly discussed and debated its effect between each other, well before they executed the SPA.  When LaVelle resigned from Arborwell in April 2021, he represented, falsely, to several Arborwell employees that he was not leaving Arborwell to start a competing tree-care business.  Arborwell reminded him of his Non-Compete, which he verbally acknowledged.  However, LaVelle and Woolner have now admitted that they began looking for competing companies to purchase around that time, and they have not denied that they reached an agreement in principle to purchase Arbor MD before Woolner resigned on May 19, 2021.  They then immediately began soliciting Arborwell's customers, including Apple and several other of Arborwell's largest customers.  Under these circumstances, a reasonable

FIRST AMENDED COMPLAINT

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

person would have anticipated potential litigation and preserved all potentially relevant information.

153.     Moreover, as outlined herein, on May 21, 2021, two days after Woolner resigned, Arborwell sent a formal letter, through counsel reminding Woolner of his Non-Compete, demanding that he return Arborwell documents and demanding that he preserve documents potentially relevant to a lawsuit by Arborwell to enforce the SPA and for misappropriation of its Confidential Information.   At this point, Defendants indisputably should have anticipated litigation.  Notwithstanding the May 21 letter, Dickinson, who resigned on the same day, and Yamaguchi and Hagge, who each resigned several days after the letter, thereafter performed the exact same procedure that Woolner did to securely erase their smartphone data.

154.     In addition, the Individual Defendants also erased from their company email accounts numerous email exchanges with existing customers regarding future work and potential customers, which are a part of Arborwell's compilation of confidential Customer Information.  The Individual Defendants' laptops contained copies of these emails, which were deleted by the Individual Defendants from Arborwell's email server.   Arborwell has not yet been able to determine the date that each such email was deleted; however, Arborwell is informed and believes that the Individual Defendants deleted many of these emails shortly before leaving Arborwell and that they subsequently solicited those customers and work for Arbor MD.

155.     The Individual Defendants also erased Customer Information from Arborwell's central document repository (Office 365) just before they left Arborwell.  Audit logs for the repository show that Woolner, Hagge and Yamaguchi each permanently deleted documents from the repository.  Although Arborwell's investigation is ongoing, it has already identified nearly 500 such deletions.  Arborwell has not been able to recover those documents and does not know if the Individual Defendants retained copies of those documents.

156.     All of this evidence is important to Arborwell's case because emails, text messages and phone calls are the primary means by which account managers like the Individual Defendants communicated with each other, Arborwell employees, and customers.   By erasing their smartphones, emails and documents from Arborwell's central document repository, the Individual

- 49 -

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

Defendants have destroyed evidence that they misappropriated Arborwell's Trade Secrets and Confidential Information.  As outlined herein, Plaintiffs have already found evidence that the Individual Defendants forwarded confidential customer information to their personal email accounts just prior to resigning from Arborwell (such as historical invoices for numerous customers that detail the services performed and prices charged by Arborwell).  The evidence in those few existing emails, and their spoliation of evidence, support a strong inference that it is highly likely that all of the Individual Defendants emailed themselves Arborwell's Trade Secrets and Confidential Information prior to leaving.

157.    The Individual Defendants' destruction of Arborwell's Trade Secrets and Confidential Information is a further breach of their employment agreements, which require the Individual Defendants to hold Confidential Information in trust and to only use that information for the benefit of Arborwell.

158.    Defendants' spoliation of evidence was intentional, as demonstrated by their misappropriation of Arborwell's Trade Secrets and Confidential Information, undisputed violation of their Non-Compete agreements, and undisputed solicitation of Arborwell customers.

**V.     CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**
**Breach of Fiduciary Duties Under ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1),**
**By Arborwell and SavATree against the Sortwell Defendants and Defendants Alerus,**
**Woolner and Lavelle**

159.    Plaintiffs incorporate the preceding paragraphs as though fully set forth herein.

160.    ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), requires that a fiduciary discharge his or her duties with respect to plan solely in the interest of the participants and beneficiaries, (a) for the exclusive purpose of providing benefits to participants and the beneficiaries of the plan, (b) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

161.    The Sortwells, LaVelle and Woolner, who were named fiduciaries or acting in a fiduciary capacity, breached their fiduciary duties by orchestrating the ESOP's 2020 Sale of

Arborwell, Inc. Stock to unjustly enrich themselves at the expense of the ESOP and its participants, including through the receipt of nearly $14 million in accelerated payments and the other personal benefits described herein.

162.     The Sortwells, LaVelle and Woolner further breached their fiduciary duties by agreeing in the SPA that they would not compete with Arborwell in order to obtain extensive personal benefits, even though they never intended to fulfill their contractual obligations in the SPA once those personal benefits had been paid.

163.     The Sortwells, LaVelle and Woolner are thus liable for losses caused to the Plan, its participants and the participants in the successor 401k Plan under ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), and subject to other appropriate equitable relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), including but not limited to disgorgement of their unlawful gains.

164.     To fulfill its fiduciary duties, Alerus was required to undertake an appropriate and independent investigation of the 2020 Sale and determine whether it was in the best interests of the ESOP and its participants and whether the ESOP received adequate consideration for 100% of Arborwell, Inc. stock.  Defendant Alerus was also required to ensure that the 2020 Sale would not be used by the Sortwells, LaVelle and Woolner to unjustly enrich themselves at the expense of the ESOP and its participants.

165.     An appropriate investigation would have revealed that the 2020 Sale was not in the ESOP's best interest and that the 2020 Sale was instead specifically designed to personally and unjustly enrich the Sortwells, LaVelle and Woolner at the expense of the ESOP and its participants, as well as  those participants who chose to roll over their interests into the ESOP's successor plan - the 401k Plan.  For example, the  Sortwells, LaVelle and Woolner, in conjunction with Alerus, treated ESOP participant accounts as 85% vested rather than 100% vested, which reduced the amount of the sale proceeds that went to the ESOP and increased the amount available to benefit the Sortwells, LaVelle and Woolner, and fund their various unjust personal benefits from the 2020 Sale. This also meant that any Plan participants who chose to roll over their interests into SavATree's 401k Plan had a lesser amount to roll over.

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

166.    By breaching the SPA and the Non-Compete, LaVelle and Woolner have also breached their ERISA fiduciary duties, including but not limited to  by potentially harming the ESOP participants who rolled over their interests into the 401k Plan.

167.    By allowing the Sortwells, LaVelle and Woolner to use the ESOP's 2020 Sale of Arborwell, Inc. stock to unjustly enrich themselves at the expense of the ESOP and its participants, Alerus breached its fiduciary duties, and knowingly participated in the fiduciary breaches of the Sortwells, LaVelle and Woolner.  Alerus then further breached its fiduciary duties by failing to take necessary action to remedy the Sortwells, LaVelle and Woolner's fiduciary breach and to enforce the SPA.

168.    Alerus is thus liable for losses caused to the Plan under ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), and subject to other appropriate equitable relief for knowingly participating in the Sortwells, LaVelle and Woolner's ERISA violations under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), including but not limited to disgorgement of their unlawful gains.

WHEREFORE, Plaintiffs pray for relief as set forth below.

