**GROOM LAW GROUP, CHTD.**
Lars C. Golumbic (DC 452143) (*pro hac vice*)
Ross McSweeney (DC 1018648) (*pro hac vice*)
1701 Pennsylvania Ave., N.W.
Suite 1200
Washington, D.C. 20006
T: (202) 857-0620
F: (202) 659-4503
lgolumbic@groom.com
rmcsweeney@groom.com

BROTHERS SMITH, LLP
Horace W. Green (SBN 115699)
2033 N. Main Street, Suite 720
Walnut Creek, CA 94596
T: (925) 944-9700
hgreen@brotherssmithlaw.com

*Attorneys for the Alerus Financial, N.A. Defendants*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARBORWELL, LLC; CI QUERCUS CORPORATION, et al. | Case No.: 4:23-cv-02770-HSG |
| Plaintiffs, | Judge: Hon. Haywood S. Gilliam, Jr.<br>Courtroom: 2 – Fourth Floor<br>Heading date:  December 14, 2023<br>Hearing time:  2 p.m. |
| v. | |
| ALERUS FINANCIAL, N.A., et al. | **DEFENDANT ALERUS FINANCIAL, N.A.'S NOTICE OF MOTION AND MOTION TO DISMISS UNDER RULES 12(b)(1) AND 12(b)(6)** |
| Defendants. | |

1

1

## NOTICE OF MOTION AND MOTION

2

PLEASE TAKE NOTICE THAT on December 14, 2023, at 2:00 p.m., in the courtroom of

3

the Honorable Haywood S. Gilliam, Jr., United States District Judge, Northern District of Califor-

4

nia, located at 1301 Clay Street, Oakland, CA 94612, in Courtroom 2 – Fourth Floor, Defendant

5

Alerus Financial, N.A. ("Alerus") will move to dismiss with prejudice Plaintiffs' First Amended

6

Complaint (Dkt. 54) pursuant to Federal Rules of Civil Procedure 12(b)(1) and (6).

7

Alerus's motion is based on this Notice of Motion, the Memorandum of Points and Author-

8

ties in Support thereof, the Declaration of Lars C. Golumbic in support thereof, the exhibits at-

9

tached thereto, all pleadings, records, and documents on file in this case, any arguments the Court

10

may accept at the hearing on this motion, and such other further matters of which this Court may

11

take judicial notice.

12

13

Dated October 11, 2023                              Respectfully submitted,

14

By:  */s/ Lars C. Golumbic*

15

Lars C. Golumbic (*pro hac vice*)

16

Ross McSweeney (*pro hac vice*)

**GROOM LAW GROUP, CHARTERED**

17

1701 Pennsylvania Avenue, NW

Washington, DC 20006

18

(202) 857-0620

(202) 659-4503 (facsimile)

19

lgolumbic@groom.com

rmcsweeney@groom.com

20

21

**BROTHERS SMITH, LLP**

22

Horace W. Green

23

Email:  hgreen@brotherssmithlawcom

24

*Attorneys for Defendants*

25

26

27

28

2

1
2
3
4
5
6

**GROOM LAW GROUP, CHTD.**
Lars C. Golumbic (DC 452143) (*pro hac vice*)
Ross McSweeney (DC 1018648) (*pro hac vice*)
1701 Pennsylvania Ave., N.W.
Suite 1200
Washington, D.C. 20006
T: (202) 857-0620
F: (202) 659-4503
lgolumbic@groom.com
rmcsweeney@groom.com

7
8
9
10

BROTHERS SMITH, LLP
Horace W. Green (SBN 115699)
2033 N. Main Street, Suite 720
Walnut Creek, CA 94596
T: (925) 944-9700
hgreen@brotherssmithlaw.com

11

*Attorneys for the Alerus Financial, N.A. Defendants*

12
13

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

14
15
16
17

ARBORWELL, LLC; CI QUERCUS
CORPORATION, et al.

Plaintiffs,

v.

18
19
20

ALERUS FINANCIAL, N.A., et al.

Defendants.

21
22

Case No.: 4:23-cv-02770-HSG

Judge: Hon. Haywood S. Gilliam, Jr.
Courtroom: 2 – Fourth Floor
Heading date:  December 14, 2023
Hearing time:  2 p.m.

**DEFENDANT ALERUS FINANCIAL,
N.A.'S NOTICE OF MOTION AND MO-
TION TO DISMISS UNDER RULES
12(b)(1) AND 12(b)(6)**

23
24
25
26
27
28

1

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE THAT on December 14, 2023, at 2:00 p.m., in the courtroom of the Honorable Haywood S. Gilliam, Jr., United States District Judge, Northern District of California, located at 1301 Clay Street, Oakland, CA 94612, in Courtroom 2 – Fourth Floor, Defendant Alerus Financial, N.A. ("Alerus") will move to dismiss with prejudice Plaintiffs' First Amended Complaint (Dkt. 54) pursuant to Federal Rules of Civil Procedure 12(b)(1) and (6).

Alerus's motion is based on this Notice of Motion, the Memorandum of Points and Authorities in Support thereof, the Declaration of Lars C. Golumbic in support thereof, the exhibits attached thereto, all pleadings, records, and documents on file in this case, any arguments the Court may accept at the hearing on this motion, and such other further matters of which this Court may take judicial notice.

Dated October 11, 2023

Respectfully submitted,

By:  */s/ Lars C. Golumbic*
Lars C. Golumbic (*pro hac vice*)
Ross McSweeney (*pro hac vice*)
**GROOM LAW GROUP, CHARTERED**
1701 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 857-0620
(202) 659-4503 (facsimile)
lgolumbic@groom.com
rmcsweeney@groom.com

**BROTHERS SMITH, LLP**

Horace W. Green
Email:  hgreen@brotherssmithlawcom

*Attorneys for Defendants*

2

1

**GROOM LAW GROUP, CHTD.**
Lars C. Golumbic (DC 452143) (*pro hac vice*)
Ross McSweeney (DC 1018648) (*pro hac vice*)
1701 Pennsylvania Ave., N.W.
Suite 1200
Washington, D.C. 20006
T: (202) 857-0620
F: (202) 659-4503
lgolumbic@groom.com
rmcsweeney@groom.com

**BROTHERS SMITH, LLP**
Horace W. Green (SBN 115699)
2033 N. Main Street, Suite 720
Walnut Creek, CA 94596
T: (925) 944-9700
hgreen@brotherssmithlaw.com

*Attorneys for the Alerus Financial, N.A. Defendants*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARBORWELL, LLC; CI QUERCUS CORPORATION, et al. | Case No.: 4:23-cv-02770-HSG |
| Plaintiffs, | Judge: Hon. Haywood S. Gilliam, Jr Courtroom: 2 – Fourth Floor Hearing Date:  December 14, 2023 Hearing Time:  2 p.m. |
| v. | |
| ALERUS FINANCIAL, N.A., et al. | **DEFENDANT ALERUS FINANCIAL, N.A.'S MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS UNDER RULES 12(b)(1) AND 12(b)(6)** |
| Defendants. | |

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................................ ii

INTRODUCTION ........................................................................................................................ 1

STATEMENT OF ISSUES .......................................................................................................... 3

FACTUAL BACKGROUND ....................................................................................................... 3

    I.    The 2017 Transaction and Formation of the ESOP ......................................................... 3

    II.   The 2020 Transaction and Termination of the ESOP ...................................................... 5

LEGAL STANDARDS ................................................................................................................ 8

ARGUMENT ............................................................................................................................... 9

    I.    Plaintiffs Lack Statutory Standing to Pursue Their Claims. ......................................... 10

    II.   Plaintiffs Lack Article III Standing Under Rule 12(b)(1) of the Federal Rules. ........... 15

    III.  Even if Plaintiffs Possessed Statutory and Article III Standing to Pursue Their Claims
          Against Alerus, Their Allegations Still Fail to State a Claim Under Rule 12(b)(6). ...... 20

         A.  Plaintiffs Fail to Plausibly Allege an Inadequate Process and thus Fail to State
             Claims Under Sections 404 and 406(a). ................................................................... 23