### SECOND CAUSE OF ACTION
**Engaging in Transactions Prohibited by ERISA § 406(a), 29 U.S.C. § 1106(a),**
**By Arborwell and SavATree against the Sortwell Defendants and Defendants Alerus,**
**Woolner and Lavelle**

169.    Plaintiffs incorporate the preceding paragraphs as though fully set forth herein.

170.    ERISA § 406(a)(1), 29 U.S.C. § 1106(a)(1), requires that a plan fiduciary "shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect (A) sale or exchange, or leasing of any property between the plan and a party in interest," or a "(D) transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan."

171.    ERISA § 3(14), 29 U.S.C. § 1002(14) defines a "party in interest" to include (A) any fiduciary … of such employee benefit plan", (E) a relative—which includes a spouse, ancestor, lineal descendant or the spouse of a lineal descendant—of a fiduciary, (G) a trust of or in which 50 percent or more the beneficial interest of such trust is held by a fiduciary of such plan, and (H)

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  94111-3598

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

an employee, officer or director or a 10 percent or more shareholder of an employer covered by the Plan.

172.   At least as a result of being fiduciaries of the ESOP, and as a result of being officers and/or directors of Arborwell, Inc., the Sortwells qualified as a party in interest within the meaning of ERISA § 3(14), 29 U.S.C. § 1002(14).

173.   At least as a result of being a fiduciary of the ESOP, and as a result of being an officer and director of Arborwell, Inc., LaVelle qualified as a party in interest within the meaning of ERISA § 3(14), 29 U.S.C. § 1002(14).

174.   At least as a result of being a fiduciary of the ESOP, and as a result of being an officer and employee of Arborwell, Inc., Woolner qualified as a party in interest within the meaning of ERISA § 3(14), 29 U.S.C. § 1002(14).

175.   In violation of ERISA § 406(a)(1), 29 U.S.C. § 1106(a)(1), the Sortwell Defendants and Defendants Alerus, Woolner and Lavelle caused the ESOP to engage in the 2020 Sale, during which the Sortwells, LaVelle and Woolner as parties in interest received ESOP assets and personally enriched themselves at the expense of the ESOP and its participants.

176.   Alerus (itself a party in interest), the Sortwells, LaVelle and Woolner were also aware of facts sufficient to establish that the 2020 Sale constitute a prohibited transaction with parties in interest, and knowingly participated in the prohibited transaction.

177.   Defendants are liable for losses caused to the Plan, its participants, and participants of the successor 401k Plan under ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), and subject to other appropriate equitable relief for knowingly participating in the prohibited transactions under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), including but not limited to disgorgement of their unlawful gains.

WHEREFORE, Plaintiffs pray for relief as set forth below.

### THIRD CAUSE OF ACTION
**Engaging in Transactions Prohibited by ERISA § 406(b), 29 U.S.C. § 1106(b),
By Arborwell and SavATree against the Sortwell Defendants and Defendants Alerus,
Woolner and Lavelle**

178.   Plaintiffs incorporate the preceding paragraphs as though fully set forth herein.

- 53 -

179.    ERISA § 406(b), 29 U.S.C. § 1106(b), mandates that a plan fiduciary shall not:  (1) "act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants," or (2) "deal with the assets of the plan in his own interest or for his own account," or (3) "receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan."

180.    As set forth herein, the Sortwells, LaVelle and Woolner were fiduciaries of the ESOP both prior to and at the time of the 2020 Sale.

181.    As set forth herein, the Sortwells, LaVelle and Woolner received extensive personal benefits and consideration in connection with the ESOP's 2020 Sale of Arborwell, Inc. stock.

182.    By orchestrating the ESOP's 2020 Sale of Arborwell, Inc. stock, the Sortwells, LaVelle and Woolner acted in a transaction involving a plan where their own interests were adverse to the those of the ESOP with this meaning of ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1).

183.    By orchestrating the ESOP's 2020 Sale of 100% of Arborwell, Inc.'s stock, the Sortwells, LaVelle and Woolner dealt with assets of the Plan, namely, the ESOP's stock in Arborwell, Inc. and Arborwell, Inc.'s goodwill, in their own interests, within the meaning of ERISA § 406(b)(2), 29 U.S.C. § 1106(b)(2).

184.    In connection with the ESOP's 2020 Sale of 100% of Arborwell, Inc.'s stock, the Sortwells, LaVelle and Woolner received consideration for their own personal accounts in connection with a transaction involving assets of a plan within the meaning of ERISA § 406(b)(3).

185.    The Sortwells, LaVelle and Woolner used the 2020 Sale to personally enrich themselves at the expense of Plaintiffs, the ESOP, and the ESOP's participants.

186.    Having personally orchestrated the 2020 Sale, the Sortwells, LaVelle and Woolner were aware of facts sufficient to establish that the 2020 Sale constituted a prohibited transaction with plan fiduciaries, and knowingly participated in each other's prohibited transactions.

187.    As the ESOP's Trustee and a fiduciary, as well as a party-in-interest, Alerus was aware of facts sufficient to establish that the 2020 Sale constituted a prohibited transaction with

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  94111-3598

plan fiduciaries, and knowingly participated in the Sortwells, LaVelle and Woolner's prohibited transactions.

188.    Defendants are liable for losses caused to the Plan, its participants and participants of the successor 401k Plan under ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), and subject to other appropriate equitable relief for knowingly participating in the prohibited transactions under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), including but not limited to disgorgement of their unlawful gains.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## FOURTH CAUSE OF ACTION
### Injunctive and Other Equitable Relief Under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), By Arborwell and SavATree against Defendants LaVelle and Woolner

189.    Plaintiffs incorporate the preceding paragraphs as though fully set forth herein.

190.    Under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), a civil action may be brought "by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan."

191.    LaVelle and Woolner have violated and continue to violate ERISA, the terms of the Plan, their fiduciary duties to the Plan, the SPA, and the SPA's Non-Compete provision.

192.    In direct violation of the SPA, LaVelle and Woolner have breached their Non-Compete obligations and have solicited key Arborwell employees and high-value clients.

193.    LaVelle and Woolner's wrongful conduct has caused Plaintiffs to suffer continuing injury for which there is no other adequate remedy at law.

194.    Plaintiffs thus seek appropriate equitable relief, including an injunction, under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), including but not limited to disgorgement of their unlawful gains.

WHEREFORE, Plaintiffs pray for relief as set forth below.

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

## FIFTH CAUSE OF ACTION
### Breach of Contract for Damages as to the SPA,
### By CI Quercus against Defendants LaVelle and Woolner

195.    Plaintiffs incorporate the preceding paragraphs as though fully set forth herein.

196.    Defendants LaVelle and Woolner each entered into the SPA.

197.    Through the acts and omissions alleged herein, Defendants LaVelle and Woolner breached the Non-Compete in the SPA.

198.    CI Quercus performed all of its covenants, conditions and obligations under the SPA, except those that have been excused.

199.    As a direct and proximate result of LaVelle and Woolner's breaches, CI Quercus has suffered damages in an amount according to proof.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## SIXTH CAUSE OF ACTION
### Breach of Contract for Specific Performance as to the SPA,
### By CI Quercus against Defendants LaVelle and Woolner

200.    Plaintiffs incorporate the preceding paragraphs as though fully set forth herein.

201.    Defendants LaVelle and Woolner each entered into the SPA, which contains the Non-Compete.  The Non-Compete is sufficiently definite and certain in its terms to be enforced and is just and reasonable.

202.    Through the acts and omissions alleged herein LaVelle and Woolner breached the Non-Compete.

203.    CI Quercus performed all of its covenants, conditions and obligations under the SPA, except those that have been excused.