         B.  Plaintiffs Fail to State a Plausible Disloyalty Claim ................................................ 24

         C.  Plaintiffs Fail to State a Section 406(b) Claim ......................................................... 25

CONCLUSION .......................................................................................................................... 25

i

## **TABLE OF AUTHORITIES**

**Cases**                                                                          **Page(s)**

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ............................................................................................... 8

*Beldock v. Microsoft Corp.*,
    No. C22-1082JLR, 2023 WL 1798171 (W.D. Wash. Feb. 7, 2023) ................................. 21, 24

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ............................................................................................... 8

*Bernaola v. Checksmart Fin. LLC*,
    322 F. Supp. 3d 830 (S.D. Ohio 2018) .................................................................... 22

*Blackmar v. Lichtenstein*,
    603 F.2d 1306 (8th Cir. 1979) .............................................................................. 12, 13

*Braden v. Wal-Mart Stores, Inc.*,
    588 F.3d 585 (8th Cir. 2009) ................................................................................. 21

*Canyon Cty. v. Syngenta Seeds, Inc.*,
    519 F.3d 969 (9th Cir. 2008) ................................................................................... 8

*Chao v. Hall Holding Co.*,
    285 F.3d 415 (6th Cir. 2002) ................................................................................. 22

*Chemung Canal Tr. Co. v. Sovran Bank/Md.*,
    939 F.2d 12 (2d Cir. 1991) .................................................................................. 12, 13

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ............................................................................................. 17

*Cunningham v. Cornell Univ.*,
    No. 16-cv-6525, 2017 WL 4358769 (S.D.N.Y. Sept. 29, 2017) ................................. 23, 25

*Donne v. Hardt*,
    No. 1:10-CV-2341, 2011 WL 3925129 (E.D. Cal. Sept. 7, 2011) .............................. 12

*Donovan v. Cunningham*,
    716 F.2d 1455 (5th Cir. 1983) .............................................................................. 4, 22

*Edison v. United States*,
    822 F.3d 510 (9th Cir. 2016) ................................................................................... 9

*Fifth Third Bancorp v. Dudenhoeffer*,
    573 U.S. 409 (2014) ........................................................................................... 21, 24

ii

*Graden v. Conexant Sys. Inc.*,
    496 F.3d 291 (3d Cir. 2007) .................................................................................... 6

*H&R Convention and Catering Corp. v. Somerstein*,
    No. 12-CV-1425, 2013 WL 1911335 (E.D.N.Y. May 8, 2013) .............................. 12

*Hart Interior Design, LLC 401(k) Profit Sharing Plan v. Bain*,
    No. 16-677, 2018 WL 11304177 (D. Ariz. Apr. 26, 2018) .................................... 17

*Henry v. Champlain Enters., Inc.*,
    445 F.3d 610 (2d Cir. 2006) .................................................................................. 22

*Howard v. Shay*,
    100 F.3d 1484 (9th Cir. 1996) .......................................................................... 21, 22

*Howell v. Grindr, LLC*,
    No. 15-cv-1337-GPC(NLS), 2016 WL 1668243 (S.D. Cal. Apr. 27, 2016) ............ 8

*Hughes v. Northwestern Univ.*,
    142 S. Ct. 737 (2022) ....................................................................................... 21, 24

*Kifafi v. Hilton Hotels Ret. Plan*,
    616 F. Supp. 2d 7 (D.D.C. 2009) ............................................................................ 6

*Koster v. Whitaker*,
    843 F. App'x 917 (9th Cir. Apr. 8, 2021) ............................................................. 17

*Lee v. Argent Tr. Co.*,
    No. 5:19-CV-156, 2019 WL 3729721 (E.D.N.C. Aug. 7, 2019) ........................... 17

*Lockheed Corp. v. Spink*,
    517 U.S. 882 (1996) ............................................................................................... 19

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ........................................................................................... 9, 20

*Maya v. Centex Corp.*,
    658 F.3d 1060 (9th Cir. 2011) ................................................................................. 9

*Mitchell Rubber Prods., LLC v. Verlan Fire Ins.*,
    No. EDCV 21-1845, 2022 WL 17222233 (C.D. Cal. Aug. 12, 2022) ..................... 8

*Pension Benefit Guar. Corp ex rel. St. Vincent Cath. Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*,
    712 F.3d 705 (2d Cir. 2013) ............................................................................. 20, 23

*Pilkington PLC v. Perelman*,
    72 F.3d 1396 (9th Cir. 1995) ............................................................................ 13, 14

iii

*Quan v. Computer Scis. Corp.*,
   623 F.3d 870 (9th Cir. 2010) ................................................................ 21

*Rummel v. Consol. Freightways, Inc.*,
   No. C-91-4168 DLJ, 1992 WL 486913 (N.D. Cal. Sept. 17, 1992) ........................ 6

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016) ................................................................ 9, 16

*Swartz v. KPMG,*
   *LLC*, 476 F.3d 756 (9th Cir. 2007) ................................................... 8

*Sweda v. Univ. of Pa.*,
   923 F.3d 320 (3d Cir. 2019) ....................................................... 23, 25

*Thole U.S. Bank N.A.*,
   140 S. Ct. 1615 (2020) ............................................................... 16

*Thomson v. Caesars Holdings, Inc.*,
   No. 2:21-cv-961, 2023 WL 2480673 (D. Nev. Mar. 13, 2023) ........................... 21

*Tibble v. Edison Int'l*,
   575 U.S. 523, (2015) ................................................................. 6

*Tobias v. NVIDIA Corp.*,
   No. 20-cv-6081-LHK, 2021 WL 4148706 (N.D. Cal. Sept. 13, 2021) ..................... 9

*United States v. Jackson*,
   480 F.3d 1014 (9th Cir. 2007) ...................................................... 12

*United Transp. Union v. I.C.C.*,
   891 F.2d 908 (D.C. Cir. 1989) ...................................................... 17

*Wehner v. Genentech, Inc.*,
   No. 20-cv-06894-WHO, 2021 WL 507599 (N.D. Cal. Feb. 9, 2021) ...................... 23

**Statutes**

29 U.S.C. § 1002(18) ................................................................. 22

29 U.S.C. § 1002(21) .............................................................. 11, 12

29 U.S.C. § 1002(23)(B) ............................................................... 6

29 U.S.C. § 1104(a) .............................................................. 20, 21

29 U.S.C. § 1106 .................................................................... 23

29 U.S.C. § 1106(a) .............................................................. 22, 23

iv

29 U.S.C. § 1106(b) ............................................................................................ 25

29 U.S.C. § 1108(e) ............................................................................................ 22

29 U.S.C. § 1132(a) ................................................................................. 9, 11, 12

**Rules**

Fed. R. Civ. P. 12(b)(1)..................................................................................... 9, 15

Fed. R. Civ. P. 12(b)(6)...................................................................................... 8, 9

**Other Authorities**

I.R.S Notice 2002-4, 2002-1 C.B. 298 ................................................................ 15

Pub. L. No. 94-455, § 803(h), 90 Stat. 1590 (1976) .......................................... 4

Rev. Rul. 94-76, 1994-50 I.R.B. 5 ...................................................................... 15

**INTRODUCTION**

In 2020, Plaintiffs CI Quercus Corporation, Inc. ("CI Quercus") and Arborwell, LLC ("Arborwell")[1] made an unsolicited offer to acquire Arborwell, Inc. for $34 million. Arborwell, Inc.'s sole shareholder was the Arborwell, Inc. Employee Stock Ownership Plan. An "ESOP" is a type of retirement plan designed to invest exclusively in stock of the sponsoring company. Alerus Financial, N.A. ("Alerus") served as the ESOP's trustee. In that role, under the Employee Retirement Income Security Act of 1974 ("ERISA"), it acted solely in the interest of the ESOP's participants and beneficiaries. That duty included evaluating Plaintiffs' offer and deciding whether to accept it.

In consultation with its financial adviser, Alerus determined that Arborwell, Inc.'s stock was worth $6.6 million—meaning that Plaintiffs' offer exceeded Arborwell, Inc.'s total equity value by nearly ***$28 million***, representing a premium of over ***500%***. Alerus would have been justified in approving Plaintiffs' offer on the spot, but it wisely didn't. As is common in ESOP transactions, the Arborwell, Inc. ESOP had borrowed 100% of the price it paid in 2017 to acquire all of Arborwell, Inc.'s stock—approximately $17.7 million—from Arborwell, Inc. itself. In fully leveraged transactions like this one, the company's stock is held in a suspense account. Each year, the ESOP repaid Arborwell, Inc. a portion of the loan, and an equivalent number of shares of the company's stock were released from suspense into participants' accounts.