204.    CI Quercus has no adequate remedy at law.

205.    CI Quercus is entitled to and seeks specific performance of the Non-Compete.

WHEREFORE, Plaintiffs seek relief as set forth below.

## SEVENTH CAUSE OF ACTION
### Declaratory Relief as to the SPA,
### By CI Quercus aDefendants LaVelle and Woolner

206.    Plaintiffs incorporate the preceding paragraphs as though fully set forth herein.

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  94111-3598

Case No.
4:23-cv-2770-HSG                        FIRST AMENDED COMPLAINT

207.     There presently exists a real and actual controversy between Plaintiffs and Defendants LaVelle and Woolner regarding whether the Non-Compete is enforceable.

208.     Plaintiffs maintain that the Non-Compete is enforceable, whereas Defendants LaVelle and Woolner maintain that the Non-Compete is unenforceable.

209.     Accordingly, a judicial declaration is necessary so that the parties can determine their respective rights and obligations going forward, including but not limited to their rights and obligations under the parties' agreement alleged herein.

WHEREFORE, Plaintiffs seek relief as set forth below.

**EIGHTH CAUSE OF ACTION**
**Express Contractual Indemnity,**
**By Arborwell against Defendant Alerus**

210.     Plaintiffs incorporate the preceding paragraphs as though fully set forth herein.

211.     Pursuant to its Independent Trustee Engagement Agreement, a true and correct copy of which is attached hereto as **Exhibit L** and incorporated herein by reference Alerus is required to:

> indemnify, defend and hold the Company Indemnitees harmless from and against and shall reimburse the Company Indemnitees for all Losses that are found, in a Final Judgment, or acknowledged by Alerus to have arisen from the negligence, willful misconduct, or a Breach of Fiduciary Duty by Alerus.

Ex. L, § H(2)(b).

212.     The herein-alleged conduct by Alerus constitutes negligence, willful misconduct, and/or breach of fiduciary duty by Alerus within the meaning of the foregoing provision of the Independent Trustee Engagement Agreement.  Further, Arborwell has suffered, and will continue to suffer, "Losses" within the meaning of the foregoing contractual provision, including without limitation attorneys' fees and expenses in connection with the initiation and prosecution of this action.

213.     Accordingly, Arborwell is entitled to indemnification by Alerus in an amount according to proof.

WHEREFORE, Plaintiffs pray for relief as follows.

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

**NINTH CAUSE OF ACTION**
**Misappropriation of Trade Secrets Under Defend Trade Secrets Act**
**Against the Individual Defendants and Defendant Arbor MD**

214.     Plaintiffs incorporate the preceding paragraphs as though fully set forth herein.

215.     Arborwell owns its Trade Secrets, which are "trade secrets" as defined by the DTSA, 18 U.S.C. § 1839(3).

216.     Arborwell's confidential and proprietary information derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from their disclosure or use as set forth in the DTSA, 18 U.S.C. § 1839(3)(B).

217.     Arborwell's confidential and proprietary information is the subject of efforts that are reasonable under the circumstances to maintain their secrecy as set forth in the DTSA, 18 U.S.C. § 1839(3)(A).

218.     Arborwell did not consent to the use of any of its Trade Secrets by anyone other than authorized employees in furtherance of their employment by Arborwell.

219.     The Individual Defendants and Arbor MD willfully and intentionally misappropriated Arborwell's Trade Secrets as set forth herein, including but not limited to, on information and belief, copying Arborwell's Trade Secrets and using them for Arbor MD to solicit Arborwell's customers.   Arborwell's Trade Secrets are documented in writing.   Arborwell is informed and believes that the Individual Defendants and Arbor MD misappropriated Arborwell's Trade Secrets in print or electronically.

220.     The Individual Defendants and Arbor MD knew or should have known that the information they misappropriated were Trade Secrets and that Arborwell did not consent to the use of any of its Trade Secrets by them other than in furtherance of their employment by Arborwell, including but not limited to because of the confidentiality and non-disclosure agreements signed by each of the Individual Defendants, Arborwell's Employee Handbook, the protections and policies implemented by Arborwell to maintain the secrecy of its Trade Secrets and their fiduciary duties of loyalty.

FIRST AMENDED COMPLAINT

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

221.   As a direct and proximate result of the Individual Defendants and Arbor MD's conduct, Arborwell is threatened with injury and has been injured in an amount in excess of the jurisdictional minimum of this Court and according to proof.  Arborwell has also incurred, and will continue to incur, additional damages, costs and expenses, including attorney's fees, as a result of Defendants' misappropriation.  As a further direct and proximate result of the misappropriation and use of Arborwell's Trade Secrets, the Individual Defendants and Arbor MD were unjustly enriched.  Arborwell is therefore entitled to an award of damages under the DTSA, 18 U.S.C. § 1836(b)(3)(B).

222.   The aforementioned acts of the Individual Defendants and Arbor MD were willful, malicious and fraudulent.  Arborwell is therefore entitled to exemplary damages under the DTSA, 18 U.S.C. § 1836(b)(3)(C).

223.   The Individual Defendants and Arbor MD's conduct constitutes transgressions of a continuing nature for which Arborwell has no adequate remedy at law.  Unless and until enjoined and restrained by order of this Court, the Individual Defendants and Arbor MD will continue to retain and use Arborwell's Trade Secrets to unjustly enrich themselves and divert business from Arborwell.  Pursuant to the DTSA, 18 U.S.C. § 1836(b)(3)(A), Arborwell is entitled to an injunction against the misappropriation and continued threatened misappropriation of its Trade Secrets as alleged herein and further asks the Court to restrain the Individual Defendants and Arbor MD from using all Trade Secrets misappropriated from Arborwell and to return all Trade Secrets to Arborwell.

224.   Arborwell also requests that the Court take affirmative acts to protect Arborwell's Trade Secrets, as authorized by the DTSA, 18 U.S.C. § 1836(b)(2), including ordering an inspection of the Individual Defendants and Arbor MD's computer(s), USB drives, email accounts, cloud storage accounts and other sources and equipment by a forensics expert to determine whether Arborwell's Trade Secrets were wrongfully taken and/or disseminated to others, and to ensure that no Arborwell Trade Secrets remain saved on those systems.

225.    Pursuant to the DTSA, 18 U.S.C. § 1836 and related law, Arborwell is entitled to an award of attorneys' fees for the Individual Defendants and Arbor MD's misappropriation of Arborwell Trade Secrets.

WHEREFORE, Plaintiffs pray for relief as follows.

**TENTH CAUSE OF ACTION**
**Misappropriation of Trade Secrets Under the California Uniform Trade Secrets Act**
**Against the Individual Defendants and Defendant Arbor MD**

226.    Plaintiffs incorporate the preceding paragraphs as though fully set forth herein.

227.    Arborwell owns its Trade Secrets, which are "trade secrets" as defined by the CUTSA, California Civil Code section 3426.1(d).

228.    Arborwell's CUTSA claims, are expressly not preempted by the DTSA, 18 U.S.C. § 1838.

229.    Arborwell's confidential and proprietary information derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from their disclosure or use as set forth in California Civil Code section 3426.1(d)(1).

230.    Arborwell's confidential and proprietary information is the subject of efforts that are reasonable under the circumstances to maintain their secrecy as set forth in California Civil Code section 3426.1(d)(2).