Because the ESOP would be terminated following the sale, participants would never enjoy the full expected benefit of owning Arborwell, Inc.'s stock, most of which remained in suspense just three years after the ESOP was formed. So Alerus refused to approve the sale unless the ESOP's lenders—a collection of Arborwell, Inc. executives—agreed to offer "event protection."

---

[1] Arborwell, LLC is a subsidiary of Plaintiff SavATree, LLC ("SavATree"). FAC ¶ 1.

Essentially, the company and the ESOP treated up to 85% of Arborwell, Inc.'s stock as having been allocated to participants' accounts when divvying up the proceeds from the sale.  In other words, Alerus secured an even bigger slice of an already extra-large pie on behalf of the ESOP. As a result of Alerus's negotiations, the ESOP's debts were entirely paid off, with $12.4 million left over to split among participants. Three years later, Plaintiffs are suffering buyer's remorse. The deal has not worked out the way that they hoped, mainly because, according to Plaintiffs, two former Arborwell, Inc. executives—Defendants Neil Woolner and Andy LaVelle—allegedly breached noncompete agreements with Plaintiffs.  But rather than simply seeking to enforce the noncompete agreements against Woolner and LaVelle, Plaintiffs sued Alerus, alleging that it breached its fiduciary duties in connection with Arborwell, Inc.'s 2020 sale.  According to Plaintiffs, Alerus should have declined Plaintiffs' lavish offer and instead held out for some unknown buyer to offer even more money at some unknown future date.

The Amended Complaint fails for several reasons.  First, Plaintiffs lack statutory standing to sue Alerus under ERISA for breach of fiduciary duty or causing the ESOP to engage in prohibited transactions.  ERISA limits the universe of potential plaintiffs to participants, beneficiaries, and fiduciaries, and Plaintiffs—the ESOP's counterparty in the sale of Arborwell, Inc.—do not qualify.  Second, Plaintiffs lack Article III standing because they have not demonstrated that they suffered any injury from Alerus's supposed ERISA violations.  That Alerus could have held out for a better deal is too speculative to support a finding that the ESOP's participants were harmed by Alerus's decision to accept Plaintiffs' generous offer.  If anything, the participants richly benefitted from Alerus's decision-making.  To the extent Plaintiffs allege they were harmed by the alleged breach of Woolner and Lavelle's noncompete agreements, those breaches occurred after

the sale closed, the ESOP ceased to exist, and Alerus stopped being a fiduciary.  Third, even assuming Plaintiffs had both statutory and Article III standing, the Amended Complaint fails to state a claim upon which relief can be granted.  Alerus owed a duty to the ESOP as the sellers—not to Plaintiffs as the buyers on the opposite side of the sale transaction.  Far from suggesting that Alerus acted imprudently in approving Arborwell, Inc.'s sale, Plaintiffs' allegations show that participants greatly prospered because of Alerus's able service as ESOP trustee in connection with the 2020 Transaction.

## STATEMENT OF ISSUES

1.      Do Plaintiffs—who are not "participants, beneficiaries, or fiduciaries"—have statutory standing to bring claims under Sections 502(a)(2) or (3) of ERISA?

2.      Have Plaintiffs satisfied the injury-in-fact requirement of Article III standing, where their allegations show that the ESOP and participants were not harmed by Plaintiffs' acquisition of Arborwell, Inc. stock?

3.      Have Plaintiffs stated plausible claims that Alerus (1) breached its fiduciary duties of prudence and loyalty under ERISA Section 404, (2) caused the ESOP to engage in prohibited transactions under ERISA Sections 406(a) and (b), or (3) must indemnify Plaintiffs under the trust agreement between Alerus and the ESOP?

## FACTUAL BACKGROUND

**I.      The 2017 Transaction and Formation of the ESOP**

Arborwell Inc. provided commercial tree care and management services.  First Amended Complaint, ECF 45 ("FAC") ¶ 33.  Until the ESOP's formation in 2017, Defendants Peter Sortwell and his spouse, Anne B. Sortwell, Andrew G. LaVelle, and Neil Woolner (collectively, the "Individual Defendants") were the only shareholders of Arborwell, Inc. and each were Directors of the Company.  *Id.* ¶ 34.  On January 1, 2017, the Individual Defendants established the ESOP and

3

subsequently sold 100% of Arborwell, Inc. stock to the ESOP on November 1, 2017 ("2017 Trans-action").  *Id.* ¶ 35.  ESOPs are a type of tax-qualified employee benefit plan designed to invest primarily in employer stock.  One key purpose of an ESOP is to motivate employees by allowing them to share in the company's financial successes via their holdings in the company's stock.  *See* Tax Reform Act of 1976, Pub. L. No. 94-455, § 803(h), 90 Stat. 1590 (1976) ("Congress . . . has made clear its interest in encouraging employee stock ownership plans as a bold and innovative method of strengthening the free private enterprise system which will solve the dual problems of securing capital funds necessary for capital growth and of bringing about stock ownership by all employees."), *cited in Donovan v. Cunningham*, 716 F.2d 1455, 1466 n.24 (5th Cir. 1983).

ESOPs commonly acquire stock in a transaction in which the ESOP, represented by an independent trustee appointed by the sponsor company, buys stock held by the company's current stockholders.  *See, e.g., Donovan*, 716 F.2d at 1459 (describing the mechanics of a typical ESOP transaction).  Although ESOPs have no assets when first established, employee-participants are not required to contribute to finance the ESOP's initial stock purchase.  Instead, ESOPs in nearly all initial purchases borrow funds to finance their acquisitions.  *See* Vaughn Gordy, *et al.*, Nat'l Ctr. for Emp. Ownership, LEVERAGED ESOPS AND EMPLOYEE BUYOUTS 5-9 (6th ed. 2017) ("Leveraged ESOPs"), attached as Golumbic Decl., Ex. A.

One common arrangement to structure an ESOP transaction involves a two-step redemption and purchase:  the sponsor company redeems the stockholders' stock for some mix of cash and notes, and then the ESOP issues a note to the company to acquire stock directly from the company:

*See id.* at 130.

In a typical ESOP transaction, the parties structure the loan with a repayment period designed to spread stock distributions over several years.  As the ESOP pays down the loan, the company's shares (held in a suspense account) are released to ESOP participant accounts in proportion to the amount of the amortized debt.  *See generally id.* at 5-9.  Structuring transactions this way spreads share distributions and thus allows employees to share in the company's growth over time.

Here, Arborwell, Inc. redeemed 100% of Arborwell, Inc. stock from the Individual Defendants for $17.7 million, which Arborwell, Inc. paid in various notes, warrants, and stock appreciation rights ("SARs").  *See* FAC ¶¶ 5, 35.  In turn, the ESOP purchased 100% of Arborwell, Inc. stock from the company for the same price.  *See id.*  The Individual Defendants engaged Alerus to serve as the ESOP's trustee.  *Id.* ¶ 43.  The ESOP document lists Arborwell, Inc. as the named fiduciary of the ESOP.  *Id.* ¶ 38.

## II.     The 2020 Transaction and Termination of the ESOP

In June 2020, CI Quercus made an unsolicited offer to buy 100% of Arborwell, Inc. stock from the ESOP.  *Id.* ¶¶ 45-46.  Arborwell, Inc. engaged Alerus to evaluate the proposed terms.  *Id.* ¶ 47; *see also* FAC Ex. L, Independent Trustee Engagement Agreement.  Alerus agreed "to act as an independent trustee of the ESOP" with respect to the proposed transaction and to "determine that the price paid for the stock in any sale transaction will not be less than adequate consideration" under ERISA Section 3(18)(B).  FAC ¶ 40; *see also* FAC Ex. L at 1.