231.    Arborwell did not consent to the use of any of its Trade Secrets by anyone other than authorized employees in furtherance of their employment by Arborwell.

232.    The Individual Defendants and Arbor MD willfully and intentionally misappropriated Arborwell's Trade Secrets as set forth herein, including but not limited to, on information and belief, copying Arborwell's Trade Secrets and using them for Arbor MD to solicit Arborwell's customers. Arborwell's Trade Secrets are documented in writing.  Arborwell is informed and believes that the Individual Defendants misappropriated Arborwell's Trade Secrets in print or electronically.

233.    The Individual Defendants and Arbor MD knew or should have known that the information they misappropriated were Trade Secrets and that Arborwell did not consent to the

- 60 -

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

use of any of its Trade Secrets by them other than in furtherance of their employment by Arborwell, including but not limited to because of the confidentiality and non-disclosure agreements signed by each of the Individual Defendants, Arborwell's Employee Handbook, the protections and policies implemented by Arborwell to maintain the secrecy of its Trade Secrets and their fiduciary duties of loyalty.

234.    As a direct and proximate result of the Individual Defendants and Arbor MD's conduct, Arborwell is threatened with injury and has been injured in an amount in excess of the jurisdictional minimum of this Court and according to proof.  Arborwell has also incurred, and will continue to incur, additional damages, costs and expenses, including attorney's fees, as a result of the Individual Defendants and Arbor MD's misappropriation.  As a further direct and proximate result of the misappropriation and use of Arborwell's Trade Secrets, the Individual Defendants and Arbor MD were unjustly enriched.

235.    The aforementioned acts of the Individual Defendants and Arbor MD were willful, malicious and fraudulent.  Arborwell is therefore entitled to exemplary damages under California Civil Code section 3426.3(c).

236.    The Individual Defendants and Arbor MD's conduct constitutes transgressions of a continuing nature for which Arborwell has no adequate remedy at law.  Unless and until enjoined and restrained by order of this Court, the Individual Defendants and Arbor MD will continue to retain and use Arborwell's Trade Secrets to unjustly enrich themselves and divert business from Arborwell.  Pursuant to California Civil Code section 3426.2, Arborwell is entitled to an injunction against the misappropriation and continued threatened misappropriation of its Trade Secrets as alleged herein and further asks the Court to restrain the Individual Defendants and Arbor MD from using all Trade Secrets misappropriated from Arborwell and to return all Trade Secrets to Arborwell.

237.    Arborwell also requests that the Court take affirmative acts to protect Arborwell's Trade Secrets, as set forth in California Civil Code section 3426.2(c), including ordering an inspection of the the Individual Defendants and Arbor MD's computers, USB drives, email accounts, cloud storage accounts and other sources and equipment by a forensics expert to

determine whether Arborwell's Trade Secrets were wrongfully taken and/or disseminated to others, and to ensure that no Arborwell Trade Secrets remain saved on those systems.

238.    Pursuant to California Civil Code section 3426.4 and related law, Arborwell is entitled to an award of attorneys' fees for the Individual Defendants and Arbor MD's misappropriation of Arborwell Trade Secrets.

WHEREFORE, Plaintiffs pray for relief as follows.

**ELEVENTH CAUSE OF ACTION**
**Breach of Contract for Damages as to the Woolner Employment Agreement**
**Against Defendant Woolner**

239.    Plaintiffs incorporate the preceding paragraphs as though fully set forth herein.

240.    This cause of action is not based on the misappropriation of "trade secrets" as defined under the DTSA or the CUTSA.

241.    Woolner entered into the Woolner Employment Agreement with Arborwell, which is in writing and attached hereto as Exhibit C.

242.    Through the acts and omissions alleged herein, Woolner breached his covenants, conditions and obligations in the Woolner Employment Agreement, including but not limited to by violating the confidentiality and non-disclosure provisions contained therein, which required Woolner to maintain the confidentiality of Arborwell's Confidential Information and to not use or disclose that information for any purpose other than in furtherance of his employment for Arborwell.

243.    Arborwell performed all of its covenants, conditions and obligations in the Woolner Employment Agreement, except those that have been excused.

244.    As a direct and proximate result of Woolner's breaches, Arborwell has suffered damages in an amount according to proof.

WHEREFORE, Arborwell prays for relief as set forth below.

**TWELFTH CAUSE OF ACTION**
**Breach of Contract for Specific Performance as to the Woolner Employment Agreement**
**Against Defendant Woolner**

245.    Plaintiffs incorporate the preceding paragraphs as though fully set forth herein.

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

246. This cause of action is not based on the misappropriation of "trade secrets" as defined under the DTSA or the CUTSA.

247. Woolner entered into the Woolner Employment Agreement with Arborwell, which is in writing and attached hereto as Exhibit C.

248. Through the acts and omissions alleged herein, Woolner breached his covenants, conditions and obligations in the Woolner Employment Agreement, including but not limited to by violating the confidentiality and non-disclosure provisions contained therein, which required Woolner to maintain the confidentiality of Arborwell's Confidential Information and to not use or disclose that information for any purpose other than in furtherance of his employment for Arborwell. Those covenants, conditions and obligations are sufficiently definite and certain in their terms to be enforced and are just and reasonable.

249. Arborwell performed all of its covenants, conditions and obligations in the Woolner Employment Agreement, except those that have been excused.

250. Arborwell is entitled to and seeks specific performance of Woolner's covenants, conditions and obligations in the Woolner Employment Agreement, including but not limited to the confidentiality and non-disclosure provisions. Arborwell has no adequate remedy at law.

WHEREFORE, Arborwell prays for relief as set forth below.

### THIRTEENTH CAUSE OF ACTION
**Breach of Contract for Damages as to the Woolner Confidentiality Agreement
Against Defendant Woolner**

251. Plaintiffs incorporate the preceding paragraphs as though fully set forth herein.

252. This cause of action is not based on the misappropriation of "trade secrets" as defined under the DTSA or the CUTSA.

253. Woolner entered into the Woolner Confidentiality Agreement with Arborwell, which is in writing and attached hereto as Exhibit D.

254. Through the acts and omissions alleged herein, Woolner breached his covenants, conditions and obligations in the Woolner Confidentiality Agreement, including but not limited to by violating the confidentiality and non-disclosure provisions contained therein, which required Woolner to maintain the confidentiality of Arborwell's Confidential Information and to not use or

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

1    disclose that information for any purpose other than in furtherance of his employment for

2    Arborwell.

3          255.    Arborwell performed all of its covenants, conditions and obligations in the Woolner

4    Confidentiality Agreement, except those that have been excused.

5          256.    As a direct and proximate result of Woolner's breaches, Arborwell has suffered

6    damages in an amount according to proof.

7          WHEREFORE, Arborwell prays for relief as set forth below.

8                        **FOURTEENTH CAUSE OF ACTION**
     **Breach of Contract for Specific Performance as to the Woolner Confidentiality Agreement**
9                        **Against Defendant Woolner**

10         257.    Plaintiffs incorporate the preceding paragraphs as though fully set forth herein.

11         258.    This cause of action is not based on the misappropriation of "trade secrets" as

12   defined under the DTSA or the CUTSA.

13         259.    Woolner entered into the Woolner Confidentiality Agreement with Arborwell,

14   which is in writing and attached hereto as Exhibit D.