5

In analyzing the proposed transaction, Alerus focused on ensuring that the ESOP received the best deal possible. It engaged an independent financial advisor to opine on whether the proposed terms of the transaction were at least equal to fair market value for the ESOP's shares of Arborwell, Inc. stock. *See* Strategic Equity Group Fairness Opinion ("SEG Fairness Opinion"), attached here to as Golumbic Decl., Ex. B. The financial advisor determined that Arborwell, Inc.'s stock was worth $6.6 million, and that the proceeds from the sale that the ESOP would receive after its debts were paid—$12.4 million—was "greater than the fair market value of" the stock. *Id.* at 9.

Yet Alerus continued negotiating the best deal for ESOP participants. Alerus recognized that the offer came just over three years after the ESOP's formation, meaning that most of the ESOP's shares of Arborwell, Inc. stock were "unallocated," *i.e.,* held in the suspense account. Because unallocated shares are not considered accrued benefits, ESOP participants were not eligible to receive any proceeds stemming from the unallocated shares held in the ESOP's suspense account.[2] *See, e.g.*, *Rummel v. Consol. Freightways, Inc.*, No. C-91-4168 DLJ, 1992 WL 486913, at *4 (N.D. Cal. Sept. 17, 1992) (unallocated shares in ESOP suspense account considered "unaccrued benefits" upon partial plan termination). Therefore, Alerus negotiated to "preserve the economic interests of the ESOP participants" by securing a provision in the stock purchase agreement ("SPA") that provided that:

---

[2] The ESOP was a defined-contribution plan, meaning that participants were only eligible for "the contents of [their] account contributions . . . plus investment gains minus investment losses and any allocable expenses." *Graden v. Conexant Sys. Inc.*, 496 F.3d 291, 297, 301 (3d Cir. 2007). ERISA provides that participants are entitled only to their "accrued benefit" in their "individual account plan." 29 U.S.C. § 1002(23)(B); *see also Kifafi v. Hilton Hotels Ret. Plan*, 616 F. Supp. 2d 7, 10 (D.D.C. 2009), *aff'd,* 701 F.3d 718 (D.C. Cir. 2012). Therefore, at the conclusion of the 2020 Transaction, participants were only entitled to their vested accrued benefit in their individual ESOP accounts—not any other assets of the Plan. *See, e.g.*, *Tibble v. Edison Int'l*, 575 U.S. 523, 525, (2015) (in a defined contribution plan, "participants' retirement benefits are limited to the value of their own individual investment accounts").

6

> the Company, the Trust, the SAR Holders and the Warrant Holders have agreed to determine (i) the Closing SAR Consideration as though 75.0% of the Common Stock had been released and allocated to participant accounts, and (ii) the Closing Warrant Consideration as though 85.0% of the Common Stock had been released and allocated to participant accounts.

Ex. B, SEG Fairness Opinion at 4.  In other words, Alerus secured an agreement under which the Individual Defendants agreed to treat most of the unallocated shares of Arborwell, Inc. stock as if they had been allocated to participant accounts when valuing the outstanding warrants and SARs. *See id.*  In effect, Alerus persuaded the Individual Defendants to give money from their own pockets to the ESOP.  In a fully leveraged transaction such as this one, Alerus's shifting of more of the proceeds from the lender to the borrower would be like a homeowner persuading a bank that the homeowner should keep more of the proceeds from the sale of a mortgage-backed property.

On December 9, 2020, CI Quercus and the ESOP entered into the SPA under which CI Quercus agreed to buy 100% of Arborwell, Inc. stock from the ESOP for $34 million.  FAC ¶¶ 49-50.  The SPA provided that the ESOP would be terminated upon the closing of the 2020 Transaction.  *Id.* ¶ 6; *see also* FAC Ex. A at 5.  The SPA also included an agreement by Defendants Woolner and LaVelle to continue working for Arborwell after the close of the sale, and an agreement that these Defendants would not solicit Arborwell's customers for three years or Arborwell employees for five years after the close of the sale.  FAC ¶¶ 58, 61.

Plaintiffs allege that the ESOP received approximately $12.4 million, with the rest going either to the Individual Defendants or to pay off transaction costs and Arborwell, Inc.'s debts.  *Id.* ¶ 6.  Plaintiffs allege that the Individual Defendants obtained an early payout of the stock in their ESOP accounts and full payouts of their respective subordinated notes and stock warrants received in connection with the 2017 Transaction, and that LaVelle and Woolner received full payouts of the SARs they received in connection with the 2017 Transaction.  *Id.* ¶ 51(a)-(d).

After the 2020 Transaction, Plaintiffs allege that the ESOP was terminated.  *See id.* ¶ 6

1
2
3
4
("the 2020 Sale and subsequent termination of the ESOP . . . .").  According to Plaintiffs, certain ESOP participants chose to "roll over their interests" into the Arborwell/SavATree 401(k) Plan (the "401(k) Plan").  *Id.* ¶ 16.  But Plaintiffs do not allege that the ESOP transferred its assets and liabilities to the 401(k) plan.

5

## LEGAL STANDARDS

6
7
8
9
10
11
12
13
14
15
16
A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the legal suffi-ciency of the claims asserted in a complaint."[3]  *Mitchell Rubber Prods., LLC v. Verlan Fire Ins.,* No. EDCV 21-1845, 2022 WL 17222233, at *1 (C.D. Cal. Aug. 12, 2022).  To survive a Rule 12(b)(6) motion, a complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).  "Factual allegations must be enough to raise a right to relief above the speculative level," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007), which requires pleading "more than a sheer possibility that a defendant has acted unlawfully" or "facts that are merely consistent with a defendant's liability," *Iqbal*, 556 U.S. 678.

17
18
19
20
21
22
23
A plaintiff does not state a claim upon which relief can be granted if he does not possess "statutory standing" to bring his claims.  *See Canyon Cty. v.Syngenta Seeds, Inc.*, 519 F.3d 969, 974 n.7 (9th Cir. 2008).  Statutory standing "exists when a particular plaintiff has been granted a right to sue by the specific statute under which he or she brings suit." *Howell v. Grindr, LLC*, No. 15cv1337-GPC(NLS), 2016 WL 1668243, at *3 (S.D. Cal. Apr. 27, 2016).  Under ERISA Section 502(a)(2) and (3), only participants, beneficiaries, and fiduciaries have standing to pursue fiduciary

24
25
26
27
28

---

[3] Plaintiffs attached twelve exhibits to the Amended Complaint, *see* FAC Exs. A-L, which the Court can review for purposes of deciding Alerus's motion to dismiss under Rule 12(b)(6).  *See Swartz v. KPMG LLC*, 476 F.3d 756, 763 (9th Cir. 2007) ("In ruling on a 12(b)(6) motion, a court may generally consider only allegations contained in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice.").

breach and prohibited transaction claims.  29 U.S.C. § 1132(a)(2), (3).

A motion to dismiss filed under Rule 12(b)(1), on the other hand, "tests whether the court has subject matter jurisdiction."  *Tobias v. NVIDIA Corp.*, No. 20-cv-6081-LHK, 2021 WL 4148706, * 5 (N.D. Cal. Sept. 13, 2021).  If the plaintiff lacks Article III standing, the Court lacks subject-matter jurisdiction. [4]  *See Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011). Plaintiffs bear the burden to show they have Article III standing:  *i.e.*, that they "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of [Defendants], and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), *as revised* (May 24, 2016).  As for "injury in fact", Plaintiffs must show they suffered "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotation marks omitted) (citations omitted).  A particularized injury affects the plaintiff in a personal and individual way.  *Spokeo*, 578 U.S. at 339.  "A 'concrete' injury must be '*de facto*'; that is, it must actually exist."  *Id.* at 340.

### ARGUMENT

Plaintiffs' claims against Alerus should be dismissed for three reasons.  *First*, Plaintiffs— as a *former* fiduciary (Arborwell), a *purchaser* in the 2020 Transaction (CI Quercus), and a current, alleged *fiduciary* of an unrelated ERISA plan (SavATree)—are not "participants, beneficiaries, or fiduciaries" and therefore lack statutory standing to bring claims under ERISA for breach of fiduciary duties and prohibited transactions.

---

[4] Because Alerus is challenging the factual basis of Plaintiffs' standing allegations, the Court "may look beyond the pleadings to the parties' evidence without converting the motion to dismiss into one for summary judgment."  *See Edison v. United States*, 822 F.3d 510, 517 (9th Cir. 2016).  Alerus has attached documents concerning the 2020 Transaction to the Declaration of Lars C. Golumbic for purposes of its arguments under Rule 12(b)(1) only.  Alerus does not cite or rely on any of these exhibits in support of its arguments supporting dismissal under Rule 12(b)(6).