15         260.    The Woolner Confidentiality Agreement expressly provides that it may be

16   specifically enforced:

17       **10.  SPECIFIC PERFORMANCE**

18       I agree that it will be impossible to measure in money the damage to the Company
         or to me if either the Company or I fail to comply with any of the provisions of this
19       Agreement, and that an award of money by itself will not be sufficient to make
         either of us whole.  I agree that every provision of this Agreement is material.  I
20       therefore agree that a party who is aggrieved under this Agreement shall be entitled
         to the issuance of an injunction or the enforcement of other equitable remedies
21       against the other, without bond or other security, to compel performance of all of
         the terms of this Agreement.  The Company and I each waive any defenses to an
22       equitable remedy, including without limitation the defenses of failure of
         consideration, breach of any other provision of this Agreement, and availability of
23       relief in damages.

24   Ex. D, p. 7.

25         261.    Through the acts and omissions alleged herein, Woolner breached his covenants,

26   conditions and obligations in the Woolner Confidentiality Agreement, including but not limited to

27   by violating the confidentiality and non-disclosure provisions contained therein, which required

28   Woolner to maintain the confidentiality of Arborwell's Confidential Information and to not use or

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  94111-3598

- 64 -

disclose that information for any purpose other than in furtherance of his employment for Arborwell.  Those covenants, conditions and obligations are sufficiently definite and certain in their terms to be enforced and are just and reasonable.

262.    Arborwell performed all of its covenants, conditions and obligations in the Woolner Confidentiality Agreement, except those that have been excused.

263.    Arborwell is entitled to and seeks specific performance of Woolner's covenants, conditions and obligations in the Woolner Confidentiality Agreement, including but not limited to the confidentiality and non-disclosure provisions.  Arborwell has no adequate remedy at law.

WHEREFORE, Arborwell prays for relief as set forth below.

## FIFTEENTH CAUSE OF ACTION
### Breach of Contract for Damages as to the LaVelle Employment Agreement
### Against Defendant LaVelle

264.    Plaintiffs incorporate the preceding paragraphs as though fully set forth herein.

265.    This cause of action is not based on the misappropriation of "trade secrets" as defined under the DTSA or the CUTSA.

266.    LaVelle entered into the LaVelle Employment Agreement with Arborwell, which is in writing and attached hereto as Exhibit E.

267.    Through the acts and omissions alleged herein, LaVelle breached his covenants, conditions and obligations in the LaVelle Employment Agreement, including but not limited to by violating the confidentiality and non-disclosure provisions contained therein, which required LaVelle to maintain the confidentiality of Arborwell's Confidential Information and to not use or disclose that information for any purpose other than in furtherance of his employment for Arborwell.

268.    Arborwell performed all of its covenants, conditions and obligations in the Lavelle Employment Agreement, except those that have been excused.

269.    As a direct and proximate result of LaVelle's breaches, Arborwell has suffered damages in an amount according to proof.

WHEREFORE, Arborwell prays for relief as set forth below.

Case No.
4:23-cv-02770-HSG

FIRST AMENDED COMPLAINT

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  94111-3598

**SIXTEENTH CAUSE OF ACTION**
**Breach of Contract for Specific as to the LaVelle Employment Agreement**
**Performance Against Defendant LaVelle**

270.    Plaintiffs incorporate the preceding paragraphs as though fully set forth herein.

271.    This cause of action is not based on the misappropriation of "trade secrets" as defined under the DTSA or the CUTSA.

272.    LaVelle entered into the LaVelle Employment Agreement with Arborwell, which is in writing and attached hereto as Exhibit E.

273.    Through the acts and omissions alleged herein, LaVelle breached his covenants, conditions and obligations in the LaVelle Employment Agreement, including but not limited to by violating the confidentiality and non-disclosure provisions contained therein, which required LaVelle to maintain the confidentiality of Arborwell's Confidential Information and to not use or disclose that information for any purpose other than in furtherance of his employment for Arborwell.  Those covenants, conditions and obligations are sufficiently definite and certain in their terms to be enforced and are just and reasonable.

274.    Arborwell performed all of its covenants, conditions and obligations in the LaVelle Employment Agreement, except those that have been excused.

275.    Arborwell is entitled to and seeks specific performance of LaVelle's covenants, conditions and obligations in the LaVelle Employment Agreement, including but not limited to the confidentiality and non-disclosure provisions.  Arborwell has no adequate remedy at law.

WHEREFORE, Arborwell prays for relief as set forth below.

**SEVENTEENTH CAUSE OF ACTION**
**Breach of Contract for Damages as to the LaVelle Confidentiality Agreement**
**Against Defendant LaVelle**

276.    Plaintiffs incorporate the preceding paragraphs as though fully set forth herein.

277.    This cause of action is not based on the misappropriation of "trade secrets" as defined under the DTSA or the CUTSA.

278.    LaVelle entered into the LaVelle Confidentiality Agreement with Arborwell, which is in writing and attached hereto as Exhibit F.

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

Case No.
4:23-cv-02770-HSG                    FIRST AMENDED COMPLAINT

279.    Through the acts and omissions alleged herein, LaVelle breached his covenants, conditions and obligations in the LaVelle Confidentiality Agreement, including but not limited to by violating the confidentiality and non-disclosure provisions contained therein, which required LaVelle to maintain the confidentiality of Arborwell's Confidential Information and to not use or disclose that information for any purpose other than in furtherance of his employment for Arborwell.

280.    Arborwell performed all of its covenants, conditions and obligations in the LaVelle Confidentiality Agreement, except those that have been excused.

281.    As a direct and proximate result of LaVelle's breaches, Arborwell has suffered damages in an amount according to proof.

WHEREFORE, Arborwell prays for relief as set forth below.

## EIGHTEENTH CAUSE OF ACTION
**Breach of Contract for Specific Performance as to the LaVelle Confidentiality Agreement Against Defendant LaVelle**

282.    Plaintiffs incorporate the preceding paragraphs as though fully set forth herein.

283.    This cause of action is not based on the misappropriation of "trade secrets" as defined under the DTSA or the CUTSA.

284.    LaVelle entered into the LaVelle Confidentiality Agreement with Arborwell, which is in writing and attached hereto as Exhibit F.

285.    The LaVelle Confidentiality Agreement expressly provides that it may be specifically enforced:

**10. SPECIFIC PERFORMANCE**

I agree that it will be impossible to measure in money the damage to the Company or to me if either the Company or I fail to comply with any of the provisions of this Agreement, and that an award of money by itself will not be sufficient to make either of us whole.  I agree that every provision of this Agreement is material.  I therefore agree that a party who is aggrieved under this Agreement shall be entitled to the issuance of an injunction or the enforcement of other equitable remedies against the other, without bond or other security, to compel performance of all of the terms of this Agreement.  The Company and I each waive any defenses to an equitable remedy, including without limitation the defenses of failure of consideration, breach of any other provision of this Agreement, and availability of relief in damages.

Ex. F, p. 7.

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

286.    Through the acts and omissions alleged herein, LaVelle breached his covenants, conditions and obligations in the LaVelle Confidentiality Agreement, including but not limited to by violating the confidentiality and non-disclosure provisions contained therein, which required LaVelle to maintain the confidentiality of Arborwell's Confidential Information and to not use or disclose that information for any purpose other than in furtherance of his employment for Arborwell.  Those covenants, conditions and obligations are sufficiently definite and certain in their terms to be enforced and are just and reasonable.

287.    Arborwell performed all of its covenants, conditions and obligations in the LaVelle Confidentiality Agreement, except those that have been excused.