*Second*, even if Plaintiffs possess statutory standing, they lack Article III standing.  The crux of Plaintiffs' theory of harm is that the 2020 Transaction was premature and that the ESOP's shares of Arborwell, Inc. stock would have been worth more if the sale had occurred later in time. But the purchase price represented a premium approximately ***500%*** above the ESOP's equity value at the time, allowing the ESOP to (1) pay off all of its debts to the Individual Defendants and third parties and (2) pay $12.4 million to participants.  The ESOP and its participants—whom Plaintiffs purport to represent—were not harmed by the 2020 Transaction, but immensely benefited from the premium Plaintiffs paid for Arborwell, Inc. stock.

*Third*, Plaintiffs fail to state a claim against Alerus.  Plaintiffs' fiduciary breach and prohibited transaction claims focus on Alerus's process in analyzing the terms of the 2020 Transaction.  The Amended Complaint does not include any non-conclusory allegations about Alerus's process during the 2020 Transaction.  The few allegations Plaintiffs do assert are wholly unsupported and cannot raise an inference that Alerus's process was flawed, or that Alerus acted to benefit anyone other than the ESOP.

## I.    Plaintiffs Lack Statutory Standing to Pursue Their Claims.

Plaintiffs purport to bring their claims against Alerus under Section 502 of ERISA.[5]  But they lack statutory standing to bring claims under Section 502.  ERISA is a carefully crafted statutory scheme that permits only certain individuals to file suit under its civil enforcement provisions.  Section 502(a)(2) provides that a "civil action may be brought . . . by a participant, beneficiary or fiduciary for appropriate relief under [ERISA's fiduciary duty provision,] Section 1109." 29 U.S.C. § 1132(a)(2).  Similarly, Section 502(a)(3) provides that a "civil action may be brought

1   . . . by a participant, beneficiary, or fiduciary . . . to enjoin any act or practice which violates any

2   provision of this subchapter[.]"  *Id.* § 1132(a)(3)(A).  Under these provisions, only "participants,

3   beneficiaries, or fiduciaries" have statutory standing to file fiduciary breach or prohibited transac-

4   tion claims.

5        Plaintiffs are not "participants, beneficiaries, or fiduciaries," and therefore lack statutory

6   standing to bring their claims against Alerus.  Plaintiffs allege that Plaintiff Arborwell is the "suc-

7   cessor in interest" to Arborwell, Inc., the named fiduciary of the ESOP, apparently believing this

8   confers standing on it to bring suit under Section 502.  *See* FAC ¶ 14.  But Arborwell, Inc. ceased

9   being a fiduciary when the ESOP terminated, making Plaintiff Arborwell, at most, a *former* fidu-

10  ciary of the ESOP.  CI Quercus, on the other hand, is merely the purchaser of Arborwell, Inc. and

11  had no involvement with the ESOP before the 2020 Transaction.  *See id.* ¶ 15.  Plaintiff SavATree

12  was never affiliated with the ESOP in any way, and is only added as a named plaintiff in the

13  Amended Complaint because it is an alleged fiduciary of the 401(k) Plan.  *Id.* ¶ 16.  None of these

14  designations provide statutory standing under Section 502(a) of ERISA.

15       ERISA makes clear that entities qualifying as a "fiduciary" under Sections 502(a)(2) and

16  (3) excludes "former fiduciaries."  ERISA defines a "fiduciary" in Section 1002(21)(A) in only

17  the present tense.  *See* 29 U.S.C. § 1002(21)(A).  For example, Section 1002(21)(A) explains that

18  a fiduciary "*is* a fiduciary" for a plan "to the extent [] he *exercises* any discretionary authority or

19  discretionary control" over the management of the plan or disposition of plan assets, "*renders*

20  investment advice for a fee," or "*has* any discretionary authority or discretionary responsibility"

21  in administering the plan.  *Id.* (emphasis added).  The statute's use of only the present tense in

22  defining a fiduciary evidences Congress's intent that an individual qualifies as a fiduciary only to

23  the extent that he is performing one of the above functions.  *See, e.g.*, *United States v. Jackson*,

11

480 F.3d 1014, 1018 (9th Cir. 2007) ("The use of the present tense suggests that statutory element does not apply to [conduct] that occurred [in the past]."

ERISA does not provide a right to former fiduciaries to pursue claims under Sections 502(a)(2) or (3).  For example, in *Blackmar v. Lichtenstein*, 603 F.2d 1306, 1310 (8th Cir. 1979), a former fiduciary filed suit challenging the plan sponsor's decision to remove him as a fiduciary. *See id.* at 1309.  The former fiduciary argued that the sponsor's decision to remove him stemmed solely from the sponsor's desire to prevent him from bringing claims under Section 502(a).  *See id.*  The Eight Circuit held that the former fiduciary's argument "was not germane to the issue." *Id.* at 1310.  Rather, the Eight Circuit found that ERISA provided that "beneficiaries or the Secretary of Labor" could file suit against the sponsor, but the former fiduciary could not because he "no longer has an interest in this suit."  *Id.*  Other courts have similarly concluded that Section 502(a) excludes former fiduciaries.  *See, e.g.*, *Chemung Canal Tr. Co. v. Sovran Bank/Md.*, 939 F.2d 12, 14 (2d Cir. 1991) ("There is no indication of any legislative intent to grant a former fiduciary a continuing right to sue on behalf of the plan."); *H&R Convention and Catering Corp. v. Somerstein*, No. 12-CV-1425, 2013 WL 1911335, at *7 (E.D.N.Y. May 8, 2013) ("As a *former* fiduciary of the Plan, Quinn lacks *current* standing to assert a claim under ERISA."); *Donne v. Hardt*, No. 1:10-CV-2341, 2011 WL 3925129, at *4 (E.D. Cal. Sept. 7, 2011) ("For ERISA, former fiduciaries do not have standing to sue under 29 U.S.C. § 1132(a).").

Plaintiffs thus lack statutory standing to pursue breach-of-fiduciary-duty claims against Alerus.  Plaintiffs allege that Arborwell is the "successor-in-interest" to Arborwell, Inc.  *See* FAC ¶ 18.  Arborwell, Inc. was the ESOP's named fiduciary. *Id.* ¶ 14.  After the 2020 Transaction, the ESOP was terminated.  *See id.* ¶ 6 ("The 2020 Sale and subsequent termination of the ESOP . . . .").  Plaintiff Arborwell—standing in Arborwell, Inc.'s shoes—is the *former fiduciary* to the

4:23-cv-02770-HSG

ESOP, which no longer exists.  It thus lacks statutory standing under ERISA Section 502(a)(2) or (3) to pursue its claims against Alerus.  *See Chemung*, 939 F.2d at 15; *Blackmar*, 603 F.2d at 1310.

CI Quercus also lacks statutory standing to pursue ERISA claims against Alerus because it is the purchaser in the 2020 Transaction and owner of Arborwell.  *See* FAC ¶ 6.  No allegations suggest that CI Quercus was involved in the ESOP in any way.  *See generally id.*  Therefore, CI Quercus is clearly not a "participant, beneficiary, or fiduciary" of the ESOP, and it lacks statutory standing to pursue any claims against Alerus.

In an effort to save their claims, Plaintiffs added a new plaintiff, SavATree, to their Amended Complaint, as well as a new allegation that they now have statutory standing because certain ESOP participants chose to "roll over" their interests in the ESOP to the 401(k) Plan, thereby rendering the Arborwell 401(k) Plan the purported "successor" plan to the ESOP.  *Id.* ¶ 16.  As fiduciaries of the "successor" plan to the ESOP, Plaintiffs allege they have statutory standing under Section 502(a) of ERISA to bring suit against fiduciaries of the ESOP, as the "predecessor" plan.  *Id.*  Not so.

This desperate attempt to confer standing must fail.  The only allegation in support of this argument is that certain participants chose to "roll over" their interests in the ESOP to the 401(k) Plan.  *See* FAC ¶¶ 2, 16.  But the mere fact that some participants chose to roll over their interests in the 401(k) Plan does not transform the 401(k) Plan into a "successor" plan of the ESOP.