288.    Arborwell is entitled to and seeks specific performance of LaVelle's covenants, conditions and obligations in the LaVelle Confidentiality Agreement, including but not limited to the confidentiality and non-disclosure provisions.  Arborwell has no adequate remedy at law.

WHEREFORE, Arborwell prays for relief as set forth below.

**NINETEENTH CAUSE OF ACTION**
**Breach of Contract for Damages as to the LaVelle SavATree Employment Agreement**
**Against Defendant LaVelle**

289.    Plaintiffs incorporate the preceding paragraphs as though fully set forth herein.

290.    This cause of action is not based on the misappropriation of "trade secrets" as defined under the DTSA or the CUTSA.

291.    LaVelle entered into the LaVelle SavATree Employment Agreement with Arborwell, which is in writing and attached hereto as Exhibit G.

292.    Through the acts and omissions alleged herein, LaVelle breached his covenants, conditions and obligations in the LaVelle SavATree Employment Agreement, including but not limited to (1) by violating the confidentiality and non-disclosure provisions contained therein, which required LaVelle to maintain the confidentiality of Arborwell's Confidential Information and to not use or disclose that information for any purpose other than in furtherance of his employment for Arborwell; and (2) the Non-Compete provision therein.  The Non-Compete is enforceable under California Business and Professions Code section 16601 because LaVelle sold all of his interest and goodwill in Arborwell in exchange for the Non-Compete.

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  94111-3598

- 68 -

293.   Arborwell performed all of its covenants, conditions and obligations in the LaVelle SavATree Employment Agreement, except those that have been excused.

294.   As a direct and proximate result of LaVelle's breaches, Arborwell has suffered damages in an amount according to proof.

WHEREFORE, Arborwell prays for relief as set forth below.

**TWENTIETH CAUSE OF ACTION**
**Breach of Contract for Specific Performance as to the LaVelle SavATree Employment Agreement**
**Against Defendant LaVelle**

295.   Plaintiffs incorporate the preceding paragraphs as though fully set forth herein.

296.   This cause of action is not based on the misappropriation of "trade secrets" as defined under the DTSA and the CUTSA.

297.   LaVelle entered into the LaVelle SavATree Employment Agreement with Arborwell, which is in writing and attached hereto as Exhibit G.

298.   Through the acts and omissions alleged herein, LaVelle breached his covenants, conditions and obligations in the LaVelle SavATree Employment Agreement, including but not limited to (1) by violating the confidentiality and non-disclosure provisions contained therein, which required LaVelle to maintain the confidentiality of Arborwell's Confidential Information and to not use or disclose that information for any purpose other than in furtherance of his employment for Arborwell; and (2) the Non-Compete therein.  Those covenants, conditions and obligations are sufficiently definite and certain in their terms to be enforced and are just and reasonable.  The Non-Compete is enforceable under California Business and Professions Code section 16601 because LaVelle sold all of his interest and goodwill in Arborwell in exchange for the Non-Compete.

299.   Arborwell performed all of its covenants, conditions and obligations in the LaVelle SavATree Employment Agreement, except those that have been excused.

300.   The LaVelle SavATree Employment Agreement expressly provides that it may be specifically enforced:

11.  <u>Remedies</u>.  Employee acknowledges that:  (a) the Company's products and services are highly specialized; (b) the identity and particular needs of the

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

Company's customers are not generally known in the industry; (c) the Company has a proprietary interest in the identity of its customers and customer lists; (d) the Company has devoted a substantial amount of time, effort, and money towards developing and maintaining its customer and alliance partner relationships; and (e) documents and information regarding the Company's methods, business practices, sales, pricing, costs, and the specialized requirements of the Company's customers are highly confidential and constitute trade secrets. Employee further acknowledges: (f) that Sections 6 [the Non-Compete], 7, and 8, above, are reasonable in scope and necessary to protect the aforementioned and any other legitimate interests of the Company, and (g) that a breach of any of these covenants will result in irreparable and continuing damage to the Company, for which money damages is not likely to provide adequate relief. Consequently, Employee agrees that in the event he breaches or threatens to breach one or more of the covenants in Section 6 [the Non-Compete], 7, and/or 8, the Company shall be entitled to both: (h) a temporary restraining order and a preliminary and/or permanent injunction to prevent the continuation of harm, and (i) money damages insofar as they can be determined. To the extent permitted by law, Employee hereby waives any requirement that the Company post a bond or other security in connection with an application for a temporary restraining order or preliminary injunction. Employee also hereby waives any right he may have to assert in any proceeding concerning the enforceability of this Agreement that the Company has an adequate remedy at law. Nothing in this agreement shall be construed to prohibit the Company from also pursuing any other remedy, the parties having agreed that all remedies are cumulative.

Ex. G, pp. 7–8 (emphasis added).

301.     Arborwell is entitled to and seeks specific performance of LaVelle's covenants, conditions and obligations in the LaVelle SavATree Employment Agreement, including but not limited to the confidentiality, non-disclosure and Non-Compete provisions. Arborwell has no adequate remedy at law.

WHEREFORE, Arborwell prays for relief as set forth below.

## TWENTY-FIRST CAUSE OF ACTION
### Declaratory Relief as to the LaVelle SavATree Employment Agreement
### Against Defendant LaVelle

302.     Plaintiffs incorporate the preceding paragraphs as though fully set forth herein.

303.     This cause of action is not based on the misappropriation of "trade secrets" as defined under the DTSA or the CUTSA.

304.     There presently exists a real and actual controversy between Arborwell and LaVelle regarding whether the Non-Compete in the LaVelle SavATree Employment Agreement is enforceable.

305.     LaVelle maintains that the Non-Compete is unenforceable under California law, whereas Arborwell maintains that the Non-Compete is enforceable.

306.    Accordingly, a judicial declaration is necessary so that the parties can determine their respective rights and obligations going forward, including but not limited to their rights and obligations under the parties' agreement alleged herein.

WHEREFORE, Arborwell prays for relief as set forth below.

**TWENTY-SECOND CAUSE OF ACTION**
**Breach of the Fiduciary Duty of Loyalty**
**Against the Individual Defendants**

307.    Plaintiffs incorporate the preceding paragraphs as though fully set forth herein.

308.    This cause of action is not based on the misappropriation of "trade secrets" as defined under the DTSA or the CUTSA.

309.    As high-level employees who participated in management of Arborwell and had discretionary authority in that capacity, the Individual Defendants owed a fiduciary duty of loyalty to Arborwell.

310.    The Individual Defendants breached their duty of loyalty through the acts and omissions set forth herein, including but not limited to by (1) unlawfully preparing to compete, including by using Arborwell's time, facilities and Confidential Information; (2) failing to disclose their preparations to compete to Arborwell even though their non-disclosure was harmful to the corporation, including Arborwell's ability to secure and service its customers following Defendants' resignations; (3) misrepresenting to Arborwell their true intentions to compete; (4) on information and belief, copying or retaining Confidential Information; (5) on information and belief, soliciting employees and customers while still employed by Arborwell; and (6) on information and belief, disparaging Arborwell to employees, customers and other persons.

311.    Because the Individual Defendants' conduct was self-interested, the business judgment rule does not apply, and they have the burden of establishing that their conduct was "entirely fair" to Arborwell in both substance and process.  The Individual Defendants' conduct was not "entirely fair" to Arborwell, so they cannot meet that burden.