The very case Plaintiffs rely on reveals the flaw in their argument.  In *Pilkington PLC v. Perelman*, 72 F.3d 1396 (9th Cir. 1995), the Ninth Circuit found that a fiduciary of a successor plan has standing to sue the fiduciaries of a predecessor plan whose actions harmed the successor plan.  *Id.*  There, an employer who terminated its pension plan then purchased an annuity contract providing the identical same benefits to the same employees.  *Id.* at 1397.  Later, the employer

13

sold a subsidiary to a third-party buyer.  *Id.*  As part of this transaction, the seller transferred the "paid up annuity contract" to the buyer to cover the pension liabilities of the subsidiary's employees.  *Id.* at 1397-98.  But the annuity insurer soon went bankrupt, and fiduciaries of the "new" plan sued fiduciaries of the "old" plan for imprudently selecting an insolvent carrier.  *Id.* at 1398.  The Ninth Circuit found that fiduciaries of the "new" plan—which had "succeeded to all of the assets and liabilities of the [seller's] plan"—had statutory standing to sue because they "inherited any injuries that had been sustained by [the seller's] post-spin-off plan." *Id.* at 1399 ("[T]he Visioncare plan effectively *is* the new Revlon plan in another mantle, created by Revlon's sales of its subsidiary Visioncare companies to Pilkington.").

Not so here.  Unlike *Pilkington,* Plaintiffs do not allege that the 401(k) Plan assumed all of the ESOP's assets and liabilities, or that all the participants in the 401(k) Plan were participants of the ESOP.  *See id.*  And unlike *Pilkington,* Plaintiffs do not allege that the 401(k) Plan provides the same benefits as the ESOP, or even that the 2020 Transaction in any way harmed the 401(k) Plan.  Rather, Plaintiffs merely allege that an undefined number of ESOP participants chose to roll over their interests in the ESOP to the e 401(k) Plan.  *Id.* ¶¶ 2, 16.  Such allegations are insufficient under *Pilkington* to find that the Arborwell/SavATree 401(k) Plan is the "successor" plan to the ESOP.

The Internal Revenue Code regulations defining "successor" and "predecessor" plans bolster this conclusion.  When a transaction occurs that results in a change in employer, the new employer's plan is a "successor" plan only if the new employer assumes all of the assets and liabilities, preserves all of the benefits. of the "predecessor" plan and of the "predecessor" plan.  *See* I.R.S Notice 2002-4, 2002-1 C.B. 298.  A hallmark of this type of transaction is that participants

14

who transfer to the "successor" plan cannot take a distribution of their interests in the "predecessor" plan because the transaction does not amount to a severance of employment. *Id.* at 3 (explaining that a distribution can occur "upon the employee's severance from employment," but that "[a]n employee does not have a severance from employment if . . . the employee's new employer maintains the section 401(k) plan with respect to the employee (for example, by . . . accepting a transfer of plan assets and liabilities)"). In fact, the IRS has explicitly found that a rollover of assets—as Plaintiffs allege happened here—is *not* a transfer of assets and liabilities, but is merely a distribution of the participant's interest in the plan. *See* Rev. Rul. 94-76, 1994-50 I.R.B. 5.

Here, Plaintiffs do not allege that the 401(k) Plan assumed any of the assets or liabilities of the ESOP, or provides all of the same benefits to participants as the ESOP. *See generally* FAC. This failure alone is enough to defeat Plaintiffs' characterization of the 401(k) Plan as the "successor" plan. *See* IRS Notice 2002-4. But Plaintiffs' theory is undercut even more by their allegation that certain participants took a distribution of their interests in the ESOP by rolling them into the 401(k) Plan, *see* Rev. Rul 94-76, which is not allowable unless there is a severance of employment, *see* IRS Notice 2002-4, at 6. Thus, the 401(k) Plan cannot be labeled the "successor" plan to the ESOP, and Plaintiffs have not established statutory standing.

Because no Plaintiff has statutory standing to pursue ERISA claims against Alerus, the Court should dismiss Claims I, II, and III of the Amended Complaint as to Alerus, with prejudice, for failure to state a claim.

## II.    Plaintiffs Lack Article III Standing Under Rule 12(b)(1) of the Federal Rules.

Plaintiffs also lack Article III standing because they have not demonstrated that they suffered an injury-in-fact that is traceable to Alerus's conduct. Plaintiffs do not "automatically satisf[y] the injury-in-fact requirement [] whenever a statute [like ERISA] grants a person a statutory right and purports to authorize that person to sue to vindicate that right." *Spokeo*, 578 U.S. at 341.

15

"There is no ERISA exception to Article III[,]" *Thole U.S. Bank N.A.*, 140 S. Ct. 1615, 1622 (2020), and plaintiffs in ERISA cases have Article III standing only to the extent they seek redress for injuries ***they*** experienced personally—***not*** generalized injuries to a plan in which they participated. *See id.* at 1619-20.

Plaintiffs cannot demonstrate that they or the ESOP participants were harmed by the 2020 Transaction. Plaintiffs' primary theory of harm is that the 2020 Transaction was premature and the value of Arborwell, Inc. would have increased had the 2020 Transaction not occurred. *See* FAC ¶¶ 52, 55-56. Not only is this theory of harm entirely speculative and contingent on events outside of Arborwell, Inc.'s control, the Amended Complaint also demonstrates that the Arborwell, Inc. stock was not undervalued in the 2020 Transaction.

To support their argument that the ESOP's shares of Arborwell, Inc. stock would have been worth more if the 2020 Transaction had not occurred (or had occurred later in time), Plaintiffs allege that Arborwell, Inc. would have experienced "near-certain future financial growth." *Id.* ¶ 56. This allegation hinges on a chain of events that, at the time Alerus was evaluating the 2020 Transaction, were pure speculation. For example, Plaintiffs allege that Arborwell, Inc.'s "financial performance was improving year-to-year" and would continue in the absence of the 2020 Transaction. *Id.* This prediction relies on forecasting events entirely outside of Arborwell, Inc.'s control—including, among other things, improving general economic conditions during the height of the Covid-19 pandemic. Such an allegation is too attenuated to satisfy the immanency requirement of an Article III injury. *See, e.g.*, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013) (rejecting theory of standing that "relie[d] on a highly attenuated chain of possibilities"); *Koster v. Whitaker*, 843 F. App'x 917, 918 (9th Cir. Apr. 8, 2021) (same); *United Transp. Union v. I.C.C.*, 891 F.2d 908, 912 (D.C. Cir. 1989) ("When considering any chain of allegations for standing purposes,

16

we may reject as overly speculative those links which are predictions of future events (especially future actions to be taken by third parties) . . .[*i.e.*,] those types of allegations that are not normally susceptible of labeling as 'true' or 'false.'"); *see also Hart Interior Design, LLC 401(k) Profit Sharing Plan v. Bain*, No. 16-677, 2018 WL 11304177, at *8 (D. Ariz. Apr. 26, 2018) ("[A]llegations regarding what might have happened if [the] transaction had not occurred . . . are too speculative to support a claim of loss").

Aside from the speculative nature of Plaintiffs' theory, the allegations refute that the ESOP was harmed by the 2020 Transaction.  Rather, the allegations show that the ESOP and its participants benefited greatly from the terms of the SPA.  *Lee v. Argent Tr. Co.*, No. 5:19-CV-156, 2019 WL 3729721 (E.D.N.C. Aug. 7, 2019), illustrates this point.  In *Lee*, the court analogized a leveraged ESOP transaction to a mortgage transaction:

> Suppose that a buyer finds a house that is listed at $198,000.  The buyer has no money for a down payment, however, so she obtains a $198,000 mortgage loan in order to buy the house.  The buyer has taken on a $198,000 debt (the mortgage) and, in return, obtained a $198,000 asset (the home).  As a result, she has experienced no change in equity; her asset and her corresponding obligation result in $0 in new equity.  But now suppose that the $198,000 house is actually worth $262,800, and our buyer was able to purchase the house at a discount.  She still has her $198,000 mortgage, but now she also has $64,800 in equity; if she were to turn around and sell the house at its $262,800 value, after paying off her mortgage, she would be left with a tidy profit of $64,800.

*Id.* at *3.