312.    As a direct and proximate result of the Individual Defendants' breach of their fiduciary duty of loyalty, Arborwell has been damaged in an amount according to proof.

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  94111-3598

313.    The Individual Defendants' conduct as alleged herein was willful, malicious and taken in conscious or reckless disregard of Arborwell's rights, thus justifying an award of punitive damages against them.

WHEREFORE, Arborwell prays for relief as set forth below.

**TWENTY-THIRD CAUSE OF ACTION**
**Intentional Interference with Contractual Relations**
**Against the Individual Defendants and Defendant Arbor MD**

314.    Plaintiffs incorporate the preceding paragraphs as though fully set forth herein.

315.    This cause of action is not based on the misappropriation of "trade secrets" as defined under the DTSA or the CUTSA.

316.    Arborwell had and has contracts with its customers, including but not limited to Apple, and each of the Defendants knew of the existence of those contracts.

317.    Defendants acted intentionally to induce one or more of Arborwell's customers to breach, terminate or otherwise disrupt their contracts with Arborwell.  Those contracts were actually breached, terminated or disrupted.

318.    For example, Defendants acted intentionally to induce Apple to terminate its contract with Arborwell and instead hire Arbor MD in place of Arborwell, causing Arborwell to lose more than half a million dollars of expected revenue over the next two years.

319.    Similarly, Arborwell is informed and believes that Defendants acted intentionally to induce Equity Residential to terminate its contract with Arborwell for services at 45 of its properties.  Arborwell is informed and believes that Defendants instructed Apple to find other providers for the services that Arbor MD could not provide, or offered to subcontract out those services.

320.    As a direct and proximate result of Defendants' intentional interference, Arborwell has been damaged and will continue to be damaged, in an amount according to proof.

WHEREFORE, Arborwell prays for relief as set forth below.

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

Case No.
4:23-cv-02770-HSG
FIRST AMENDED COMPLAINT

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

**TWENTY-FOURTH CAUSE OF ACTION**
**Intentional Interference with Prospective Economic Relations**
**Against the Individual Defendants and Defendant Arbor MD**

321. Plaintiffs incorporate the preceding paragraphs as though fully set forth herein.

322. This cause of action is not based on the misappropriation of "trade secrets" as defined under the DTSA or the CUTSA.

323. Arborwell had economic relationships with numerous past, current and prospective customers that likely would have resulted in prospective economic benefit to Arborwell, and Defendants knew of those relationships and knew there was a probability that those relationships would result in an economic benefit to Arborwell.

324. Defendants acted intentionally and wrongfully to disrupt, and did actually disrupt those relationships, and converted them to their own benefit by, upon information and belief, misrepresenting to customers Arborwell's ability to service them, and using Arborwell's Confidential Information to solicit them. The interference was wrongful independent of the interference itself, including but not limited to because the Individual Defendants breached their written contracts and their fiduciary duty of loyalty, and Defendants acted deceptively to conceal their wrongful conduct.

325. As a direct and proximate result of Defendants' intentional conduct, Arborwell has been damaged and will continue to be damaged, in an amount according to proof.

WHEREFORE, Arborwell prays for relief as set forth below.

**TWENTY-FIFTH CAUSE OF ACTION**
**Violation of California Business and California Unfair Competition Law**
**Against the Individual Defendants and Defendant Arbor MD**

326. Plaintiffs incorporate the preceding paragraphs as though fully set forth herein.

327. This cause of action is not based on the misappropriation of "trade secrets" as defined under the DTSA or the CUTSA.

328. Defendants have engaged in (and continue to engage in) unlawful, fraudulent, and unfair business acts and practices described throughout this Complaint in violation of California's Unfair Competition Law (the "UCL"), California Business and Professions Code section 17200 et seq.

Case No.
4:23-cv-02770-HSG
FIRST AMENDED COMPLAINT

329.    Defendants' business acts and practices were unlawful under the UCL because those acts and practices resulted in the violations of state common law, including but not limited to breach of fiduciary duty of loyalty, breach of contract, intentional interference with contractual relations and intentional interference with prospective economic advantage.

330.    Defendants' business acts and practices were fraudulent because a reasonable person would likely be deceived by Defendants' false statements to, and concealment from, Arborwell, its customers and its employees.

331.    Defendants' business acts and practices are unfair, including but not limited to because the harm suffered by Arborwell described herein outweighs any justification that Defendants may assert for engaging in those acts and practices.  Moreover, Arborwell could not have avoided the harm it suffered as a result of Defendants' unfair acts and practices because Defendants made every effort to obscure and conceal from Arborwell the existence and extent of their harmful acts and practices.

332.    Defendants' unlawful, unfair and fraudulent business acts and practices were carried out and effectuated in California and injured Arborwell in California.

333.    Arborwell suffered harm as herein alleged as a direct and proximate result of Defendants' unlawful, unfair and fraudulent business acts and practices.

334.    Arborwell is entitled to an injunction enjoining Defendants from such further violations of the UCL.  Such an injunction will benefit Arborwell and the general public.

WHEREFORE, Arborwell prays for relief as set forth below.

### TWENTY-SIXTH CAUSE OF ACTION
**Breach of Contract for Damages as to the Dickinson Employment Agreement Against Defendant Dickinson**

335.    Plaintiffs incorporate the preceding paragraphs as though fully set forth herein.

336.    This cause of action is not based on the misappropriation of "trade secrets" as defined under the DTSA or the CUTSA.

337.    Dickinson entered into the Dickinson Employment Agreement with Arborwell, which is in writing and attached hereto as Exhibit H.

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

338. Through the acts and omissions alleged herein, Dickinson breached his covenants, conditions and obligations in the Dickinson Employment Agreement, including but not limited to by violating the confidentiality and non-disclosure provisions contained therein, which required Dickinson to maintain the confidentiality of Arborwell's Confidential Information and to not use or disclose that information for any purpose other than in furtherance of his employment for Arborwell.

339. Arborwell performed all of its covenants, conditions and obligations in the Dickinson Employment Agreement, except those that have been excused.

340. As a direct and proximate result of Dickinson's breaches, Arborwell has suffered damages in an amount according to proof.

WHEREFORE, Arborwell prays for relief as set forth below.

## TWENTY-SEVENTH CAUSE OF ACTION
### Breach of Contract for Specific Performance as to the Dickinson Employment Agreement Against Defendant Dickinson

341. Plaintiffs incorporate the preceding paragraphs as though fully set forth herein.

342. This cause of action is not based on the misappropriation of "trade secrets" as defined under the DTSA or the CUTSA.

343. Dickinson entered into the Dickinson Employment Agreement with Arborwell, which is in writing and attached hereto as Exhibit H.

344. Through the acts and omissions alleged herein, Dickinson breached his covenants, conditions and obligations in the Dickinson Employment Agreement, including but not limited to by violating the confidentiality and non-disclosure provisions contained therein, which required Dickinson to maintain the confidentiality of Arborwell's Confidential Information and to not use or disclose that information for any purpose other than in furtherance of his employment for Arborwell. Those covenants, conditions and obligations are sufficiently definite and certain in their terms to be enforced and are just and reasonable.

345. Arborwell performed all of its covenants, conditions and obligations in the Dickinson Employment Agreement, except those that have been excused.

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

346.    Arborwell is entitled to and seeks specific performance of Dickinson's covenants, conditions and obligations in the Dickinson Employment Agreement, including but not limited to the confidentiality and non-disclosure provisions.  Arborwell has no adequate remedy at law.