Here, the 2017 and 2020 Transactions are like the mortgage example described in *Lee*.  The total purchase price for the 2017 Transaction was approximately $17.7 million.  The 2017 Transaction was fully leveraged, meaning that the ESOP financed its purchase of the stock through various loans from the Individual Defendants.  FAC ¶¶ 5, 35.  At the close of the 2017 Transaction, the ESOP's total debt was $17.7 million, and its equity value—the value left to stockholders after subtracting the company's debt—was zero.

17

Between the 2017 Transaction and the 2020 Transaction, the ESOP—using the company's profits—incrementally paid off its debt to the Individual Defendants in return for the company releasing shares of stock into participant accounts.  Just like a home buyer making monthly mortgage payments, as the ESOP made payments to the Individual Defendants, its debt decreased while its equity value increased.

The total purchase price for the 2020 Transaction was $34 million.  FAC ¶ 50.  Alerus's independent financial advisor determined that the fair market value of the ESOP's shares of Arborwell, Inc. stock was approximately $6.6 million.  *See* Strategic Equity Group Valuation of a Control, Non-Marketable Interest in the Common Stock of Arborwell, Inc., at 8 ("Valuation of Common Stock"), attached as Golumbic Decl., Ex. C.  In other words, Plaintiffs' unsolicited offer to buy Arborwell, Inc. outright from the ESOP represented a ***500%*** increase over the equity value of the ESOP's shares.  *Compare* FAC ¶ 50, *with* Golumbic Decl., Ex. C, Valuation of Common Stock, at 8.  Much like a homeowner who sells her property for twice the amount of the remaining mortgage, ESOP participants made "a tidy profit" from the 2020 Transaction.  As Plaintiffs recognize, the purchase price was enough to pay off ***all*** of the ESOP's debts stemming from the 2017 Transaction, with an additional $12.4 million in proceeds split among participants.  FAC ¶¶ 50-52.

Here, Alerus secured *even more* economic benefits for participants than in *Lee*'s mortgage analogy.  When a homeowner sells her house, she must repay the outstanding mortgage balance to the bank, and can keep whatever proceeds remain.  In the 2020 Transaction, Alerus demanded that the selling shareholders treat unallocated shares in the ESOP suspense account as though they had been almost fully allocated to participant accounts when valuing outstanding SARs and warrants.  Golumbic Decl., Ex. C, Valuation of Common Stock, at 8.  This is like the homeowner negotiating

18

with the bank to keep some of the money that would otherwise be used to pay off the mortgage. Alerus thus provided ESOP participants additional economic benefits that otherwise would have been reaped by the selling shareholders, including Woolner and LaVelle.

Boiled down, Plaintiffs' primary theory of harm is that they—the ***buyers***—were harmed in the 2020 Transaction because the ESOP—the ***seller***—negotiated a bad deal. But Plaintiffs do not allege—nor can they—that the 2020 Transaction was for ***less*** than the fair market value of the Arborwell, Inc. stock. *See generally* FAC. Instead, their allegations amount to arguing that Alerus should have timed the market better and rejected Plaintiffs' offer to hold out for a better deal. The substantial profit the ESOP enjoyed refutes this theory.[6]

Despite the inherent inconsistencies, Plaintiffs appear to allege a second harm—the ESOP was *overvalued* in the 2020 Transaction because the purchase price depended on Woolner and LaVelle's noncompete and employment agreements that they "always intended to" breach. FAC ¶ 62. Because Woolner and LaVelle allegedly breached their noncompete and employment agreements in 2021, Plaintiffs allege that they and Plan participants have been "potentially" harmed. *See id.* ¶¶ 62, 65.

Putting aside the merits of these claims, the harm stemming from this alleged conduct cannot be traced to Alerus's conduct. To show an Article III injury, Plaintiffs must allege facts demonstrating "a causal connection between the injury and the conduct complained of" by showing that the injury is "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560

---

[6] Plaintiffs' theory also incorrectly assumes that Alerus had the authority to accept or reject Plaintiffs' offer. This is not the case. Alerus's only role in the 2020 Transaction was to determine the fair market value of the shares, negotiate the terms on behalf of the ESOP, and make a *recommendation* to the ESOP on whether to accept or reject the proposed transaction. *See* FAC Ex. L at 1. The determination of whether to accept the proposed transaction and subsequently terminate the ESOP was a settlor, not a trustee, function. *See, e.g.*, *Lockheed Corp. v. Spink*, 517 U.S. 882, 890 (1996).

(cleaned up).  Plaintiffs attribute the harm they complain of to Woolner and LaVelle's alleged actions, not Alerus's.  *See* FAC ¶¶ 62, 65.  Alerus played no role in these alleged breaches in 2021—which is *after* the 2020 Transaction had closed and Plaintiffs had terminated the ESOP (and by extension, Alerus's fiduciary relationship with the ESOP).  Moreover, Alerus owed no duty to Plaintiffs to enforce the non-compete agreements and/or remedy the alleged breaches of those agreements.  *See* FAC Ex. L at 1 (providing that Alerus was to act as "an independent trustee of the ESOP for the purpose of reviewing, analyzing, and making a determination as to whether the ESOP should approve, consent to, and/or otherwise engage in" the 2020 Transaction).

A fiduciary's process is judged "under the circumstances then prevailing," 29 U.S.C. § 1104(a)(1)(B), "***not from the vantage point of hindsight***[*.*]"  *Pension Benefit Guar. Corp. ex rel. St. Vincent Cath. Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 716 (2d Cir. 2013) (emphasis added)  To trace any harm stemming from Woolner and LaVelle's alleged breaches to Alerus, Plaintiffs must allege that Alerus's process in analyzing the 2020 Transaction in connection with the noncompete agreements was flawed.  The only allegation Plaintiffs raise in this regard is entirely conclusory with no factual support.  *See* FAC ¶ 64 (alleging that Alerus "failed to conduct due diligence into whether LaVelle and Woolner intended to honor the Non-Compete in breach of its fiduciary duties").  Without such allegations, there is no basis to trace the harm alleged to Alerus's conduct.

Because Plaintiffs fail to allege facts showing a concrete injury that is traceable to Alerus's conduct, they lack Article III standing to pursue their claims against Alerus.

**III.    Even if Plaintiffs Possessed Statutory and Article III Standing to Pursue Their Claims Against Alerus, Their Allegations Still Fail to State a Claim Under Rule 12(b)(6).**

Claims I, II, and III of the Amended Complaint allege that Alerus violated ERISA Sections 404 and 406 by causing the ESOP to enter into the 2020 Transaction.  Plaintiffs allege that Alerus

violated Section 404(a) of ERISA, which requires fiduciaries to exercise the requisite duty of care "under the circumstances then prevailing …."

*Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 595 (8th Cir. 2009) (citing 29 U.S.C. § 1104(a)) (emphasis added); *see also Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996).  In determining whether the duty of prudence has been met, courts focus on "whether the [fiduciaries], at the time they engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the" transaction.  *Thomson v. Caesars Holdings, Inc.*, No. 2:21-cv-961, 2023 WL 2480673, at *8 (D. Nev. Mar. 13, 2023) (internal quotation marks omitted); *see also Quan v. Computer Scis. Corp.*, 623 F.3d 870, 885 (9th Cir. 2010) (abrogated in part on other grounds in *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 417 (2014) (holding that imprudence claim cannot "rel[y] on the hindsight conclusion that the fiduciary acted imprudently"); *Beldock v. Microsoft Corp.*, No. C22-1082JLR, 2023 WL 1798171, at *6 (W.D. Wash. Feb. 7, 2023) (quoting *Hughes v. Northwestern Univ.*, 142 S. Ct. 737, 742 (2022) (explaining that the duty of prudence "analysis is 'context specific' and must give 'due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise").

Sections 406(a) and 408, on the other hand, supply the framework for ERISA's "prohibited transaction" rules:  Section 406(a) bars virtually all transactions between a party in interest and a plan unless carved out in Section 408.  *See* 29 U.S.C. § 1106(a); *id.* § 1108.  Section 408(e) states that Section 406(a)'s prohibitions "shall not apply to the acquisition" of employer stock by an ESOP "if such acquisition . . . is for adequate consideration."  29 U.S.C. § 1108(e). "[A]dequate consideration" in the context of closely-held corporations is "the fair market value of the asset as determined in good faith by the trustee or named fiduciary pursuant to the terms of the plan."