WHEREFORE, Arborwell prays for relief as set forth below.

## TWENTY-NINTH CAUSE OF ACTION
**Breach of Contract for Damages as to the Yamaguchi Employment Agreement Against Defendant Yamaguchi**

347.    Plaintiffs incorporate the preceding paragraphs as though fully set forth herein.

348.    This cause of action is not based on the misappropriation of "trade secrets" as defined under the DTSA or the CUTSA.

349.    Yamaguchi entered into the Yamaguchi Employment Agreement with Arborwell, which is in writing and attached hereto as Exhibit I.

350.    Through the acts and omissions alleged herein, Yamaguchi breached his covenants, conditions and obligations in the Yamaguchi Employment Agreement, including but not limited to by violating the confidentiality and non-disclosure provisions contained therein, which required Yamaguchi to maintain the confidentiality of Arborwell's Confidential Information and to not use or disclose that information for any purpose other than in furtherance of his employment for Arborwell.

351.    Arborwell performed all of its covenants, conditions and obligations in the Yamaguchi Employment Agreement, except those that have been excused.

352.    As a direct and proximate result of Yamaguchi's breaches, Arborwell has suffered damages in an amount according to proof.

WHEREFORE, Arborwell prays for relief as set forth below.

## THIRTIETH CAUSE OF ACTION
**Breach of Contract for Specific Performance as to the Yamaguchi Employment Agreement Against Defendant Yamaguchi**

353.    Plaintiffs incorporate the preceding paragraphs as though fully set forth herein.

354.    This cause of action is not based on the misappropriation of "trade secrets" as defined under the DTSA or the CUTSA.

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

Case No.
4:23-cv-02770-HSG

FIRST AMENDED COMPLAINT

355.    Yamaguchi entered into the Yamaguchi Employment Agreement with Arborwell, which is in writing and attached hereto as Exhibit I.

356.    Through the acts and omissions alleged herein, Yamaguchi breached his covenants, conditions and obligations in the Yamaguchi Employment Agreement, including but not limited to by violating the confidentiality and non-disclosure provisions contained therein, which required Yamaguchi to maintain the confidentiality of Arborwell's Confidential Information and to not use or disclose that information for any purpose other than in furtherance of his employment for Arborwell.  Those covenants, conditions and obligations are sufficiently definite and certain in their terms to be enforced and are just and reasonable.

357.    Arborwell performed all of its covenants, conditions and obligations in the Yamaguchi Employment Agreement, except those that have been excused.

358.    Arborwell is entitled to and seeks specific performance of Yamaguchi's covenants, conditions and obligations in the Yamaguchi Employment Agreement, including but not limited to the confidentiality and non-disclosure provisions.  Arborwell has no adequate remedy at law.

WHEREFORE, Arborwell prays for relief as set forth below.

## THIRTY-SECOND CAUSE OF ACTION
### Breach of Contract for Damages as to the Hagge Employment Agreement
### Against Defendant Hagge

359.    Plaintiffs incorporate the preceding paragraphs as though fully set forth herein.

360.    This cause of action is not based on the misappropriation of "trade secrets" as defined under the DTSA or the CUTSA.

361.    Hagge entered into the Hagge Employment Agreement with Arborwell, which is in writing and attached hereto as Exhibit J.

362.    Through the acts and omissions alleged herein, Hagge breached his covenants, conditions and obligations in the Hagge Employment Agreement, including but not limited to by violating the confidentiality and non-disclosure provisions contained therein, which required Hagge to maintain the confidentiality of Arborwell's Confidential Information and to not use or disclose that information for any purpose other than in furtherance of his employment for Arborwell.

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  94111-3598

- 77 -

363.    Arborwell performed all of its covenants, conditions and obligations in the Hagge Employment Agreement, except those that have been excused.

364.    As a direct and proximate result of Hagge's breaches, Arborwell has suffered damages in an amount according to proof.

WHEREFORE, Arborwell prays for relief as set forth below.

**THIRTY-THIRD CAUSE OF ACTION**
**Breach of Contract for Specific Performance as to the Hagge Employment Agreement**
**Against Defendant Hagge**

365.    Plaintiffs incorporate the preceding paragraphs as though fully set forth herein.

366.    This cause of action is not based on the misappropriation of "trade secrets" as defined under the DTSA or the CUTSA.

367.    Hagge entered into the Hagge Employment Agreement with Arborwell, which is in writing and attached hereto as Exhibit J.

368.    Through the acts and omissions alleged herein, Hagge breached his covenants, conditions and obligations in the Hagge Employment Agreement, including but not limited to by violating the confidentiality and non-disclosure provisions contained therein, which required Hagge to maintain the confidentiality of Arborwell's Confidential Information and to not use or disclose that information for any purpose other than in furtherance of his employment for Arborwell.  Those covenants, conditions and obligations are sufficiently definite and certain in their terms to be enforced and are just and reasonable.

369.    Arborwell performed all of its covenants, conditions and obligations in the Hagge Employment Agreement, except those that have been excused.

370.    Arborwell is entitled to and seeks specific performance of Hagge's covenants, conditions and obligations in the Hagge Employment Agreement, including but not limited to the confidentiality and non-disclosure provisions.  Arborwell has no adequate remedy at law.

WHEREFORE, Arborwell prays for relief as set forth below.

## VI.    PRAYER FOR RELIEF

Plaintiffs prays for relief as follows:

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

1.    For general, special and compensatory damages according to proof in excess of $25,000;

2.    For declaratory relief that Woolner and LaVelle's Non-Compete in the Stock Purchase Agreement is enforceable;

3.    For declaratory relief that LaVelle's Non-Compete in the Lavelle SavATree Employment Agreement is enforceable;

4.    For specific performance of Woolner's contractual obligation not to use or disclose Arborwell's Confidential Information under the Woolner Employment Agreement, the Woolner Confidentiality Agreement and the Stock Purchase Agreement;

5.    For specific performance of LaVelle's contractual obligation not to use or disclose Arborwell's Confidential Information under the LaVelle Employment Agreement, the LaVelle Confidentiality Agreement, the LaVelle SavATree Employment Agreement and the Stock Purchase Agreement;

6.    For specific performance of the Woolner and LaVelle's Non-Compete in the Stock Purchase Agreement;

7.    For specific performance of LaVelle's Non-Compete in the LaVelle SavATree Employment Agreement;

8.    For specific performance of Dickinson, Yamaguchi and Hagge's contractual obligations not to use or disclose Arborwell's Confidential Information under their respective employment agreements;

9.    For a temporary restraining order and preliminary and permanent injunctive relief;

10.    For punitive damages;

11.    For restitution and disgorgement;

12.    For a constructive trust;

13.    For an accounting;

14.    For attorneys' fees and costs;

15.    For pre- and post-judgment interest; and

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

16. For such other and further relief, in law or in equity, as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury of all issues so triable pursuant to Federal Rule of Civil Procedure 38.

Dated:  August 28, 2023                                      SHARTSIS FRIESE LLP


                                                             */s/ Richard F. Munzinger*
                                                  By:        RICHARD F. MUNZINGER

                                                  Attorneys for Plaintiffs
                                                  CI QUERCUS CORPORATION, INC.,
                                                  SAVATREE, LLC, and
                                                  ARBORWELL, LLC

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  94111-3598