1   *Henry v. Champlain Enters., Inc.*, 445 F.3d 610, 618 (2d Cir. 2006) (citing 29 U.S.C. § 1002(18));

2   *see also Chao v. Hall Holding Co.*, 285 F.3d 415, 425 (6th Cir. 2002) (same).

3          Claims under Section 404 and Sections 406(a) and 408(e) are process-based; that is, they

4   hinge on the soundness of the fiduciary's process in arriving at the challenged decision, ***not*** the

5   outcome of that decision. *See, e.g.*, *Howard*, 100 F.3d at 1488 (citing *Donovan v. Cunningham*,

6   716 F.2d 1455, 1467 (5th Cir. 1983)) ("Like the inquiry into whether a fiduciary acted with loyalty

7   and care, the inquiry into whether the ESOP received adequate consideration focuses on the thor-

8   oughness of the fiduciary's investigation."). In other words, in suits challenging ESOP stock trans-

9   actions, the Section 406(a) and Section 404 inquiries effectively merge. *Chao*, 285 F.3d at 437

10  (quoting *Cunningham*, 716 F.2d at 1467-68) ("[D]etermining 'adequate consideration' . . . requires

11  . . . an examination of the process that led to the determination of fair market value in light of §

12  404's fiduciary duties."); *Bernaola v. Checksmart Fin. LLC*, 322 F.Supp.3d 830, 839 (S.D. Ohio

13  2018) (the good-faith standard for determining adequate consideration under § 408 applies to the

14  breach-of-fiduciary duty analysis in § 404 when both claims are brought). Both set of claims re-

15  quire plaintiffs to plausibly allege that an ESOP trustee's process was flawed.

16         To make this showing, plaintiffs must do more than allege that a transaction falling within

17  Section 406(a) occurred. Otherwise, fiduciaries would face potential liability for every ESOP

18  transaction. *See Sweda v. Univ. of Pa.*, 923 F.3d 320, 337 (3d Cir. 2019), *cert. denied*, 206 L. Ed.

19  2d 496 (Mar. 30, 2020) ("Reading § 1106(a)(1) as a per se rule barring all transactions between a

20  plan and party in interest would . . . expose fiduciaries to liability for every transaction whereby

21  services are rendered to the plan."); *Cunningham v. Cornell Univ.*, No. 16-cv-6525, 2017 WL

22  4358769, at *10 (S.D.N.Y. Sept. 29, 2017) (creating a pleading standard coextensive with the basic

22

elements of § 1106 "would transform § [1106] . . . into a statutory provision that proscribes retirement pension plan's most basic operations") (citation omitted); *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.").

### A. Plaintiffs Fail to Plausibly Allege an Inadequate Process and thus Fail to State Claims Under Sections 404 and 406(a).

Claims I and II should be dismissed because Plaintiffs fail to plausibly allege that Alerus's process in evaluating the 2020 Transaction was flawed.  The Amended Complaint contains no facts describing Alerus's process for evaluating the 2020 Transaction.  *See* FAC ¶ 55 (alleging that Alerus "failed to perform appropriate due diligence and financial determinations regarding the 2020 Sale").  Where, as here, a complaint alleges nothing at all regarding a fiduciary's process, "a claim alleging a breach of fiduciary duty may still survive a motion to dismiss" only "if the court, based on circumstantial factual allegations, may reasonably 'infer from what is alleged that the process was flawed.'"  *Wehner v. Genentech, Inc.*, No. 20-cv-06894-WHO, 2021 WL 507599, at *4 (N.D. Cal. Feb. 9, 2021) (quoting *St. Vincent*, 712 F.3d at 718)).  There are no circumstantial allegations sufficient to infer that Alerus's process in evaluating and negotiating the 2020 Transaction was flawed.

Rather, the allegations show that Alerus used a prudent process in evaluating and negotiating the 2020 Transaction, which resulted in a boon for ESOP participants.  As discussed above, the ESOP and its participants derived immense benefits from the terms of the 2020 Transaction.  *See* FAC ¶ 6 (alleging that ESOP participants received $12.4 million from the 2020 Transaction).  Rather than securing a purchase price that covered only the debt to the Individual Defendants, Alerus secured an extra ***$12.4 million*** for participants.  *See id.*

As the Supreme Court explained in *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409,

23

413 (2014), motions to dismiss in ESOP cases are "important mechanism[s] for weeding out mer-itless claims" that "require[] careful judicial consideration." In separating the "meritless goats" from the "plausible sheep," *id.* at 426, the Court "must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise." *Hughes*, 142 S. Ct. at 742. Plaintiffs' theory that Alerus mistimed the market and should have held out for a better deal contradicts this binding precedent. The financial benefits ESOP participants derived from the 2020 Transaction show that Alerus's recommendation to accept the proposed transaction fell well within the "range of reasonable judgments a fiduciary" could have made and belie Plaintiffs' contention that Alerus's used a flawed process to evaluate the proposed terms. The Court should dismiss Claims I and II of the Amended Complaint against Alerus.

**B.      Plaintiffs Fail to State a Plausible Disloyalty Claim**

Plaintiffs also fail to state a claim in Claim I that Alerus breached its duty of loyalty to the ESOP under Section 404(a). To state a plausible disloyalty claim, Plaintiffs must present allega-tions that Alerus "engaged in self-dealing[ or] took actions for the purpose of benefitting [itself] or a third party at the expense of Plan participants." *Beldock*, 2023 WL 1798171, at *7.

Here, Plaintiffs' disloyalty claim is even more speculative than their imprudence and pro-hibited transaction claims. There are ***no*** allegations that Alerus acted to personally benefit itself in evaluating or negotiating the 2020 Transaction. Rather, Plaintiffs allege that Alerus acted to benefit the Individual Defendants to allow them to "enrich[] themselves" through the 2020 Trans-action. But as discussed above, Plaintiffs' allegations Alerus did exactly what the engagement letter provides: it negotiated on behalf of the ESOP and secured $12.4 million in proceeds for participants. *See* FAC ¶ 6. Therefore, the Court should dismiss Plaintiffs' disloyalty claim, with prejudice.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### C.      Plaintiffs Fail to State a Section 406(b) Claim

In Claim III, Plaintiffs allege that Alerus breached Section 406(b), which provides that plan fiduciaries may not "act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants." FAC ¶ 187; 29 U.S.C. § 1106(b)(2).  The Court should dismiss this claim, as the only allegation Plaintiffs raise in support of this claim is that, in approving the 2020 Transaction, Alerus "was aware of facts sufficient to establish that the 2020 Sale constituted a prohibited transaction with plan fiduciaries."  FAC ¶ 186.  Plaintiffs must allege something more than that a transaction that falls within the confines of Section 406 occurred.  *See Sweda*, 923 F.3d at 337; *Cunningham*, 2017 WL 4358769, at *10.  Because Plaintiffs merely assert that the 2020 Transaction occurred and parrot the statutory language regarding prohibited transaction claims, they have not stated a plausible prohibited transaction claim under Section 406(b).  Therefore, the Court should dismiss Claim III against Alerus, with prejudice.

### CONCLUSION

For all these reasons, Alerus respectfully requests that the Court dismiss the claims against it in Claims I, II, III, and VIII of the Amended Complaint, with prejudice.[7]

Dated October 11, 2023

Respectfully submitted,

By:  */s/ Lars C. Golumbic*
Lars C. Golumbic (*pro hac vice*)
Ross McSweeney (*pro hac vice*)
**GROOM LAW GROUP, CHARTERED**
1701 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 857-0620

---

[7] Because Plaintiffs lack statutory and Article III standing to pursue their claims against Alerus, and/or have failed to state any plausible claims for relief against Alerus, the Court should also dismiss Plaintiffs' indemnification claim in Claim VIII of the Amended Complaint.  *See* FAC ¶¶ 210-13.

25

(202) 659-4503 (facsimile)
lgolumbic@groom.com
rmcsweeney@groom.com

**BROTHERS SMITH, LLP**

Horace W. Green
Email:  hgreen@brotherssmithlawcom

*Attorneys for Defendants*

4:23-cv-02770-HSG